# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
GREGORY SMITH,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Case No. 15-CV-161 (ABJ)
                                        )
DISTRICT OF COLUMBIA, *et al.*,         )
                                        )
            Defendants.                 )
_____ )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants District of Columbia, Jack Jones and Jeanette Myrick (Defendants), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56, herein move for summary judgment as to Plaintiff's First Amended Complaint [36]. Defendants are entitled to summary judgment on Plaintiff's Fifth Amendment claim pursuant to 42 U.S.C. § 1983 because 1) Plaintiff cannot establish a Fifth Amendment violation; 2) Defendants Jones and Myrick are entitled to qualified immunity; and 3) Plaintiff cannot prove municipal liability against the District. Additionally, Plaintiff's common law false imprisonment fails as a matter of law. Plaintiff's negligence claims fail because he cannot establish a duty of care that was breached by Defendants. Moreover, Plaintiff's negligent supervision and training claim should be dismissed for failure to comply with D.C. Code § 12-309.

A memorandum of points and authorities and a proposed order are attached hereto for the Court's consideration.

                              Respectfully submitted,

                              KARL A. RACINE
                              Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Michael K. Addo
MICHAEL K. ADDO
D.C. Bar No. 1008971
Chief, Civil Litigation Division, Section IV

/s/ Alicia M. Cullen
ROBERT A. DEBERARDINIS, JR.
D.C. Bar No. 335976
ALICIA M. CULLEN
D.C. Bar No.1015227
Assistant Attorney General
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202 724-6642; (202) 442-9840
(202) 741-8895; (202) 715-7721 (facsimile)
robert.deberardinis@dc.gov; alicia.cullen@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
GREGORY SMITH,               )
                                    )
        Plaintiff,         )
                                    )
        v.                  )     Case No. 15-CV-161 (ABJ)
                                    )
DISTRICT OF COLUMBIA, *et al.*,  )
                                    )
        Defendants.      )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants District of Columbia, Jack Jones, and Jeanette Myrick (Defendants), by and through undersigned counsel, hereby respectfully submit this Memorandum of Points and Authorities in support of their Motion for Summary Judgment.

**STATEMENT OF FACTS**

This action arises as a result of Plaintiff Gregory Smith's (Plaintiff) incarceration with the Department of Corrections.  On March 15, 2014, the District of Columbia Department of Corrections (DOC) received a commitment order from D.C. Superior Court in Case Number 2012 CMD 007806 ordering that Plaintiff was to be committed to the custody of DOC until further order from the Court.  Statement of Material Facts as to Which There Is No Genuine Dispute (hereinafter "SOMF") at ¶ 1.  On March 15, 2014, DOC received a commitment order from D.C. Superior Court in Case Number 2014 CMD 004452 ordering that Plaintiff was to be committed to the custody of DOC until further order from the Court.  *Id*. at ¶ 2.

Subsequently, on March 18, 2014, DOC received a release order for Plaintiff in Case Number 2014 CMD 004452.  *Id.* at ¶ 3.  DOC did not receive a release order for Plaintiff in Case

1

Number 2012 CMD 007806 on March 18, 2014.  *Id.* at ¶ 4.  In fact, DOC did not receive a

release order for Plaintiff in Case Number 2012 CMD 007806 until April 10, 2014.  *Id.* at ¶ 5.

When a D.C. Superior Court judge authorizes a release, the courtroom clerk is

responsible for generating the release order.  *Id.* at ¶ 6.  The clerk then prints two copies of the

order for the judge's signature.  The clerk also signs both copies of the order.  *Id.* at ¶ 7.  One

copy is to be scanned into CourtView and one copy is to be given the Deputy U.S. Marshall.  *Id.*

at ¶ 8.  The Deputy U.S. Marshall would then sign a copy of the Order.  *Id.* at ¶ 9.  The clerk is

responsible for taking the Court's copy to the scanning department on the fourth floor at D.C.

Superior Court for it to be scanned into CourtView.  *Id.* at ¶ 10.

The Deputy U.S. Marshall receives a copy of the order from the courtroom clerk.  *Id.* at ¶

11.  At some point, the Deputy U.S. Marshall would then take the release order and prisoner to

the main cellblock in D.C. Superior Court.  *Id.* at ¶ 12.  The Deputy U.S. Marshal then hand

delivers a copy of the release order to a DOC employee at the satellite office in D.C. Superior

Court.  *Id.* at ¶ 13.  Typically a DOC legal instrument examiner receives a release order via hand

delivery from a U.S. Marshal at the satellite office at D.C. Superior Court.  *Id.* at ¶ 14.  The legal

instrument examiner at the satellite office then uploads the document into an electronic system

known as Transaction Management System (TMS).  *Id.* at ¶ 15.  Thereafter, a legal instrument

examiner at the D.C. Jail can access the document and begin processing the release.  *Id.* at ¶ 16.

In order to process the release, a legal instrument examiner pulls the inmate's institutional

file for review to ensure the release order matches the commitment by PDID number, inmate's

name, date of birth, and case number.  *Id.* at ¶ 17.  After that is completed, the legal instrument

examiner accesses DOC's internal system known as JACCS to ensure all documents are posted,

all information is accurate, the release order matches with the commitment order, and closes out

the case as directed by the Court's order.  *Id.* at ¶ 18.  Once the release order is verified by a legal instrument examiner and matches the information in JACCS, the release order is scanned into DOC's internal system called Paper Clips.  *Id.* at ¶ 19.  The legal instrument examiner is also required to check MyJUSTIS to verify that the individual can be released on that specific case.  *Id.* at ¶ 20.  MyJUSTIS is a court-based system that reflects information that was inputted by the court.  *Id.* at ¶ 21.  In late 2012 or early 2013, DOC staff began to utilize MyJUSTIS, a system that reflects the same information contained in CourtView.  *Id.* at ¶ 22.  A legal instrument examiner is also required to perform a Washington Area Law Enforcement System (WALES) check to identify any active local warrants, as well as conduct a National Crime Information Center (NCIC) check to identify any active felony, extraditable, or fugitive warrants.  At some point, WALES became eAgent.  *Id.* at ¶ 23.  After a legal instrument examiner performs his tasks, a supervisory legal instrument examiner is required to double check all work completed by the legal instrument examiner and prepare a release authorization form.  *Id.* at ¶¶ 24-25.  Once this process is completed, misdemeanor inmates are released directly from D.C. Superior Court.  *Id.* at ¶ 26.

Plaintiff alleges he was over-detained by DOC from March 28, 2014, until April 10, 2014.  *See generally* First Am. Compl. [36].  Plaintiff brings claims for 1) violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983 (Count I); 2) common law false imprisonment (Count II); 3) negligence (Count III); and 4) negligent supervision and training (Count IV).  Defendants herein move for summary judgment on these claims.

## **STANDARD OF REVIEW**

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 where, as here, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Brehm v. Dep't of Defense*, 577 F. Supp. 2d 446, 448 (D.D.C. 2008). "[C]ourt[s] must look to the substantive law on which each claim rests" in determining which facts are material. *Brehm*, 577 F. Supp. 2d at 448 (citation omitted). "A genuine issue is one whose resolution could establish an element of a claim or defense, and, therefore, affect the outcome of the action." *Id.* (internal quotation marks and citation omitted).

To survive summary judgment, the nonmoving party must present evidence to support each essential element of his or her claims. *Celotex v. Cattret*, 477 U.S. 317, 322-23 (1986). It "may not rely solely on allegations or conclusory statements" and must instead "present specific facts that would enable a reasonable jury to find in its favor." *Brehm*, 577 F. Supp. 2d at 448 (citations omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

## ARGUMENT

I.  **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FIFTH AMENDMENT CLAIM PURSUANT TO 42 U.S.C. § 1983.**

a.  **Defendants Jack Jones and Jeanette Myrick are Not Liable for Any Violation of Plaintiff's Fifth Amendment Rights.**

Defendant Jack Jones is a legal instrument examiner for the Department of Corrections who was responsible for processing prisoner intakes and releases at D.C. Jail.  Plaintiff alleges that Defendant Jones processed the March 18, 2014 release order for Case Number 2014 CMD 4452 but he then failed to review the Court View System or Plaintiff's institutional file to determine whether Plaintiff had any other court orders requiring processing. Amend. Compl. at ¶ 9  Had he done so, he would have discovered that Plaintiff was also being held in case (2012 CMD 7806) and needed to be processed for release in that case.  *Id.*

4

Defendant Jeanette Myrick is employed at D.C. Jail as the correctional program administrator and is responsible for "oversee[ing] the day-to-day operations of the Inmate Records Office" at D.C. Jail. In that capacity she supervises the legal instrument examiners. Plaintiff alleges that despite her knowledge of the failings of her subordinates she failed to undertake steps that would have prevented overdetentions and as a result Plaintiff was overdetained. *Id.* at ¶ 8.

Plaintiff seeks to hold Defendants Smith and Myrick liable for a violation of what he terms is his "constitutional rights." *Id*. at ¶ ¶ 33, 34. Although Plaintiff fails to identify what constitutional rights he claims were violated, Defendants presume Plaintiff is referring to his Fifth Amendment substantive due process rights.

As demonstrated below, Defendants Jones and Myrick are entitled to qualified immunity as to Plaintiff's constitutional claim.

**b. Defendants Jones and Myrick Are Entitled to Qualified Immunity.**

It is well settled that public officials enjoy a qualified immunity from constitutional and statutory claims against them. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002). The doctrine of qualified immunity shields a public official from constitutional liability, insofar as the official's conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *See Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, a government official cannot be held personally liable for conduct that he would not have reasonably known was unconstitutional. *Saucier v. Katz*, 533 U.S. 194, 2002 (2001). The right the official is alleged to have violated must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id* at 202.

The Supreme Court has further explained that the trial court must consider two factors in analyzing the merits of a qualified immunity claim. *Pearson*, 555 U.S. at 231-32. The Court must determine whether plaintiff has proved facts that show deprivation of a constitutional right. *Id*. at 232. The Court must also decide whether the constitutional right at issue was clearly established at the time of the officer's alleged conduct. *Id*. The Court has the discretion to decide which question should be analyzed first, in light of the particular circumstances of the case at hand. *Id*. at 235-36.

Here, there exists insufficient evidence in this case to demonstrate a Fifth Amendment violation on the part of Defendants Jones and Myrick. In the alternative, should the Court find a violation of Fifth Amendment, the particularized facts of this case were not clearly established at the time of the violation.

### c. Plaintiff Cannot Establish A Fifth Amendment Violation.

Only the most egregious and arbitrary acts of government officials are sufficient to trigger the substantive due process clause. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). The conduct must be "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8; *see also Collins*, 503 U.S. at 128; *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001). The action most likely to rise to the "conscious shocking level," is conduct intended to injure the plaintiff in a way unjustifiable by any government interest. *FOP v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (quoting *Lewis*, 523 U.S. at 849 (citing *Daniel v. Williams*, 474 U.S. 327, 331 (1986)). This stringent requirement exists to differentiate substantive due process from local tort law. *Butera*, 235 F.3d at 651.

Here, Plaintiff does not appear to allege nor is there any evidence in the record demonstrating that Defendants Jones and Myrick intended to cause the Plaintiff to be over-

detained. Instead, Plaintiff proceeds on a "failure to act" theory. In the case of Defendant Jones, the "failure to act" was his alleged failure to undertake additional record searches that would have allegedly revealed that Plaintiff should be released from incarceration on March 18, 2014. As to Defendant Myrick, the "failure to act" is her alleged failure to properly supervise the Inmate Records Office.

A plaintiff alleging a Fifth Amendment "failure to act" violation must prove that the official was at least deliberately indifferent to his constitutional rights. *See Collins,* 503 U.S. at 117; *City of Canton v. Harris,* 489 U.S. 378, 390 (1989) (city must exhibit deliberate indifference toward individual in its custody before he can bring § 1983 claim based on its failure to train officers). Deliberate indifference is "a mental state more blameworthy than negligence," and is "a state of mind that is the equivalent of criminal recklessness." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003). Conduct rising to the level of deliberate indifference must also shock the conscience. *Estate of Phillips v. District of Columbia,* 455 F.3d 397, 404 (D.C. Cir. 2006).

Deliberate indifference requires an omission of "indifference to a serious risk that is voluntary, not accidental." *Farmer v. Brennan,* 511 U.S. 825, 840 (1994). Thus, there can be no liability "unless the official knows of and disregards an excessive risk…; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. There is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not." *Id.* at 838.

Given the standard for establishing deliberate indifference, the Supreme Court has categorically rejected the notion that common law torts or negligently inflicted harm may provide the basis for a substantive due process claim. *Lewis,* 523 U.S. at 848-49. Thus,

inadvertent errors or even negligence in the performance of official duties, do not warrant redress under the substantive due process clause. *Cnty. of Sacramento,* 523 U.S. at 849, ("the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *see also Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988).

Here, it cannot be said that Defendants Jones and Myrick were deliberately indifferent to any risk that Plaintiff Smith might be over-detained. As to Defendant Jones, at best, from what can be gleaned from the record in this matter and as alleged by Plaintiff, Defendant Jones processed the March 18, 2014 release order for Case Number 2014 CMD 4452, but he then allegedly failed to review the CourtView system or Plaintiff's institutional file to determine whether Plaintiff had any other court orders requiring processing. Amend. Compl. at ¶ 9. Had he done so, he would have allegedly discovered that Plaintiff was also being held in Case Number 2012 CMD 7806 and needed to be processed for release in that case. *Id.*

At worst, the conduct of Defendant Jones in failing to undertake further investigation after processing the release in one case amounts to negligence. As ably said by Plaintiff's expert penologist, "I don't know if one of these individuals who is responsible for reviewing the record had a migraine headache and they didn't review things quite as carefully." Lindsay Dep. at 69:18-24. Succinctly stated, there is absolutely no evidence in the record from which it could be concluded that the alleged failing amounted to anything more than negligence. For example, Plaintiff might enjoy a colorable Fifth Amendment claim had Defendant Jones deliberately failed to undertake further investigation of the records after processing the release, because he wanted to leave work early. *See Farmer v. Brennan,* 511 U.S. 825, 840 (1994) (Deliberate indifference requires an omission of indifference to a serious risk that is voluntary, not accidental.) Because

Plaintiff cannot demonstrate a violation of the Fifth Amendment, Defendant Jones is entitled to qualified immunity.

As to Defendant Myrick, a defendant may be held liable as a supervisor under Section 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional. *International Action Center v. United States*, 365 F.3d 20, 27-28 (D.C. Cir. 2004). A supervisor who merely fails to detect and prevent a subordinate's misconduct, therefore, cannot be liable for that misconduct. "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id*. at 28, quoting *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988) (Posner, J.).

Here, there is paucity of evidence demonstrating supervisory deliberate indifference on the part of Defendant Myrick. For one, there is no evidence that she had any involvement in the processing of Plaintiff's paperwork. Nor is there any evidence that she was aware of any chronic deficiencies in Defendant Jones' work which she chose to ignore. Moreover, if staff in the Inmate Records Office learn of an over-detention incident, they are required to report the incident to their supervisor. SOMF at ¶ 34. Additionally, when the office learns of an incident of overdetention, it is investigated and a report is prepared with the inmate's name, DC number, days of over-detention, and reasons. *Id.* at ¶ 35. The report is transmitted by Defendant Myrick to DOC's Deputy Director. *Id.* at ¶ 35. If an over-detention is the result of an error by a DOC employee, the employee is disciplined. *Id.* at ¶ 37. Additionally, when records office staff are hired, they receive forty hours of on-the-job training. *Id.* at ¶ 30. This training covers topics directly related to the work performed by this office, including intakes, court returns, processing releases, and sentence computations. *Id.* at ¶ 31. Indeed, it is clear that Defendant Jones was

familiar with the procedure in place for processing a release order.  *Id.* at ¶ 29.  Given these scenarios, it is clear that Defendant Myrick did not violate Plaintiff's Fifth Amendment rights and as a result, she is entitled to qualified immunity.

Should the Court find a constitutional violation on the part of either Defendant Jones or Myrick, the relevant Fifth Amendment law would not have placed them on notice that their conduct violated Plaintiff's Fifth Amendment rights.  *See Butera v. District of Columbia*, 235 F.3d 637, 652-54 (plaintiff's verdict as to Fifth Amendment claim reversed where law in light of the circumstances of case was not clearly established).  Here, in light of the facts and circumstances of this case, case law was not available to the Defendants that would have established that their conduct was unconstitutional.

### d.  The District of Columbia Is Entitled to Summary Judgment As To Plaintiff's Fifth Amendment Claim.

Because there is insufficient evidence to establish a Fifth Amendment claim as to the individual defendants, he cannot maintain his Fifth Amendment claim against the District.  A municipality's liability under § 1983 is limited; it cannot be held liable under 42 U.S.C. § 1983 on the theory of *respondent superior*.  *See Monell v. Dep't of Soc. Serves. of City of N.Y.,* 436 U.S. 658, 691, 694 (1978); *Triplett v. District of Columbia*, 108 F. 3d 1450, 1453 (D.C. Cir. 1997); *Hunter v. District of Columbia*, 943 F. 2d 69, 74 (D.C. Cir. 1991); *Graham v. Davis*, 880 F. 2d 1414, 1421 (D.C. Cir. 1989).  "[A] local government may not be substituted under § 1983 for an injury inflicted by its employees or agents.  Instead it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."  *Monell,* 426 U.S. at 694.  A prima facie case for a *Monell* claim requires both (1) a "predicate constitutional violation" and (2) "that a custom or policy of the municipality caused the violation."  *See Baker v. Dist. of Columbia,* 326 F.3d 1302, 1305 (D.C. Cir. 2003), citing

*Collins v. City of Harked Heights, Tex.* 503 U.S. 115, 120 (1992); *accord Brown v. Dist. of Columbia,* 514 F.3d 1279, 1283 (D.C. Cir. 2008); *Kona v. Dist. of Columbia,* 971 F. Supp. 2d 74, 81 (D.D.C. 2013).

In this case, as demonstrated above, there is no predicate Fifth Amendment violation, and as a result the District is also entitled to summary judgment as to Plaintiff's Fifth Amendment claim.

Assuming—for the sake of argument only—that the Court finds a predicate constitutional violation, the District is nonetheless entitled to summary judgment as to Plaintiff's constitutional claim. Municipal liability under Section 1983 attaches only where a deliberate choice to follow a course of action is made from among various alternatives by city policymakers. *City of Canton*, 489 U.S. at 389. This requirement ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. *Board of the Cnty. Comm'rs v. Brown,* 520 U.S. 397, 403-04 (1997). Accordingly a plaintiff can prove that a municipal custom or policy caused the constitutional harm by demonstrating that: (1) "the municipality or one of its policymakers explicitly adopted the policy that was 'the moving force of the constitutional violation,'" *Warren v. District of Columbia,* 353 F.3d 36, 39 (D.C. Cir. 2004), quoting *Monell*, 436 U.S. at 694; (2) a policymaker "knowingly ignore[d] a practice that was consistent enough to constitute custom," *id.,* citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); or (3) the municipality failed to respond "'to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations.'" *Id.,* quoting *Baker* v. *District of Columbia*, 326 F.3d 1302, 1306; *see generally*

*Connick v. Thompson*, 563 U.S. 51 (2011) (Court outlines the requirements for holding a municipality liable under §1983).

Plaintiff apparently does not advance the argument that policymakers have explicitly adopted unconstitutional policies. According to Plaintiff's expert penologist, Plaintiff would not have been over-detained had Defendant Jones followed the procedures in place for processing prisoners. Lindsay Dep. 51:10-12.

In support of his deliberate indifference claim, Plaintiff claims that policymakers of the District knowingly ignored a practice (i.e. over detentions) that was consistent enough to constitute custom. *See* Amend. Compl. It is clear, however, that policymakers were not deliberately indifferent. For example, Plaintiff acknowledges that in 2007, 302 inmates were over-detained, 143 in 2008, 56 in 2009, 85 in 2010, 34 in 2011, 8 in 2012, and 11 in 2013. Amend. Compl. at 29. This drastic reduction in over-detentions did not result by accident. It came about because the District of Columbia addressed the problem. Consequently, no reasonable juror could conclude that the District ignored the problem of over-detention and was therefore deliberately indifferent to the problem. *See Barnes v. District of Columbia,* 793 F.Supp. 2d 260, 281 (D.D.C. 2011).

Finally, Plaintiff contends that his over-detention resulted from a lack of training of staff, thereby violating his Fifth Amendment rights. Lindsay Deposition at 38. Because a finding of liability in the context of a failure to train amounts to a judicial determination that "the city itself [decided] to violate the Constitution," the Supreme Court has imposed "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* 563 U.S. 51, 61–62, (2011); *Robinson v. Pezzatt*, 818 F.3d 1, 12

(D.C. Cir. 2016). Moreover, a plaintiff bears the burden of proving that the lack of training actually caused the violation in question. *Connick*, 563 U.S. at 61-62.

Here, there is ample evidence that the Department of Corrections was not deliberately indifferent to the need for training in the Inmate Records Office. When legal instrument examiners are hired, they receive 40 hours of on-the-job training. SOMF at ¶ 30. The on-the-job training covers topics directly related to the work performed by legal instrument examiners such as intakes, court returns, how to process releases, sentence computations. *Id.* at ¶ 31. The legal instrument examiners are also provided training materials that detail procedures related to their job. *Id.* at ¶ 31. Furthermore, there is no evidence in this case demonstrating that Defendant Jones was unaware of the appropriate procedures for processing inmates. As a result, the District is entitled to summary judgment as to Plaintiff's Fifth Amendment failure to train theory.

## II. PLAINTIFF'S COMMON LAW FALSE IMPRISONMENT CLAIM FAILS AS A MATTER OF LAW.

Pursuant to District of Columbia law, false imprisonment is "the restraint by one person of the physical liberty of another without consent or legal justification." *Faneil v. Chesapeake & Potomac Tel. Co. of Md.,* 404 A.2d 147, 150 (D.C. 1979). A claim for false imprisonment "historically has been viewed as an intentional tort." *Johnson v. United States,* 547 F.2d 688 (D.C. Cir. 1976) ("[N]otwithstanding liability for negligence causing a confinement when actual damage ensues, only an act intended to impose confinement or known by the actor to be substantially certain of doing so generates the common law tort of false imprisonment.") Here, no Defendant intentionally caused Plaintiff to be detained against his will. On March 15, 2014, DOC received two separate commitment orders from D.C. Superior Court—one in Case Number 2012 CMD 007806 and one in Case Number 2014 CMD 004452—both ordering that Plaintiff was to be committed to the custody of DOC until further order from the Court. SOMF ¶¶ 1-2.

On March 18, 2014, DOC received a release order for Plaintiff in Case Number 2014 CMD 004452.  *Id.* at ¶ 3.  DOC did *not* receive a release order for Plaintiff in Case Number 2012 CMD 007806 on March 18, 2014.  *Id.* at ¶ 4.  In fact, DOC did not receive a release order for Plaintiff in Case Number 2012 CMD 007806 until April 10, 2014.  *Id.* at ¶ 5.  Because Defendants were not in possession of a release order for Plaintiff in Case Number 2012 CMD 007806 on March 18, 2014, and were only in possession of a commitment order, it was reasonable for Defendants to believe that Plaintiff was to be committed to DOC's custody until they received a further order from the court.  *See DeWitt v. District of* Columbia, 43 A.3d 291, 295 (D.C. 2012) ("It is a familiar principle that probable cause for an arrest and detention constitutes a valid defense to a claim of false . . . imprisonment . . . it is sufficient that the arresting officer have a good faith, reasonable belief in the validity of the arrest and detention") (internal quotations and citations omitted).  Because Defendants had a good faith reasonable belief that Plaintiff was to be committed to DOC custody from March 18, 2014, until April 10, 2014, Plaintiff's false imprisonment claim fails as a matter of law.

III.  **PLAINTIFF'S NEGLIGENCE CLAIMS FAIL BECAUSE HE CANNOT ESTABLISH A DUTY OF CARE THAT WAS BREACHED BY THE DEFENDANTS.**

In any negligence action, the plaintiff "must establish by competent evidence a standard of care; that the defendant violated that standard; and that such violation proximately caused injury to the plaintiff."  *District of Columbia v. Carmichael,* 577 A.2d 312, 314 (D.C. 1990) (citation omitted).  Expert testimony is required "if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson."  *Briggs v. Wash. Metro. Transit Area Auth.,* 481 F.3d 839, 845 (D.C. Cir. 2007); *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000), quoting *Messina v. District of*

*Columbia*, 663 A.2d 535, 538 (D.C. 1995). Expert testimony is not required "if the subject matter is within the realm of common knowledge and everyday experience." *Briggs,* 481 F.3d at 845. Here, the operations of a detention facility, including the processing of prisoners, and the training and supervision required of correctional staff are not matters of common knowledge. Therefore it is undisputed that expert testimony is required.[1] *See Varner v. District of Columbia*, 891 A.2d 260, 267 (D.C. 2006) (expert testimony is required "in negligence cases . . . which involve issues of safety, security and crime prevention.)"

The expert testimony must articulate and refer to a standard of care by which the defendant's actions can be measured. *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988); *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987). "'The purpose of expert testimony is to avoid jury findings based on mere conjecture or speculation. The sufficiency of the foundation of those opinions should be measured with this purpose in mind.'" *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996), quoting *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990). The standard of care must be "specific, articulable (and articulated)," and directly relate to the defendant's alleged misconduct. *Carmichael*, 577 A.2d at 315; *see Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998).

Expert testimony "'is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances. Nor is it enough for the expert simply to declare that the [defendant] violated the national standard of care." *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997), quoting *Messina*, 663 A.2d at 537. "The failure to prove a standard of care is fatal because, in order to recover damages for negligence, 'the plaintiff must prove that the defendant deviated from the applicable standard of care.' … If the

_____

[1] Indeed, Plaintiff has admitted as much by retaining a correctional expert, Cameron Lindsay. *See* SOMF ¶ 38.

standard itself is not proven, then a deviation from that standard is incapable of proof."

*Carmichael*, 577 A.2d at 314, quoting *Toy*, 549 A.2d at 6; *see Clark*, 708 A.2d at 635 (if an

expert fails "clearly articulate and [refer to] a standard of care by which the defendant's actions

can be measured … a directed verdict for the defendant is properly granted").

      **a.   Plaintiff's Expert Did Not Articulate A Single Standard of Care that Was Breached By Defendants in this Case.**

In order to establish a standard of care, the expert "must clearly relate the standard of care

to the practices in fact generally followed by other comparable . . . facilities or to some standard

nationally recognized by some units. *Briggs,* 481 F.3d at 846, citing *Clark,* 708 A.2d at 635.

Despite being asked on more than five occasions, Plaintiff's liability expert, Cameron Lindsay,

did not identify *any* national standard of care or provide a source for any standard allegedly

breached by the Defendants in this case. *See* Lindsay Dep. at 12:7-4, 38:5-14, 49:11-20, 57:22-

24, 85:21-86:1. When asked "[w]hat standards of care were breached in this case that resulted in

the overdetention," Mr. Lindsay's response was "I do not know." *Id.* at 85:21-86:1; *see also id.*

39:3-7. Mr. Lindsay further testified that while he does not know whether Defendants failed to

meet the penological standard of care, what he does "know is that he should have been – Mr.

Smith should have been released on a specific date. He was not. There are a multitude of

reasons for that breakdown, from my perspective." *Id.* at 38:5-14. This, however, is not

sufficient to articulate and establish a standard of care. *See Clark,* 708 A.2d at 635 ("Nor is it

enough for the expert simply to declare that the defendant violated the national standard of

care").

Mr. Lindsay also testified that Defendants "didn't follow their own policies and

procedures." Lindsay Dep. at 34:16-17. However, he did not identify which policy or procedure

was not followed.[2]  *See id.* at 42:5-8.  In fact, at deposition, Mr. Lindsay admitted he was not

even aware what procedures were in place for processing prisoners from the D.C. Jail.  *See id.* at

51:1-5.  More importantly, however, Mr. Lindsay presented *no* testimony that the DOC's

policies and procedures represented the national standard of care.  *See generally id.*; *see also*

*Clark,* 708 A.2d at 636-37 (internal policies—standing alone—cannot demonstrate the applicable

standard of care); *Briggs,* 481 F.3d at 848 (While internal regulations may be admissible as

bearing on the standard of care, admission at trial of [such regulations] alone would be

insufficient because expert testimony would still be required to establish that the [regulations] . .

. embody the national standard of care and not a higher, more demanding one") (internal

quotations and citation omitted); *Varner,* 891 A.2d at 272 ("Aspirational practices do not

establish a standard of care which the plaintiff must prove in support of an allegation of

negligence").

Mr. Lindsay's opinions rest primarily on three criticisms:  that the District 1) did not

utilize Courtview; 2) did not have a paperless system; and 3) failed to implement an inmate

processing center.  *See* Lindsay Dep. at 41:12-20, 48:2-6.  None of these criticisms, however,

represent the failure to meet a national standard of care.  *First*, with respect to Courtview, Mr.

Lindsay admitted he did not even know what Courtview was; nor was he aware of its purpose or

functions.  *Id.* at 41:1-6.  *Second*, when asked about the paperless system, Mr. Lindsay

acknowledged he did not know how a paperless system operates.  *Id.* at 57:13-15.  In fact, he

admitted a paperless system was not utilized at the Metropolitan Detention Center where he

served as Warden.  *Id.* at 52:22-24.  Most importantly, Mr. Lindsay conceded that a paperless

system is *not* the relevant standard of care for correctional facilities.  *Id.* at 57:22-24.  *Finally*,

_____

[2] Interestingly, Mr. Lindsay testified that if the procedures were followed, Plaintiff would have been released.  *See* Lindsay Dep. at 51:10-12.

Mr. Lindsay did not identify any source to suggest that an intake processing center is necessary to meet the national standard of care. *See Briggs*, 481 F.3d at 847 ("Even when a purported standard sounds like nothing more than 'a lofty goal,' a party may still satisfy the expert testimony requirement if the expert demonstrates that the purported standard is 'not merely a goal but [is] in fact . . . a national standard applicable to [the defendant's] efforts"), citing *Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp.,* 244 F.3d 153, 157 (D.C. Cir. 2001). As a result, none of Mr. Lindsay's criticisms amount to a discernable standard of care that is applicable to this case.

### b. Plaintiff's Expert Did Not Identify Any Comparable Institutions.

While an expert may support a purported standard by showing that it has been accepted as controlling in facilities that are similar to defendants' facility, Plaintiff's expert has not done so here. *See Clark,* 708 A.2d at 635 (finding that expert who "never testified with any specificity that the standard of care he had in mind was used by other facilities comparable to [the institution at issue]" failed to demonstrate an applicable standard of care). Mr. Lindsay has failed to identify *any* institution comparable to the D.C. Jail. Indeed, Mr. Lindsay could not delineate how the procedure for processing inmates from the D.C. Jail compared to any other institution. Lindsay Dep. at 20:2-13. Nor could he compare the District's overdetention rate to the overdetention rate in any other institution. *Id.* at 73:20-74:9; 97:6-9. In fact, he could not identify a single facility in another jurisdiction that was comparable to the D.C. Jail and its functions. *Id.* at 53:18-54:5. Plaintiff's expert therefore failed to articulate a national standard through this method.

### a. Plaintiff's Negligent Supervision and Training Claim Against the District of Columbia Fails As a Matter of Law.

Plaintiff's expert takes issue with the training that was provided to employees in the records office at the Department of Corrections. *See id.* at 38:19-39:2. Mr. Lindsay opines that

the on-the-job training provided to legal instrument examiners was insufficient, despite the fact that he did not review any training records or manuals. *See Id*. at 66:23-24, 100:13-16. Instead, Mr. Lindsay points to the fact that the training in the DOC was different than what was provided at an institution within the Bureau of Prisons where he previously served as Warden. *See id.* at 61:15-62:16. This, however, is insufficient to establish a national standard of care. *See Briggs,* 481 F.3d at 846 ("Expert testimony is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances").

It is important to first note that there is no evidence that the institution referenced is comparable to the D.C. Jail. Mr. Lindsay was unaware of how the number of inmates processed annually from the Metropolitan Detention Center in Brooklyn, New York compares to the number of inmates processed at the D.C. Jail. Lindsay Dep. at 14:15-20. He also admitted he does know how the number of releases from Superior Court compares to the number of releases from the Eastern District of New York. *Id.* at 55:4-11. Therefore, because he cannot prove this is a comparable institution, he has failed to properly establish that this facility's practice sets forth the national standard of care.

Moreover, even if this were a comparable institution, reference to a single institution is not sufficient to establish a national standard of care. *See Toy,* 549 A.2d 1 (D.C. 1988). In *District of Columbia v. Peters,* 527 A.2d 1269 (D.C. 1987), a police practices expert established a national standard of care where he testified about the training provided by "many police departments" and "[h]e also gave as examples specific law enforcement agencies which provide such training." *Peters*, 527 A.2d at 1273. The expert specifically identified police departments in a broad enough geographical area—Seattle, Tallahassee, Jacksonville, Miami, Los Angeles and Virginia—to establish that the practice was employed in comparable facilities nationwide. *Id.*

Additionally, as the expert provided specific examples, "[he] gave the jury a factual basis for determining a standard of care beyond the expert's personal opinion of what he or she would do under similar circumstances." *Toy,* 549 A.2d at 7, citing *Meek v. Shepard,* 484 A.2d 579 (D.C. 1984).

Conversely, in *Toy,* the D.C. Court of Appeals found that the expert had failed to establish the national standard of care when he only made general references to ACA standards and a report by the National Center of Institutions and Alternatives, named only one specific police department with the relevant practice, and otherwise failed to indicate how many police departments throughout the country utilized the practice. 549 A.2d at 7-8. The Court held that "[o]ne instance of a police department [with the relevant practice] is plainly insufficient to provide a factual basis for an expert opinion that the national standard of care requires police departments" to engage in such practices. *Id.* at 8. Here, like the expert in *Toy,* Mr. Lindsay points to only one institution that provides training allegedly different than what is provided to legal instrument examiners with the Department of Corrections. Mr. Lindsay concedes he is unfamiliar with the training that is provided to legal instrument examiners at any other institution. Lindsay Dep. at 109:8-16. Therefore, there is no basis to find that Mr. Lindsay has established a national standard of care.

Overall, Plaintiff's expert failed to articulate or refer to a standard of care by which Defendants' actions can be measured. Because the failure to establish a standard of care is fatal to a negligence claim, Defendants are entitled to judgment as a matter of law on Counts III and IV of Plaintiff's First Amended Complaint.

### b. Plaintiff's Negligence Claim Against Jack Jones Fails As A Matter of Law.

Plaintiff has brought a negligence claim against Jack Jones (Count III). Jack Jones is a legal instrument examiner with the Department of Corrections who is responsible for processing

intakes, court returns, misdemeanor sentences, releases, transport, transportation between any

individual that is being transported to the Federal Bureau of Prisons or any other jurisdiction

outside of Washington, D.C. Jones Dep. at 6:14-17; 10:8-15. Plaintiff is not presenting expert

testimony with respect to Mr. Jones. Lindsay Dep. at 91:13-15. Plaintiff's failure to identify an

expert on this issue is fatal to any negligence claim he has against Mr. Jones. The job performed

by legal instrument examiners is not within the realm of common knowledge or everyday

experience. Because Plaintiff cannot properly establish a standard of care that was breached by

Mr. Jones, he cannot establish how any of Mr. Jones' actions caused him harm. As a result,

Plaintiff's negligence action against Mr. Jones fails as a matter of law.

## IV. PLAINTIFF'S NEGIGLIENT SUPERVISION AND TRAINING CLAIM SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH D.C. CODE § 12-309.

Plaintiff's negligent supervision and training claim against the District is barred by D.C.

Code § 12-309. In order to maintain any action against the District for unliquidated damages,

Plaintiff must satisfy the mandatory notice requirement of D.C. Code § 12-309. Section 12-309

provides in pertinent part that:

> An action may not be maintained against the District of Columbia
> for unliquidated damages to person or property unless, within six
> months after the injury or damage was sustained, the claimant, his
> agent, or attorney has given notice in writing to the Mayor of the
> District of Columbia of the approximate time, place, cause, and
> circumstances of the injury or damage.

*See* D.C. Code § 12-309. The requirements of the statute are not mere technicalities. The

requirements of § 12-309 are mandatory as a prerequisite to filing suit against the District of

Columbia. *Pitts v. Dist. of Columbia*, 391 A.2d 803, 807 (D.C. 1978) (citation omitted); *Brown

v. Dist. of Columbia*, 853 A.2d 733, 736 (D.C. 2004); *Cason v. D.C. Dep't of Corrections*, 477 F.

Supp. 2d 141, 146 (D.D.C. 2007). Since § 12-309 departs from the common law norm of

sovereign immunity by allowing suits against the District, the statute's notice requirements are a mandatory prerequisite to filing a lawsuit against the District. *Blocker-Burnette v. Dist. of Columbia*, 730 F. Supp. 2d 200 (D.D.C. 2010). Indeed, in *District of Columbia v. Dunmore*, 662 A.2d 1356 (D.C. 1995), the D.C. Court of Appeals expressly held that Section 12-309 must be construed narrowly against claimants. *See also Giardino v. Dist. of Columbia*, 252 F.R.D. 18, 23 (D.D.C. 2008) ("a plaintiff bringing claims under the DCHRA for unliquidated damages is not excused from providing notice pursuant to § 12-309").

Plaintiff's negligent supervision and training claim against the District is barred because he failed to provide timely notice of his claim to the Mayor as required by § 12-309. Here, Plaintiff notified the District of his intent to sue for his alleged illegal detention, and specifically indicated in his May 7, 2014 notice letter that "Mr. Smith's liberty was taken from him without Due Process and as a result of the extended unlawful incarceration, Mr. Smith's employer terminated Mr. Smith's employment." *See* May 7, 2014, Letter from David Akulian, Esq. to Mayor Vincent Gray, attached as Exhibit 13. Based on the information provided in the letter, the District had no reason to believe that Plaintiff would file a lawsuit raising negligent supervision and training as his notice letter makes no mention of any such claim. In *Breen v. District of Columbia,* 400 A.2d 1058, 1062 (D.C. 1979), the court granted judgment to the District because Plaintiff's notice letter referred specifically to "a complaint of racial discrimination" but did not include any reference to libel, defamation, or a similar-sounding claim. The Court held that "[t]o hold that notice was proper here would be to frustrate the purposes of § 12-309, namely, to give the District an opportunity to investigate and make timely adjustment of the claim (here, libel)." *Id.* Similarly, here, Plaintiff specifically raised a due process claim and made no mention of negligence, particularly negligent supervision or training. To allow him to now proceed against

the District on his claim for negligent supervision and training would frustrate the purposes of the statute. For that reason, Plaintiff's negligent supervision and training claim against the District should be dismissed. *See Owens v. Dist. of Columbia*, 993 A.2d 1085 (D.C. 2010); *Byrd v. Dist. of Columbia*, 538 F. Supp. 2d 170, 175-76 (D.D.C. 2008) (dismissing claims brought under the DCHRA for failure to provide mandatory notice pursuant to Section 12-309).

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Michael K. Addo
MICHAEL K. ADDO
D.C. Bar No. 1008971
Chief, Civil Litigation Division, Section IV

/s/ Alicia M. Cullen
ROBERT A. DEBERARDINIS, JR.
D.C. Bar No. 335976
ALICIA M. CULLEN
D.C. Bar No.1015227
Assistant Attorney General
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202 724-6642; (202) 442-9840
(202) 741-8895; (202) 715-7721 (facsimile)
robert.deberardinis@dc.gov; alicia.cullen@dc.gov

*Counsel for Defendants*

———————————————————————— )
                                   )
GREGORY SMITH,                 )
                                   )
           Plaintiff,           )
                                   )
          v.                     )      Case No. 15-CV-161 (ABJ)
                                   )
DISTRICT OF COLUMBIA, *et al.*,    )
                                   )
          Defendants.       )
———————————————————————— )

## DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

       Defendants District of Columbia, Jack Jones, and Jeanette Myrick (Defendants), by and through undersigned counsel, submit the following statement of material facts to which there is no genuine dispute in support of their Motion for Summary Judgment.

       1.      On March 15, 2014, the District of Columbia Department of Corrections (DOC) received a commitment order from D.C. Superior Court in Case Number 2012 CMD 007806 ordering that Gregory Smith was to be committed to the custody of DOC until further order from the Court.  3/15/14 2012 CMD 0007806 Commitment Order, attached hereto as Exhibit 1.

       2.      On March 15, 2014, DOC received a commitment order from D.C. Superior Court in Case Number 2014 CMD 004452 ordering that Gregory Smith was to be committed to the custody of DOC until further order from the Court.  3/15/14 2014 CMD 004452 Commitment Order, attached hereto as Exhibit 2.

       3.      DOC received a release order for Gregory Smith in Case Number 2014 CMD 004452 on March 18, 2014.  3/18/14 Release Order, attached hereto as Exhibit 3.

4.      DOC did not receive a release order for Gregory Smith in Case Number 2012 CMD 007806 on March 18, 2014.  Deposition of Jeanette Myrick ("Myrick Dep.") at 72:21-22, attached hereto as Exhibit 4.

5.      DOC did not receive a release order for Gregory Smith in Case Number 2012 CMD 007806 until April 10, 2014.  *Id.* at 79:8-10; 4/10/14 Release Order, attached hereto as Exhibit 5.

6.      If a D.C. Superior Court judge authorizes a release, the courtroom clerk is responsible for generating the release order.  Deposition of Svetlana Polonchuk ("Polonchuk Dep.") at 14:1-4, attached hereto as Exhibit 6.

7.      The clerk then prints two copies for the judge's signature.  The clerk also signs both copies.  *Id.* at 14:13-15.

8.      One copy is to be scanned into CourtView and one copy is to be given the Deputy U.S. Marshall.  *Id.* at 14:16-19.

9.      The Deputy U.S. Marshall would then sign a copy of the Order.  Deposition of David Neumann ("Neumann Dep.") at 36:12-15, attached hereto as Exhibit 7; Polonchuk Dep. at 15:3-5.

10.      The clerk is responsible for taking the Court's copy to the scanning department on the fourth floor at D.C. Superior Court for it to be scanned into CourtView.  Polonchuk Dep. at 15:8-21, 33:21-34:7.

11.      The Deputy U.S. Marshall receives a copy of the order from the courtroom clerk. Neumann Dep. at 16:10-15.

12.      The Deputy U.S. Marshall then takes the release order and prisoner to the main cellblock in D.C. Superior Court.  Neumann Dep. at 26:14-17.

13.     The Deputy U.S. Marshal then hand delivers a copy of the release order to a DOC employee at the satellite office in D.C. Superior Court.  Deposition of Robilyn Brown ("Brown Dep.") at 15:9-12, attached hereto as Exhibit 8.

14.     Typically a DOC legal instrument examiner receives a release order via hand delivery from a U.S. Marshal at the satellite office at D.C. Superior Court.  *Id.* at 18:10-12, 19-21; Neumann Dep. at 20:16-22.

15.     The legal instrument examiner at the satellite office then uploads the document into an electronic system known as Transaction Management System (TMS).  Brown Dep. at 19:6-10; Deposition of Jack Jones ("Jones Dep.") at 15:1-5, attached hereto as Exhibit 9.

16.     Thereafter, a legal instrument examiner at the D.C. Jail can access the document and begin processing the release.  Brown Dep. at 19:11-14.

17.     In order to process the release, a legal instrument examiner pulls the inmate's institutional file for review to ensure the release order matches the commitment by PDID number, inmate's name, date of birth, and case number.  Brown Dep. at 19:21-20:12; Myrick Dep. at 48:6-16.

18.     After that is completed, the legal instrument examiner accesses DOC's internal system known as JACCS to ensure all documents are posted, all information is accurate, the release order matches with the commitment order and closes out the case as directed by the Court's order.  Brown Dep. at 20:21-22:1; Myrick Dep. at 48:17-21.

19.     Once the release order is verified by a legal instrument examiner and matches the information in JACCS, the release order is scanned into DOC's internal system called Paper Clips.  Brown Dep. at 22:21-23:2.

20.     The legal instrument examiner is also required to check MyJUSTIS to verify that the individual can be released on that specific case.  *Id.* at 24:14-16.

21.     MyJUSTIS is a court-based system that reflects information that was inputted by the court.  *Id.* at 24:21-25:1.

22.     In late 2012 or early 2013, DOC staff began to utilize MyJUSTIS, a system that reflects the same information contained in CourtView.  *Id.* at 27:10-11; Jones Dep. at 20:1-12.

23.     A legal instrument examiner is also required to perform a Washington Area Law Enforcement System (WALES) check to identify any active local warrants, as well as conduct a National Crime Information Center (NCIC) check to identify any active felony, extraditable, or fugitive warrants.  Myrick Dep. at 49:1-8.  At some point, WALES became eAgent.  Brown Dep. at 27:11.

24.     A supervisory legal instrument examiner is required to double check all work completed by the legal instrument examiner.  Brown Dep. at 31:12-14; Deposition of Fred Thompson ("Thompson Dep.") at 24:13-17, attached hereto as Exhibit 10.

25.     A supervisory legal instrument examiner then prepares a release authorization form.  Myrick Dep. at 53:6-12.

26.     Misdemeanor inmates are released directly from D.C. Superior Court.  *Id.* at 54:11-12.

27.     Jack Jones is employed by DOC as a legal instrument examiner.  Jones Dep. at 6:14-17.

28.     His responsibilities as a legal instrument examiner including processing intakes, court returns, misdemeanor sentences, jail credit sentences, releases, transport, transportation

between any individual who is leaving the D.C. Jail and is being transferred to the Federal Bureau of Prisons or any other jurisdiction outside of Washington, D.C. *Id.* at 10:10-15.

29. Jack Jones knows the procedure for processing a release order. *Id.* at pp. 12-21.

30. When legal instrument examiners are hired, they receive 40 hours of on-the-job training. Brown Dep. at 8:9-11, 9:16-17; Myrick Dep. at 32:13-14.

31. The on-the-job training covers topics directly related to the work performed by legal instrument examiners such as intakes, court returns, how to process releases, sentence computations. Brown at 9:16-10:11; Myrick Dep. at 32:20-33:2.

32. The legal instrument examiners are also provided training materials that detail procedures related to their job. *Id.* at 32:18-33:2.

33. Jeanette Myrick is employed by DOC as a Correctional Program Administrator. *Id.* at 26:11-16.

34. If DOC staff learns of an over-detention incident, the staff is required to report the incident to their supervisor. *Id.* at 36:1-8; Thompson Dep. at 39:19-40:3, 43:1-4

35. Each time DOC learns of an incident of overdetention, the District investigates the incident and prepares a report with the inmate's name, DC number, days of overdetention and reasons. Myrick Dep. at 18:9-11, 19:16-19, 35:18-21; Thompson Dep. at 43:11-14.

36. The report is transmitted to DOC's Deputy Director. Myrick Dep. at 18:15-17.

37. If an overdetention is the result error by a DOC employee, the employee is disciplined. *Id.* at 36:15-18.

38. Plaintiff designated Cameron Lindsay as a liability expert in this matter. *See* Curriculum Vitae of Cameron Lindsay, attached hereto as Exhibit 11.

39. When asked "[w]hat standards of care were breached in this case that resulted in the overdetention," Mr. Lindsay's response was "I do not know." Deposition of Cameron Lindsay ("Lindsay Dep.") at 85:21-86:1, attached hereto as Exhibit 12.

40. When asked whether "the systems in place on March 18, 2014, did not meet the penological standard of care, Mr. Lindsay responded "Again, I don't know. What I do know is that he should have been – Mr. Smith should have been released on a specific date. He was not. There are a multitude of reasons for the breakdown, from my perspective." *Id.* at 38:5-14.

41. Mr. Lindsay testified "They Didn't follow their own policies and procedures." *Id.* at 34:16-17.

42. However, when asked "what policies that were breached in your opinion resulted in the overdetention," Mr. Lindsay responded "Specifically I can't answer that for you." *Id.* at 42:5-8.

43. Mr. Lindsay also testified "Again, sir, I mean, I have to rely back on what I just said. I cannot tell you specifically what went wrong. Maybe – you know, and any number of things could have – could have happened. I don't know if one of these individuals who is responsible for reviewing the record had a migraine headache and they didn't review things quite as carefully. I don't know." *Id.* at 69:18-24.

44. When asked "could you tell me what CourtView – what CourtView did? How did it function?" Mr. Lindsay testified "I can't tell you that." *Id.* at 41:1-3.

45. When asked "[t]ell me about how a paperless system works," Mr. Lindsay responded "I cannot – I can't do that, sir. I don't know." *Id.* at 57:13-15.

46. When asked "[i]s a paperless system the relevant standard of care for correctional facilities?" He responded "I don't think so." *Id.* at 57:22-24.

47.     Mr. Lindsay testified "But, again, I cannot delineate for you specific differences between any of those systems compared to the D.C. Superior Court and the D.C. DOC." *Id.* at 20:11-13.

48.     When asked "how did the District of Columbia's rate of overdetention compare to comparable institutions?" He responded "Yeah, I – I can't answer that. I don't know." *Id.* at 73:20-74:9.

49.     When asked whether he was "familiar with the rate of overdetentions at facilities comparable to the D.C. Jail" Mr. Lindsay testified "Again, sir, no." *Id.* at 97:6-9.

50.     When asked "[w]hat training records, if any, did you review?" Mr. Lindsay testified "None that I recall." *Id.* at 66:23-24.

51.     When asked whether he "review[ed] any DOC manuals that would have been provided to the examiners" Mr. Lindsay testified "I did not." *Id.* at 100:13-16.

52.     When how the number of inmates processed annually from the Metropolitan Detention Center in Brooklyn, New York compares to the number of inmates processed at the D.C. Jail, Mr. Lindsay responded "I don't know." *Id.* at 14:15-20.

53.     He also testified he does not know how the number of releases from Superior Court compares to the number of releases from the Eastern District of New York. *Id.* at 55:4-11.

54.     When asked "[a]re you familiar with the training that individuals employed to do the job that Jack Jones did in other institutions, what kind of training they receive, other than – other than the institution where you served?" Mr. Lindsay responded "No, sir." *Id.* at 109:8-16.

55.     Plaintiff is not presenting expert testimony with respect to Mr. Jones. *Id.* at 91:13-15.

56.     The District has implemented a number of reforms which has significantly decreased the number of overdetentions since 2005.   *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011).

57.     On May 7, 2014, Plaintiff—through counsel—submitted a Notice Letter to the Mayor indicating "Mr. Smith's liberty was taken from him without Due Process and as a result of the extended unlawful incarceration, Mr. Smith's employer terminated Mr. Smith's employment."  5/7/14 Notice Letter, attached hereto as Exhibit 13.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Michael K. Addo
MICHAEL K. ADDO
D.C. Bar No. 1008971
Chief, Civil Litigation Division, Section IV

/s/ Alicia M. Cullen
ROBERT A. DEBERARDINIS, JR.
D.C. Bar No. 335976
ALICIA M. CULLEN
D.C. Bar No.1015227
Assistant Attorney General
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202 724-6642; (202) 442-9840
(202) 741-8895; (202) 715-7721 (facsimile)
robert.deberardinis@dc.gov; alicia.cullen@dc.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                            )
GREGORY SMITH,                  )
                            )
        Plaintiff,           )
                            )
        v.                  )     Case No. 15-CV-161 (ABJ)
                            )
DISTRICT OF COLUMBIA, *et al.*,   )
                            )
        Defendants.      )
_____ )

## <u>ORDER</u>

Upon consideration of Defendants the District of Columbia, Jack Jones and Jeanette Myrick (Defendants) Motion for Summary Judgment, any Opposition or Reply thereto, and the entire record herein, it is this _____ day of _____, 2016, hereby

**ORDERED** that the Defendants' Motion is GRANTED for the reasons set forth therein; and it is further

**ORDERED:** that judgment is entered in favor of the District on all counts in Plaintiff's First Amended Complaint; and it is further

**ORDERED:** that Plaintiff's First Amended Complaint is dismissed with prejudice.

**SO ORDERED.**


_____
HON. AMY BERMAN JACKSON
United States District Court for the District of Columbia