# EXHIBIT 16

to

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT ON LIABILITY**

---

Lindsay Expert Report

**Cameron K. Lindsay**
**108 Eagle Glen Drive**
**East Fallowfield, PA 19320**
**Cell: 267-252-4965**
**clindsay50@yahoo.com**

April 13, 2016

Brendan J. Klaproth
Klaproth Law PLLC
406 5th Street NW
Suite 350
Washington, DC 20001

Re:   Smith v. District of Columbia (1:15-cv-00161-ABJ)

Dear Mr. Klaproth:

I have examined the circumstances surrounding the overdetention of Gregory Smith by the D.C. Department of Corrections (DOC). My findings and opinions are detailed in this report. This report is preliminary and based on the information indicated herein. Should additional information become available, a supplemental report may be made. My fees for testifying and reviewing materials in connection with this case is $200 per hour, and $100 per hour for travel.

**QUALIFICATIONS**

I have twenty (20) years of experience working for the Federal Bureau of Prisons. I served as the Warden for the Metropolitan Detention Center in Brooklyn, New York; the United States Penitentiary in Canaan, Pennsylvania; and (3) the Federal Correctional Institution in Lompoc, California. As the Warden of the Metropolitan Detention Center in Brooklyn, New York. I was responsible for overseeing approximately 600 employees and an inmate population of approximately of 2,800. This particular Detention Center was a pre-trial/pre-sentencing facility that processed releases twenty-four hours per day, and processed over 10,000 individuals into and out of the facility a year. I also served as the Regional Director for the Northeast Regional Office for the Federal Bureau of Prisons.

I have a Bachelor's of Science in Criminal Justice. I also have Master's Degrees from West Virginia University in Safety, and Counseling and Guidance. I was a member of the United States Government Senior Executive Services (SES) from 2005-2009. I also held a United States Government Top-Secret Security Clearance from 2002-2009.

**FACTUAL BACKGROUND**

On March 15, 2014, Mr. Smith was arrested and charged in the District of Columbia with a misdemeanor. He was held at the D.C. Jail for three days in connection with two

-1-

misdemeanors: 2012 CMD 7806 and 2014 CMD 4452.  On March 18, 2014, Mr. Smith was ordered by the D.C. Superior Court to be released in both misdemeanor cases.  The CourtView system shows that a "Release Order" was sent to the D.C. Jail on "March 18, 2014 13:26:46.79" in connection with case 2012 CMD 7806.  A "Release Order" was sent to the D.C. Jail on "March 18, 2014 13:28:00.75" in connection with case 2014 CMD 4452.  Despite the Superior Court ordering Mr. Smith to be released on March 18, 2014, the DOC detained Mr. Smith until April 10, 2014. During his twenty-three (23) day overdetention, Mr. Smith stated that he complained to several DOC staff members indicating that the Court had ordered him to be released.

DOC claims it only received the March 18, 2014 release order in connection with case 2014 CMD 4452, and that it did not receive the March 18, 2014 release order in connection with case 2012 CMD 7806. (Interrogatory Response 9).

**STATEMENT OF OPINIONS AND BASES**

**I.    The D.C. Department of Corrections has a History of Overdetentions at the D.C. Jail**

The fundamental principle of every jail or prison in the United States is that an individual cannot be detained unless there is a court order mandating that the jail detain that individual. Conversely, when a court orders a jail to release an individual, the jail must release the individual.  The Federal Bureau of Prisons (BOP) memorializes this fundamental standard of care in its written policy statement.  Specifically, BOP Program Statement 5800.15 provides that the Correctional Systems Department's (the equivalent of D.C. DOC's Records Office) responsibilities include: "[e]nsuring the legality of an inmate's admission and release," "[c]oordinating and reviewing paperwork associated with inmate movement and release," "[e]stablishing and maintaining a 'records control system' to effect the release of inmates on the correct date," and "reviewing commitment and release paperwork." Though less detailed, DOC's policy mirrors this basic standard of care by requiring that "prior to accepting custody of an inmate, staff [must] determine[] that the inmate is legally committed to the facility."  In the same vein, the DOC's policies require that "inmates are appropriately released at the end of their term and that upon release."

Notwithstanding DOC's written policy statement to release inmates at the conclusion of their detention term, the DOC has systemically overdetained individuals at the D.C. Jail. There have been two class action lawsuits against the District of Columbia addressing the issue of DOC overdetentions: (1) *Bynum v. District of Columbia*, 02-956 (D.D.C.); and (2) *Barnes v. District of Columbia*, 06-315 (D.D.C.). In addition, according to DOC's Overdetention Report, between October 2, 2010 through April 30, 2014, there were a total of seventy-two (72) overdetentions at the D.C. Jail. (DOC Overdetention Report, GSmith DC 000690-GSmith DC 00712).  Of those seventy-two (72), thirty-two (32) were due to staff error. When staff error was the cause of overdetention, the average period of overdetention was roughly 12.16 days. The number of overdetentions at the D.C. Jail falls below the standard of care required for a jail in processing prisoner releases.

Notably, DOC figures underreport the actual overdetentions. For example, no investigation or report was ever conducted in connection with the overdetention of Mr. Smith. This underreporting is directly attributable to the policies of the DOC. Specifically, D.C. corporate representative, Jeanette Myrick, testified that DOC did not have a policy that staff in the Records Office report prisoner overdetentions to a supervisor. (Myrick Dep. 34-35). Thus the failure to report Mr. Smith's overdetention, is representative of a larger underreporting problem by DOC.

In addition, the DOC Overdetention Report further demonstrates DOC's underreporting of overdetentions when it is cross-referenced with the overdetentions that DOC reported to the D.C. Council. The significant discrepancy between the DOC Overdetention Report and the overdetentions reported to the D.C. Council shows the inadequate monitoring and record keeping by DOC in connection with overdetentions. The same underreporting is present when cross-referencing the DOC Overdetention Report with the Defendants Interrogatory responses.

Confronted with the high number of overdetentions at the D.C. Jail, DOC had a duty to implement policies and practices to prevent further overdetention of inmates. As discussed more fully below, DOC's policies, or absence of policies, demonstrates a deliberate indifference to the overdetention problem at the D.C. Jail. This lack of policies and procedures contributed directly to the DOC overdetaining Gregory Smith.

## II.    The D.C. Department of Correction's Policies and Practices Caused Mr. Smith's Overdetention

Given the history of overdetentions at the D.C. Jail, a consultant was hired to analyze the paperflow process and release policies at the D.C. Jail. (See Review of Paperflow Process Between the Superior Court, the U.S. Marshal Service and the Department of Corrections, Karen Schneider (2008) ("Paperflow Report")). Similarly, D.C. Jail entered into a settlement agreement in 2006 in response to a class action law suit involving prisoner overdetentions. In response to the *Bynum* class action lawsuit, DOC stated it would implement new policies such as new training programs, a courthouse release program, monitoring of overdetentions, and the building of the inmate processing facilities. (Reforms discussed by the *Barnes* case). Although the *Bynum* class action was settled in January 2006 and DOC was on notice of the overdetention problem at the D.C. Jail, it appears many of the promised reforms were still not implemented over eight (8) years later when Mr. Smith was overdetained. Most notably, the completion of the "Inmate Processing Center" was still not complete and the move to a paperless system to process releases was not effectively implemented at the time of Mr. Smith's overdetention. Thus, DOC has failed to largely implement the recommendations in the Paperflow Report and its intended reforms. This failure has been a cause of the continued overdetentions at the D.C. Jail.

More specifically, the following policies and customs directly caused Mr. Smith's overdetention and demonstrate the DOC's deliberate indifference to the overdetention problem:

### 1.   DOC's Policies Do Not Require DOC Staff to Report Prisoner Overdetentions.

It is required for a jail, such as the D.C. Jail, to have written policies in place regarding the overdetention of inmates and to report all instances of overdetention. This is necessary to

prevent future occurrences of overdetention. BOP Program Statement 5800.15 details specific procedures that must be strictly adhered to in the instance in which an individual is not released on the same day a court order is issued.  Specifically, in the instance of an overdetention, an "Untimely Release Notification" must be completed and the head supervisor must "review the circumstances of each early/late release and work closely with the Correctional Programs Administrator, Central Office, and institution staff to prevent additional occurrence."

In contrast, according to D.C. corporate representative, Jeanette Myrick, staff in the Records Office at the D.C. Jail are not required to report instances of overdetention.  (*See* Myrick Dep. 34-35).

> Q Is there a policy at the Department of Corrections that if an LIE learns that a prisoner has been overdetained that he must report it to a supervisor?
> **A Not to my knowledge.**
> Q Is there a policy that if an LLIE learns of a prisoner overdetention that they must report it to a supervisor?
> **A Not to my knowledge.**
> Q And that's the same for supervisors?
> **A As far as a policy?**
> Q Uh-huh.
> **A Not to my knowledge.**
> Q And that's also the same for the three correctional program officers, correct?
> **A Correctional officers?**
> Q Correctional program officers.
> **A Oh, okay, I'm sorry. Yes.**
> Q And that's the same, there's no policy?
> **A That's the same, yes.**

The policy of not monitoring and reporting overdetentions contributes to the overdetentions of prisoners at the D.C. Jail. Notably, in relation to the overdetention of Mr. Smith, there was no report or investigation of his overdetention. Likewise, Mr. Smith complained to several DOC staff members about the overdetention. No action was taken in response to his complaints and there is no evidence his overdetention was reported to a supervisor.

### 2. DOC's Policy Requires Staff to Review CourtView when Processing a Release; in Practice DOC Staff do Not Review CourtView When Processing a Release.

DOC's written policy on inmate "Release Clearance" requires that the "Records Office Legal Instruments Examiners shall obtain and review printouts from…COURT VIEW…" (DOC Program Statement: Admission, Transfers, and Releases).  Consistent with this policy, the Prisoner Release Authorization form also has a checkbox where the Legal Instrument Examiner must state that they have review "Courtview" and the Inmate Release Check List also has a checkbox where the employee must initial that they have reviewed "CourtView Open Cases." Contrary to this written policy, corporate representative, Jeanette Myrick, testified that it is not

the practice of the Records Office staff to review CourtView because they do not have access to the program. (Myrick Dep. 46-47).

> Q So it's fair to say then that prior to an inmate being released, a records office legal instruments examiner shall obtain and review a printout from CourtView; is that correct?
> **A No, we don't have CourtView, we don't have access to CourtView.**
> Q So then this policy here is not accurate then, based on the actual practice?
> **A For CourtView only. The NCIC, the WALES, and the JACCS, and reviewing the institutional record is accurate.**
> Q But not as it pertains to CourtView?
> **A Not as it pertains only to CourtView.**
> Q Do you as the correction program administrator have access to CourtView?
> **A No, I do not.**

The CourtView system shows that a "Release Order" was sent to the D.C. Jail on "March 18, 2014 13:26:46.79" in connection with case 2012 CMD 7806. A "Release Order" was sent to the D.C. Jail on "March 18, 2014 13:28:00.75" in connection with case 2014 CMD 4452. Had it been the custom and practice of the staff at the DOC Records Office to check CourtView, as they were required to do, then DOC staff would have saw that Mr. Smith was ordered to be released on March 18, 2014. Thus, DOC's practice of not reviewing CourtView as part of the release process resulted in Mr. Smith's overdetention.

### 3. DOC's Practice of Receiving Court-Ordered Releases through "Fax, Email, Staff" Caused Mr. Smith's Overdetention

According to the Paperflow Report, at the time of the report, the "District's system to transfer commitment and release orders from the Court to DOC for processing [was] a very lengthy, cumbersome, paperdriven process...." In response to the *Bynum* and *Barnes* lawsuits, DOC stated that it had moved to a paperless system to process releases. Contrary to adopting the policy and practice of a paperless system, DOC still relies upon release orders to be delivered by "fax, email, [and in person by] staff." (Myrick Dep. 73). Notably, Ms. Myrick did not investigate whether the March 18, 2014 releases ordered in connection with Mr. Smith were received by fax, email, or in person. (Myrick Dep. 73). Indeed, DOC has not explained how the March 18, 2014 release orders ended up in Mr. Smith's institutional file. Had DOC fully implemented the paperless system for processing release orders, it would not have lost and/or overlooked the March 18, 2014 release order it had received in connection with the case of 2012 CMD 7806. Thus, DOC's failure to fully implement the recommended practice of a paperless system to process releases resulted in the overdetention of Mr. Smith.

### 4. DOC's Practice of Not Processing All Misdemeanant Releases from the Courthouse Resulted in Mr. Smith's Detention.

The Paperflow Report recommended that releasing defendants directly from the courthouse. According to DOC, it has adopted this recommendation. At the time of Mr. Smith's overdetention, DOC's policy was to process releases for individuals held on misdemeanor

charges directly from the D.C. Superior Court. (Myrick Dep. at 54 and DOC Program Statement: Admission, Transfers, and Releases).

On March 18, 2014, Mr. Smith was released on two misdemeanor charges. Had it been DOC's practice to actually follow its policy of releasing misdemeanants directly from the D.C. Superior Court, Mr. Smith would not have been overdetained.

Accordingly, DOC's practices and policies are a direct cause of Mr. Smith's overdetention.

### III.    The D.C. Department of Corrections Has Failed to Adequately Train its Employees to Process Prisoner Releases

An essential part of the timely processing of releases from an institution, such as the D.C. Jail, is staff training. For example, the BOP has the Employee Development Manual which establishes a comprehensive employee training program, the requirement of an annual training plan, and stringent record keeping requirements on employee training. In addition, the BOP requires that all staff complete a five-day orientation and training program. BOP further requires that employees in the Correctional Systems Department (formally known as "Receiving and Discharge" and BOP equivalent of the DOC's Records Office), must successfully complete training modules within nine months of appointment. A minimum score of 75% must be achieved to pass each module. In contrast, DOC has no training modules for the staff in the Records Office or testing to ensure the qualifications of the staff in the Records Office. Instead, DOC relies upon "on the job" training" which is not standardized and has no performance metrics.

According to Jack Jones, the individual who processed Mr. Smith's release orders on March 18, 2014, the only training he received in relation to his position was "on-the-job training." (Jones Dep. at 9). Jones stated, "we are taught the basics of each part of our job, and we pretty much do the work and we learn further into it by doing the work." (Jones Dep. at 10). Jones further stated that he had not received any specialized training on how to prevent over-detentions. (Jones Dep. at 43).

Similarly, Legal Instrument Examiner Fred Thompson stated that the only training he received was "training on the job. Like training on the job. We didn't have, like, a class we went to or something like that for training. We trained on the job." (Thompson Dep. at 10). Mr. Thompson explained, "When we first came in, it was like the people that was already there training us, showing us different things, and *we had manuals that we had to look at ourselves to really learn ourselves."* (Thompson Dep. at 9). Mr. Thompson did receive training on the TMS computer system when it was implemented, but only "about an hour." (Thompson Dep. at 13). Furthermore, while Mr. Thompson did state that the entire DOC staff would receive annual training on "harassment" and safety", this training did not relate to the records office. (Thompson Dep. at 12-13).

Similarly, Jeanette Myrick, stated that the only training the staff in the Records Office received relating to their job responsibilities (e.g. sentence computation) was provided when the

staff member was first hired. (Myrick Dep. 32). The programs administrator, stated that her staff received an annual training on "key control, first aid, different divisions of what goes on in HR, human resource office...respect at the workplace. GBLT, or GLBT...It's gays, lesbians, that training." (Myrick Dep. 30).

Legal Instrument Examiner Brown testified she had not received training in over two years. (Brown Dep. 9). Most importantly, the personnel file for Jack Jones, the individual responsible for processing Mr. Smith's release orders on March 18, 2014, indicates that Mr. Jones received no training from DOC.

The D.C. Jail is required to train its employees to properly process release orders received from the D.C. Superior Court. Prior to the overdetention of Mr. Smith, DOC had actual notice that staff errors had resulted in a overdetentions of inmate according to its Overdetention Report. Nevertheless, DOC has failed to adequately train its employees in the Records Office, and this failure, resulted in the overdetention of Mr. Smith.

Thus, DOC's failure to adequately train its staff members resulted in the overdetention of Mr. Smith.

## IV.   The D.C. Department of Corrections Has Failed to Adequately Supervise its Employees to Process Prisoner Releases

Given the danger that innocent men and women can be held as prisoners if court ordered releases are not properly processed, it is necessary for a jail, such as D.C. Jail, to adequately supervise its Legal Instrument Examiners who are responsible for processing release orders.

For example, The BOP has very structured controls in place to ensure late releases do not occur. The BOP conducts on a continual basis scheduled, informal but well-documented, internal (intra-facility) audits known as Operational Reviews throughout the year. This is done in addition to Program Reviews which, are essentially a week-long formal audits conducted by the Central Office in the BOP. Program Reviews include a Reviewer in Charge, and usually include 4-8 additional team members that are comprised of technical subject-matter experts from Central Office, and select staff from other BOP correctional facilities who possess unique subject matter expertise, and have demonstrated a high degree of technical competence in terms of the discipline to be reviewed. This oversight and supervision system implemented by BOP helps ensure that inmates are neither released early and/or late.

In contrast, DOC does not have monitoring controls in place to supervise its employees. DOC stated that it has implemented a TMS system to ensure employee accountability. (Myrick Dep. II at 26). This system is only used, however, to measure employee productivity; not to supervise the quality of the work or identify staff errors. (Myrick Dep. II at 26-27). This is especially notable because the system does not indicate the individual who placed the March 18, 2014 release order for case 2012 CMD 7806 in Mr. Smith's institutional file, but failed to process it.

Similarly, DOC has a policy that each document placed in an institutional must be initialed by the individual who processed the document and timestamped when it was received by DOC. (Jones Dep. 37-39, 46-47). Although rudimentary, this system is designed for employee accountability if an error were to occur in processing a release. DOC failed, however, to supervise its Legal Instrument Examiners to ensure that this practice was actually followed. For example, Jack Jones processed one release order, as indicated by his initials on the documents, but failed to time stamp the document as required. (Jones Dep. 53-54). The March 18, 2014 release order contained in Mr. Smith's file in connection with case 2012 CMD 7086 is neither initialed or timestamped. (GSmith DC 00052). The failure by DOC to supervise employee compliance with the initial/timestamp system, has resulted in a lack of oversight in processing release orders and has contributed to the overdetention problem at the D.C. Jail.

Moreover, the supervisor for the Records Office at DOC, has acknowledged her lack of oversight and supervision of her staff. In connection with Gregory Smith's overdetention, Ms. Myrick testified that she performed no investigation into Gregory Smith's overdetention, and did not question any of her employees regarding Mr. Smith's overdetention (Myrick Dep. 70-71).

Accordingly, DOC's practice of failure to adequately supervise its employees, and to hold those employees whose errors result in overdetentions accountable, caused Mr. Smith's overdetention.

**CONCLUSION**

Based upon the evidence reviewed to date, it is my opinion that the policies and practices of DOC caused Mr. Smith's overdetention. In addition, is further my opinion that DOC's failure to adequately train and supervise its employees in the DOC Records Office caused Mr. Smith's overdetention. My opinions detailed in this report are to a professional degree of certainty. Should additional information become available, a supplemental report may be made.

Sincerely,

Cameron Lindsay

## EXHIBIT A
## DOCUMENTS REVIEWED

1. Deposition Transcript of Jeanette Myrick (Volume I)
2. Deposition Transcript of Jeanette Myrick (Volume II)
3. Deposition Transcript of Jack Jones
4. Deposition Transcript of Robilyn Brown
5. Deposition Transcript of Fred Thompson
6. Deposition Transcript of Svetlana Polonchuk
7. Deposition Transcript of David Neumann (US Marshalls Service)
8. Deposition Transcript of Plaintiff Gregory Smith
9. DOC Program Statement – Admission, Transfers, and Releases
10. DOC Program Statement – Inmate Gratuity Release
11. DOC Program Statement – Custody Classification System
12. Gregory Smith Institutional File
13. DOC Chain of Command
14. DOC Organizational Chart
15. My Justis Printouts
16. Amended Complaint
17. Overdetention Reports
18. DOC Paperflow Report
19. CourtView Printouts
20. Barnes v. District of Columbia, 924 F. Supp. 2d 74, 77 (D.D.C. 2013)
21. Barnes v. District of Columbia, 793 F. Supp. 2d 260, 265 (D.D.C. 2011)
22. Bynum v. District of Columbia, 412 F. Supp. 2d 73 (D.D.C. 2006)
23. Jack Jones Personnel File
24. D.C. Interrogatory Responses
25. Press Release on Inmate Processing Center
26. Release Orders

**EXHIBIT B**
**LIST OF CASES**

| Case | Type of Testimony |
| --- | --- |
| *Forshey v. Huntingdon County, et. al,* No. 13-CV-00285; United States District Court, Middle District of Pennsylvania | Deposition |
| *White v. Pallito* (Vermont DOC Commissioner), anticipation of litigation | Deposition |
| *Morgal v. Jacobs, et al.;* No. CV-12-280-TUC-CKJ, United States District Court, District of Arizona | Deposition |

**EXHIBIT C**
**CV**

# Cameron K. Lindsay
**108 Eagle Glen Drive**
**East Fallowfield, PA 19320**
**Cell: 267-252-4965**
**clindsay50@yahoo.com**

## EDUCATION:
Master's of Science Degree in Safety
West Virginia University, Morgantown, WV

Master's of Arts Degree in Counseling and Guidance
West Virginia University, Morgantown, WV

Bachelor's of Science Degree in Criminal Justice
Fairmont State College, now known as Fairmont State University; Fairmont, WV

## EMPLOYMENT:
Expert Witness in Prison/Jail Litigation
Self-Employed
August 2014--Present

Warden, Delaware County Prison (2000 beds; 575 staff)
Community Education Centers, Inc.
500 Cheyney Road, Thornton, Pennsylvania 19373
September 2012-August 2014

Warden, Moshannon Valley Correctional Center (1500 beds; 275 staff)
The GEO Group, Inc.
555 Cornell Drive, Philipsburg, Pennsylvania 16866
October 2009 – August 2012

United States Department of Justice
Federal Bureau of Prisons 1989-2009
Warden, Metropolitan Detention Center, Brooklyn, New York (3000 beds; 550 staff)
Warden, United States Penitentiary, Canaan, Pennsylvania (1600 beds; 350 staff)
Warden, Federal Correctional Institution, Lompoc, California (1800 beds; 275 staff)
Deputy Regional Director, Northeast Regional Office; Philadelphia, Pennsylvania
Associate Warden, United States Penitentiary, Lewisburg, Pennsylvania
Associate Warden, Federal Correctional Institution, Lompoc, California
Warden's Executive Assistant, Federal Correctional Institution, McKean, Pennsylvania
Unit Manager, Federal Correctional Institution, McKean, Pennsylvania
Management Analyst, Federal Correctional Institution, McKean, Pennsylvania
Case Manager, Federal Correctional Institution, McKean, Pennsylvania
Safety Specialist Intern, Federal Correctional Institution, Morgantown, West Virginia

Employment Prior to 1989:
Tenure-track Instructor of Criminal Justice; Fairmont State College, Fairmont, WV
Therapist; The Manchin Clinic, Farmington, West Virginia (part-time)
Police Officer; Morgantown Police Department, Morgantown, West Virginia
(patrol, traffic and detective divisions)
Police Officer; Star City Police Department, Star City, West Virginia
Radio-Operator; West Virginia State Police, Morgantown, West Virginia

Part-Time Teaching Positions from 1988 – 2011:
The Pennsylvania State University, State College, PA
West Virginia University, Morgantown, West Virginia
University of Pittsburgh, Bradford, Pennsylvania
Jamestown Community College, Olean, New York
Chapman University, Vandenberg Air Force Base, Lompoc, California

**PROFESSIONAL ACCOMPLISHMENTS:**
United States Government Top-Secret Security Clearance (2003-2009)

Trained and certified as a Hostage Negotiator by the FBI

Member of the United States Government Senior Executive Service (SES) 2005-2009

Graduate of the Federal Law Enforcement Training Center, Glynco, Georgia (voted class
speaker by fellow graduates)

Graduate of the Aspen Institute's Justice in Society Program, Aspen, Colorado

Guest lecturer at John Jay School of Criminal Justice, New York, New York

Nominee for Fairmont State College's 1987 Boram Award (most outstanding lecturer)

Past president of WVU's Chapter of American Society of Safety Engineers

Graduate of the 13-week residential West Virginia State Police Basic Police Academy

Recipient of Special Recognition Award by the United States Department of Justice's
Federal Bureau of Prisons for a life-saving act

Recipient of multiple United States Department of Justice Special Act and Sustained
Superior Performance Awards

Recipient of Meritorious Service award from Fraternal Order of Police.