

# PLANET DEPOS
## We make it >*happen.*

Transcript of **Robilyn Brown**

Date: December 14, 2015

Case: Smith -v- District of Columbia, et al.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

1 you in trouble.

2       Have you received any training in relation
3 to the position of legal instruments examiner?

4     A   On-job training or -- well, let me -- could
5 you rephrase that. Like, you mean prior?

6     Q   Prior to becoming a legal instrument
7 examiner, did you receive training?

8     A   Oh. No.

9     Q   And then once you were hired, then you
10 received on-the-job training?

11     A   That's correct.

12     Q   And did you receive any classroom training
13 or manuals or just on-the-job?

14     A   Yes.

15     Q   Just on-the-job?

16     A   No. Classroom and --

17     Q   And what was the classroom training?

18     A   40 hours annually every year.

19     Q   And is that specific to the position of
20 legal instruments examiner or is that annual 40-hour
21 training applied to everyone for the Department of
22 Corrections?

1  A 40-hour training for everyone.

2  Q And is there any training specific to the

3 legal instrument examiner position that occurs during

4 the 40-hour annual training?

5  A Yes.

6  Q What is that?

7  A It's like an in-office training.

8  Q And who conducts that training?

9  A Supervisors and CPOs.

10  Q And how often is that training?

11  A It's -- well, I can only say it was maybe

12 two years ago. Two years ago.

13  Q So you haven't had that training in over two

14 years?

15  A That's correct.

16  Q And how long was that training?

17  A 40 hours.

18  Q It was 40 hours?

19  A Uh-huh.

20  Q Okay. What were the topics covered during

21 the training?

22  A Intakes, court returns, releases.

```
 1          Q    And what did you specifically cover in that
 2    training on releases?
 3          A    How to process.
 4          Q    And how do you process?
 5          A    By reviewing the documents in full detail.
 6          Q    What documents are you referring to?
 7          A    Court documents.
 8          Q    Is there anything else other than intake,
 9    court returns, and releases that were covered in that
10    training?
11          A    Sentence computations -- also, computations.
12          Q    And at the time, did all supervisory legal
13    instrument examiners have to go to that training?
14          A    I would say no, because some gave the
15    training.  They facilitated.
16          Q    So the persons receiving the training, is it
17    fair to say it was some supervisory legal instrument
18    examiners and then legal instrument examiners?
19          A    Yes.
20          Q    So one of the topics -- so I have four
21    topics:  intake, court returns, release, and sentence
22    computations.  One of them was court returns.  What
```

1      A    In Superior Court, D.C. Superior Court.

2      Q    I see.  So the marshal only hand-delivers to
3 the LIE at the Superior Court, not to an LIE at D.C.
4 Jail.

5      A    That's correct.

6      Q    And then the LIE at the satellite office,
7 the Superior Court, scans that document?

8      A    That's -- uh-huh.

9      Q    Uploads it to the TMS system?

10     A    Correct.  Yes.

11     Q    And after that occurs, what's the next step
12 in the process?

13     A    An LIE from D.C. Jail will select that
14 document and they'll begin the process.

15     Q    So once the LIE at the Superior Court
16 uploads the document to TMS, it then appears on the
17 computer?

18     A    It's like a pull.  It's a -- TMS is a
19 transaction management system, so they'll click "Next"
20 and it will pull the next priority.

21     Q    I see.  What does the LIE at the D.C. Jail
22 do once they pull the court document?

1  A   Pull the institutional record.

2  Q   And that's a hard copy?

3  A   That's correct.

4  Q   And what do they do with the institutional
5  record?

6  A   Review it and compare all documents.

7  Q   And what are they looking for in the
8  institutional record?

9  A   The commitment; if they received a release
10 order, just to make sure the release order matches the
11 commitment by PDID number, inmate's name, date of
12 birth, and case number.

13 Q   All right. So after checking the
14 institutional record where they're checking the
15 identifying information, if that's correct; right?

16 A   Correct.

17 Q   What's the next step for the LIE?

18 A   Depending on what they're processing with
19 it.

20 Q   Let's say a release order.

21 A   Okay. So they would match the document, go
22 into the internal system called JACCS, assure that

1  everything that's in the hard copy is in the
2  institutional record is posted, and then they would
3  look at the release order and go into JACCS and close
4  out that specific case as directed by the order of the
5  Court.
6      Q   So when you say they match the document,
7  what do you mean by that?
8      A   They compare every specific -- specifics, as
9  I stated earlier, with the -- from the release order
10 to the committing document to make sure everything
11 matches.
12     Q   So if you're comparing the release order to
13 the committing document, are you just looking at the
14 case number, the prisoner ID, and their name?
15     A   No, you're looking at the prisoner's PDID
16 number, the case number, the date of birth, the -- and
17 then on a release order, you're going to cross and
18 just make sure the judge has ordered this individual
19 to be released on this day, on that specific day.
20     Q   And what do you check to ensure that the
21 judge did release the individual on that day?
22     A   It will read it on the commitment.  It will

1  read it on the release order.

2      Q   Just to clarify, it will state it on the

3  commitment?

4      A   No.  On the commitment, it will say,

5  "Committed."  The release order will say, "Release."

6  And then it will have -- it will read something, "You

7  are hereby released from custody on this case."  It

8  says --

9      Q   Will it say that in the release order in one

10 of the systems?

11     A   Excuse me?

12     Q   Will it say that on the release order

13 itself?

14     A   Yes.

15     Q   And that's -- once the LIE sees that --

16     A   Uh-huh.

17     Q   -- then they just check the date of birth,

18 prisoner ID?

19     A   And the judge's signature, to make sure it's

20 signed by a judge.

21     Q   And if the release order is verified by the

22 LIE and matches, then what's the next step?

1    A    They close it out in JACCS.  They scan it
2    into our internal system called Paper Clips.
3    Q    And you said the internal system is called
4    "Paper Clips"?
5    A    Paper Clips, it's a scanning -- it's where
6    we hold documents.  It's like a cloud.
7    Q    I see.  And does that get saved, a copy of
8    the release order get saved, in JACCS or it just gets
9    saved in Paper Clips?
10   A    Just in Paper Clips.
11   Q    And every document that is received from the
12   Court by an LIE has to get scanned into Paper Clips?
13   A    That's correct.
14   Q    And does a copy of the -- of the document
15   issued from the Court, such as a release order, does a
16   hard copy get printed and put into --
17   A    The institutional file.
18   Q    -- the institutional file?
19   A    That's correct.
20   Q    So does each prisoner have a file in Paper
21   Clips?
22   A    Yes.

```
 1        Q    And those documents are retained --
 2        A    Yes.
 3        Q    -- in Paper Clips?
 4        A    Yes.
 5        Q    And a document only gets uploaded in Paper
 6   Clips, not when it's received but when it's scanned;
 7   correct?
 8        A    That's correct.
 9        Q    At any point does an LIE need to check the
10   JUSTIS system?
11        A    Yes.
12        Q    And at what point in the release process, so
13   to speak, is that?
14        A    Once the LIE has determined that this
15   individual can be released on this case, that's when
16   they can go into, you know, MyJUSTIS and verify.
17        Q    And that's a necessary step is to check with
18   MyJUSTIS?
19        A    Yes.
20        Q    And what is the MyJUSTIS system?
21        A    It's a court-based system, external.  It's
22   court-based.  It's where the Courts enter their
```

1   information and we just verify what they put in.

2   Q   Is it fair to say that the LIE is verifying

3   that the documents they receive are consistent with

4   the Court system?

5   A   Yes.

6   Q   And do you have any reason to believe that

7   MyJUSTIS would contain inaccurate information?

8   A   Yes.

9   Q   You do have reason to believe?

10  A   Uh-huh.

11  Q   Why is that?

12  A   Because sometimes we'll get documents that

13  haven't been uploaded in MyJUSTIS or we can get

14  documents -- we cannot have received documents and

15  MyJUSTIS will not reflect it and then, maybe a day

16  later, it will be in MyJUSTIS, like a backlog.

17  Q   And if there's any discrepancy between

18  MyJUSTIS and the documents received by the Court, what

19  do you do?

20  A   Call -- call quality assurance at the D.C.

21  Superior Court.

22  Q   If I can have you turn to DC 3.

1  Office Legal Instruments Examiners shall obtain and

2  review printouts from the National Crime Information

3  Center, COURT VIEW, WALES II and JACCS to determine if

4  there are any outstanding warrants or charges

5  preventing release, prior to an inmate's release from

6  the custody of DOC."  Is that information accurate?

7         MS. COPPOCK:  Objection to form.  Go ahead.

8     A   No.

9     Q   And what's not accurate about it?

10    A   Just the names of the specifics.  COURT VIEW

11 is now MyJUSTIS.  WALES II under MPD is now eAgent.

12    Q   WALES II is eAgent?

13    A   Yes.

14    Q   Okay.

15    A   JACCS remains our current data entry system.

16    Q   And when did COURT VIEW become MyJUSTIS?

17    A   I want to say 2012.

18    Q   Do you know why it was changed from COURT

19 VIEW to MyJUSTIS?

20    A   I don't.

21    Q   So just taking a closer look, that first

22 part states, "Records office legal instruments

1      A   Yes.

2      Q   Do you have any reason to believe that you
3 did not sign the release referenced in that
4 interrogatory?

5      A   No.

6      Q   So when you perform a release as a
7 supervisory legal instrument examiner, what is your
8 role?

9      A   To verify and -- to verify the initial --
10 yeah, the second I like to verify everything the
11 initial preparer stated and seen was correct.

12      Q   Is it fair to say it's double-checking the
13 work of the LIE?

14      A   Yes. Yes.

15      Q   And that only happens after the LIE actually
16 makes the determination that the prisoner should be
17 released; correct?

18      A   Yes.

19      Q   While performing that verification, do you
20 review the institutional file?

21      A   Yes.

22      Q   And are you required to review MyJUSTIS?