1   with the system that was in place for processing

2   prisoners from Superior Court and determining whether

3   they went back into the jail or they were released?

4       A.   Not really.  Not really.  I mean, what you see

5   in my report, that's -- that's really all I can -- I can

6   tell you about.  I can't sit here and give you a

7   detailed explanation how that process unfolds.

8       Q.   Well, are you -- are you able to compare the

9   process that is supposed to unfold that was in place

10  back in 2014 at Superior Court, can you compare that to

11  the system that was in place between the court --

12  Eastern District of New York and the Brooklyn facility

13  which you were a warden?

14           MR. KLAPROTH:  Objection.  Vague.

15      A.   In terms of training and --

16  BY MR. DEBERARDINIS:

17      Q.   I'm not asking about training.  I'm talking

18  about the literal process.  Okay?  Let's say we've got a

19  prisoner, Joe Schmo.  Okay?  Joe Schmo's got a court

20  date.  We'll make it in 2014.  Joe Schmo goes to court.

21  Okay?  Follow me so far?

22      A.   Are you talking about at a county jail?

23      Q.   No, no.  I'm talking about -- I'm talking

24  about specifically what you know about the District of

1   A.   Again, sir, I do not recall specifics about
2 that particular case.
3   Q.   **Well, how did it factor into your opinion?**
4   A.   I can tell you from -- to the best of my
5 recollection, in response to the Bynum and Barnes
6 lawsuits, that DOC had agreed to go to a paperless
7 system in terms of processing their releases. That is
8 the gist of what I recall.
9   Q.   **Okay. And when you say a paperless system,**
10 **would you describe for me the paperless system from the**
11 **time the judge ruled and what happens after that?**
12   A.   I...
13   Q.   **Tell me about how a paperless system works.**
14   A.   I cannot -- I can't do that, sir. I don't
15 know.
16   Q.   **So how would a paperless system have prevented**
17 **the overdetention in this case?**
18   A.   Well, any time you're utilizing paper, that's
19 a very cumbersome process, and I explained earlier,
20 e-mails can be missed, faxes can be inadvertently
21 discarded or not printed, et cetera.
22   Q.   **Is a paperless system the relevant standard of**
23 **care for correctional facilities?**
24   A.   I don't think so. I think what determines

1  that is how well staff are trained and how well they
2  adhere to their own policies and practices.
3    Q.    Okay.  Did there come a time -- okay.
4          Are you aware of the relationship between the
5  Department of Corrections and Superior Court and the
6  United States Marshal Services?  Do they answer to the
7  same authority, so to speak?
8    A.    Do they do what, sir?
9    Q.    Answer to the same authority.
10         MR. KLAPROTH:  Objection.  Vague.
11   A.    I don't know.
12 BY MR. DEBERARDINIS:
13   Q.    Okay.  Does the Department of Corrections --
14 does the District of Columbia have any control of a
15 court procedure going to Superior Court to your
16 knowledge?
17   A.    I'm not sure.
18   Q.    Does the District of Columbia have any control
19 over the processes of the United States Marshal Service?
20   A.    Do they have control over the United States
21 Marshal Service?
22   Q.    Yes.
23   A.    I don't know.  I mean --
24   Q.    Okay.

```
 1   indicated that Mr. Jones, who I believe was the
 2   individual who was specifically responsible for
 3   reviewing the nuances of Mr. Smith's release, had not --
 4   had not received any formalized training as well.
 5   BY MR. DEBERARDINIS:
 6       Q.   Now, when you say "formalized training," what
 7   are you talking about when you say "formalized
 8   training"?
 9       A.   Well, that ramble that I went on a minute ago
10   about the Bureau of Prisons, that is all formalized
11   training, the nine months' training, the completion of
12   the -- of the computer program components, perpetual
13   audits, operational reviews, program reviews.  I don't
14   see anything within the D.C. DOC that would be
15   comparable in any way, shape, or form.
16       Q.   How did the training received by legal
17   instrument examiners compare to comparable institutions
18   in other jurisdictions other than the one you're
19   familiar with?
20            MR. KLAPROTH:  Objection to the
21   characterization of the testimony, as well as vague.
22       A.   Can I ask you to repeat the question, please,
23   sir?
24   BY MR. DEBERARDINIS:
```

```
 1   that.
 2   BY MR. DEBERARDINIS:
 3        Q.    Okay.  So I'm going to ask you to assume that
 4   misdemeanants on March the 18th, 2014, who were ordered
 5   released from incarceration when other cases were
 6   pending, were released from the courthouse.  Can you
 7   accept that?
 8        A.    If you -- if you're stating to me that's how
 9   it was supposed to happen, I take your word at that.
10        Q.    Okay.  Okay.  What -- and then are you
11   familiar with the procedures then that transpired at the
12   courthouse?
13        A.    No, sir.  Frankly, sir, it didn't matter to
14   me.  The bottom line is he was to be released.  He
15   wasn't released.  He was incarcerated for another
16   23 days.  That's what important to me.  Not the
17   procedure.  If you tell me the procedure, I'll take your
18   word at that.
19        Q.    Okay.
20        A.    It doesn't matter to me.
21        Q.    So what procedure was breached that day that
22   allowed him -- that necessitated him to be sent back to
23   the jail?  What went wrong?
24              MR. KLAPROTH:  Objection.  Asked and
```

```
 1      A.      I do not know.
 2   BY MR. DEBERARDINIS:
 3      Q.      You do not know.  Okay.  Okay.
 4      A.      I mean, it doesn't matter to me.
 5      Q.      Okay.  Are you familiar with the rate of
 6   overdetention at any jail that you would deem comparable
 7   to D.C. Jail?
 8      A.      No, sir, I am not.
 9      Q.      Who -- which -- which individuals -- I was
10   going to use a colloquialism -- who dropped the ball
11   here that resulted in this man's overdetention, but I'm
12   going to rephrase that and say, Who breached a standard
13   of care here that resulted in Mr. -- Mr. Smith's
14   overdetention?
15              MR. KLAPROTH:  Objection.  Asked and
16   answered.
17      A.      Again, I think it was a multitude of people
18   that were involved with this, but...
19   BY MR. DEBERARDINIS:
20      Q.      Okay.
21      A.      You keep talking about the standard of care.
22   Again, I -- I'm really not sure how to -- how to
23   approach that or define -- define it in terms of what
24   you're looking for, but jails and prisons --
```

```
 1   indicated that he had not received any formalized
 2   training with respect to sentence computation and, more
 3   specifically, releases.
 4        Q.   What specific information -- let me ask you
 5   this:  You could receive -- you could be trained
 6   formally; you could be trained informally.  Correct?
 7        A.   Okay.  That's fair.
 8        Q.   Okay.  What information did he lack as to how
 9   to process inmates that resulted in the overdetention
10   here?
11             MR. KLAPROTH:  Objection.  Asked and
12   answered.
13        A.   He said, from my memory, that the only
14   training he received in relation to his job was OJT,
15   on-the-job training, and, furthermore, he said that they
16   received basic -- taught -- taught the basic components
17   of his job.  And then he said you pretty much had to
18   learn simply by doing it as you went.
19   BY MR. DEBERARDINIS:
20        Q.   Okay.  So what knowledge should he have had
21   that he lacked that would have prevented this incident?
22             MR. KLAPROTH:  Objection.  Asked and
23   answered.
24        A.   Yeah, I'm going to fall back to what I've said
```

```
 1   a couple of times.  If you compare the training that --
 2   that he got compared to what a like staff member in
 3   terms of the position in the Federal Bureau of Prisons
 4   received, I mean, there's no comparison.
 5   BY MR. DEBERARDINIS:
 6        Q.    Well, you read his deposition about what
 7   he -- what he knew he was supposed to do on the job, did
 8   you not?
 9              MR. KLAPROTH:  Objection.  Vague.  Asked
10   and answered.
11   BY MR. DEBERARDINIS:
12        Q.    Okay.  Let me rephrase that.
13              He testified as to the procedures that were
14   required of him as a records examiner; correct?
15        A.    Okay.  I take your word at that, sir.
16        Q.    Okay.  What about his testimony, if anything,
17   leads you to believe that he didn't have sufficient
18   knowledge to perform his job correctly?
19              MR. KLAPROTH:  Objection.  Asked and
20   answered about ten times now.
21        A.    Well, sir, there was -- there was
22   nothing -- nothing formal.  Nothing that would -- that
23   would be adequately documented like the federal
24   government does.  That's the comparison that I -- that I
```

1  make.

2  BY MR. DEBERARDINIS:

3      Q.   Can you point to any specific piece of
4  information that he did not have about processing
5  individuals that would have prevented this -- prevented
6  this overdetention?

7      A.   No, sir.

8      Q.   Okay. And if you've answered this already, I
9  apologize.

10          Did you review any of the manuals in place, if
11 any, for (indiscernible)?

12     A.   I'm sorry, sir. Did I review manuals what?

13     Q.   Did you review any DOC manuals that would have
14 been provided to the examiners?

15          MR. KLAPROTH: Objection. Vague.

16     A.   I did not.

17 BY MR. DEBERARDINIS:

18     Q.   Do you know what I mean by a manual?

19     A.   I believe I do.

20     Q.   Okay. And manuals are procedures that are
21 formally written that provide guidance as to how people
22 are supposed to do their jobs. Is that a fair -- is
23 that a fair definition?

24     A.   I believe so.