# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____  )
                                               )
GREGORY SMITH,                         )
                                               )
                Plaintiff,             )
                                               )
              v.                     )      Civil Action No. 15-0161 (ABJ)
                                               )
DISTRICT OF COLUMBIA, *et al.*,       )
                                               )
              Defendants.          )
_____  )

## MEMORANDUM OPINION

In 2014, plaintiff Gregory Smith was held at the D.C. jail for twenty-three days after a judge ordered that he be released. The District of Columbia has not suggested that there was any legal justification for this undisputed "overdetention"; what is at stake is whether plaintiff has founded his claims for redress on the appropriate legal theories, and whether he has come forward with sufficient evidence to support them.

Plaintiff sued the District of Columbia and two individuals who worked for the Department of Corrections ("DOC"): Jeanette Myrick and Jack Jones. He brought claims against all three defendants under 42 U.S.C. § 1983 for alleged violations of his Fifth Amendment rights, as well as common law claims alleging false imprisonment and negligence. He also brought a claim alleging negligent supervision and training against the District of Columbia. Defendants moved for summary judgment on all of the counts except the negligence claim, *see* Defs.' Mot. for Partial Summ. J [Dkt. # 73] ("Defs.' Mot."), and plaintiff filed a cross-motion for summary judgment on all four counts. *See* Pl.'s Opp. to Defs.' Mot. & Pl.'s Cross-Mot. for Summ. J. on Liability & Entry of a Permanent Inj. [Dkt. ## 75, 77] ("Pl.'s Cross-Mot.").

Defendants moved for summary judgment on the section 1983 claims in Count I on the grounds that: (1) plaintiff has not established the necessary predicate violation of his constitutional rights; (2) the individual defendants are entitled to qualified immunity; and (3) plaintiff has not satisfied the prerequisites for establishing municipal liability under section 1983, that is, the existence of a policy or practice that caused the constitutional deprivation. The Court concludes that there are genuine disputes of material fact on the questions of whether plaintiff's constitutional rights were violated, and whether the District had a custom or practice concerning its receipt of paperwork that caused plaintiff's overdetention, and those disputes preclude the entry of summary judgment for plaintiff or the District on Count I. However, the individual defendants are both entitled to qualified immunity, so summary judgment on Count I will be granted in their favor, and the other theories advanced by plaintiff for section 1983 liability will not move forward.

The Court will grant summary judgment on the false imprisonment claim in Count II in favor of plaintiff because no reasonable juror could find that he was lawfully detained. Since plaintiff did not move for summary judgment on his negligence claim in Count III on proper grounds, the Court will deny his motion on that count without prejudice. Finally, the Court will grant the District's motion for summary judgment on the negligent supervision and training claim in Count IV because plaintiff has not come forward with expert testimony to establish the existence of a national standard of care that was breached in this instance.

# BACKGROUND

The following facts regarding plaintiff's overdetention are undisputed.[1]

- On March 15, 2014, the Department of Corrections ("DOC") received commitment orders in two different D.C. Superior Court misdemeanor cases, 2012 CMD 007806 and 2014 CMD 00445, ordering that plaintiff be committed to the custody of the DOC until further order of the Court. *See* Defs.' SOF ¶¶ 1–2; Pl.'s Resp. SOF ¶¶ 1–2; Pl.'s SOF ¶ 2; Defs.' Resp. SOF ¶ 2; *see also* Ex. 13 to Pl.'s Cross-Mot. [Dkt. # 75-19] ("Court View Case No. 2014 CMD 004452"); Ex. 14 to Pl.'s Cross-Mot. [Dkt. # 75-20] ("Court View Case No. 2012 CMD 007806").

- On March 18, 2014, plaintiff was transported from D.C. jail to Superior Court, and a judge ordered him to be released in both cases. Defs.' SOF ¶ 3; Pl.'s Resp. SOF ¶ 3; Pl.'s SOF ¶ 4; Defs.' Resp. SOF ¶ 4; *see* Ex. 1 to Pl.'s Cross-Mot. [Dkt. # 75-7], Ex. 5 to Pl.'s Cross-Mot. [Dkt. ## 75-11, 79] at 30–31 (together, "Release Order Case No. 2012 CMD 007806"); Ex. 2 to Pl.'s Cross-Mot. [Dkt. # 75-8], Ex. 5 to Pl.'s Cross-Mot. [Dkt. ## 75-11, 79] at 35 (together, "Release Order Case No. 2014 CMD 004452"); *see also* Court View Case No. 2014 CMD 00452; Court View Case No. 2012 CMD 007806.

- DOC received and processed the release order for case number 2014 CMD 004452 on the same day. Defs.' SOF ¶ 22; Pl.'s Resp. SOF ¶ 22.

- Although the DOC received the release order in case number 2012 CMD 007806 on March 18, 2014, the order was not processed. Defs.' SOF ¶ 23; Pl.'s Resp. SOF ¶ 23; Pl.'s SOF ¶ 19; Defs.' Resp. SOF ¶ 19; *see also* Release Order Case No. 2012 CMD 007806.

- DOC did not release plaintiff from custody on March 18. Pl.'s SOF ¶ 5; Defs.' Resp. SOF ¶ 5.

- Plaintiff was held at the D.C. jail until April 10, 2014. Defs.' SOF ¶ 24; Pl.'s Resp. SOF ¶ 24.

---

1      In support of their motions and oppositions, each party supplied the Court with statements of fact. Defs.' Statement of Material Facts as to Which There is no Genuine Dispute [Dkt. # 73-1] ("Defs.' SOF") ¶¶ 1–2; Pl.'s Statement of Genuine Issues of Material Fact Pursuant to Local Rule 7(H) in Resp. to Defs.' SOF [Dkt. # 75-2] ("Pl.'s Resp. SOF"); Pl.'s Statement of Material Facts as to Which There is no Genuine Dispute Pursuant to Local Rule 7(H) [Dkt. # 75-3] ("Pl.'s SOF"); Defs.' Resp. to Pl.'s SOF [Dkt. # 82-1] ("Defs.' Resp. SOF"). Defendants also provided a response to plaintiff's statement of facts in response to defendants' statement of facts, *see* Defs.' Resp. to Pl.'s Resp. SOF [Dkt. # 82-2], but such a statement is not contemplated by the local rules and it is unclear why this document was provided. *See* LCvR 7(h)(1).

The process by which prisoners are supposed to be released is also largely undisputed.

After a Superior Court judge authorizes an inmate's release during a court appearance, the courtroom clerk generates a release order and prints two copies, both of which are signed by the judge, the clerk, and the U.S. Marshal in charge of the prisoner. Defs.' SOF ¶¶ 4–5, 7; Pl.'s Resp. SOF ¶¶ 4–5, 7. The clerk maintains the court's copy and is responsible for submitting it to the scanning department at the D.C. Superior Court, where the release order is then scanned into a computerized database called Court View. Defs.' SOF ¶¶ 6, 8; Pl.'s Resp. SOF ¶¶ 6, 8. This information is also reflected in another court system called MyJUSTIS. *See* Defs.' SOF ¶ 17; Pl.'s Resp. SOF ¶ 17. The Marshal retains the second copy and takes the release order and the prisoner to the main cellblock in the courthouse. Defs.' SOF ¶¶ 6, 9–10; Pl.'s Resp. SOF ¶¶ 6, 9–10.

The Marshal hand delivers the release order to a Legal Instrument Examiner ("LIE") or Lead Legal Instrument Examiner ("LLIE") located at a Department of Corrections satellite office within the courthouse, and the DOC employee then uploads the document into a database called the Transaction Management System ("TMS"). *See* Defs.' SOF ¶ 12; Pl.'s Resp. SOF ¶ 12; Ex. 7 to Defs.' Mot. [Dkt. # 73-9] at 19:1–10;[2] Ex. B to Pl.'s Cross-Mot. [Dkt. # 75-25] at 54:1–22.[3] Once the release order is uploaded in TMS, a Legal Instrument Examiner located in the Records Office at the D.C. jail itself will access the document in TMS and begin processing the inmate's

[2]     The parties cite to various portions of Robilyn Brown's deposition from December 2015. *See* Ex. 7 to Defs.' Mot. [Dkt. # 73-9]; Ex. E to Pl.'s Cross-Mot. [Dkt. # 75-27] (together, "Brown Dec. 2015 Dep."). The Court's citation to Brown's testimony encompasses all of the portions of the transcript cited by the parties.

[3]     The parties cite to various portions of Jeanette Myrick's deposition from November 2015. *See* Ex. 6 to Defs.' Mot. [Dkt. # 73-8]; Ex. B to Pl.'s Cross-Mot. [Dkt. # 75-25]; Ex. 14 to Defs.' Reply [Dkt. # 83-4] (together, "Myrick Nov. 2015 Dep."). The Court's citation to Myrick's testimony encompasses all of the portions of the transcript cited by the parties.

release by performing the series of actions specified by the system. *See* Defs.' SOF ¶ 12; Pl.'s Resp. SOF ¶ 12; *see also* Brown Dec. 2015 Dep. at 19:11–20.

Usually, the first step involved in processing the release order is to time stamp it. Pl.'s SOF ¶ 40; Defs.' Resp. SOF ¶ 40.[4] The LIE then pulls the hard copy of the inmate's institutional file to ensure that the release order matches the commitment order, and that the inmate's identifying information matches that of other records in the institutional file. *See* Defs.' SOF ¶ 13; Pl.'s Resp. SOF ¶ 13; *see also* Brown Dec. 2015 Dep. at 20:4–12; Ex. 8 to Defs.' Mot. [Dkt. # 73-10] at 16:1–8.[5] If all of the information matches, the LIE then goes into an internal database called JACCS and makes sure that all of the documents contained in the inmate's institutional file are also in JACCS, and again, that all of the information is consistent across the commitment and release orders. *See* Defs.' SOF ¶ 14; Pl.'s Resp. SOF ¶ 14; Ex. I to Pl.'s Cross-Mot. [Dkt. # 75-31] at 20:6–19 (describing how once the LIE pulls the institutional file, the LIE enters the data from the order into JACCS).[6] If all of the information is consistent, the LIE closes out the case in

---

4      While neither side has described this process in more detail, all of the records in the case that the parties agree bear a "time stamp" appear to have been inked (with varying degrees of success) through use of a physical time stamp machine or hand stamp, not dated digitally.

5      The parties cite to various portions of Jack Jones's deposition. *See* Ex. 8 to Defs.' Mot. [Dkt. # 73-10]; Ex. D to Pl.'s Cross-Mot. [Dkt. # 75-26]; Ex. 15 to Defs.' Reply [Dkt. # 83-5] (together, "Jones Dep."). The Court's citation to Jones's testimony encompasses all of the portions of the transcript cited by the parties.

6      The parties cite to various portions of Robilyn Brown's deposition from March 2017. *See* Ex. I to Pl.'s Cross-Mot. [Dkt. # 75-31]; Ex. 10 to Defs.' Mot. [Dkt. # 73-12] (together, "Brown Mar. 2017 Dep."). The Court's citation to Brown's testimony encompasses all of the portions of the transcript cited by the parties.

JACCS, prints the release order, and scans it into another DOC internal system called Paper Clips. *See* Defs.' SOF ¶¶ 14–15; Pl.'s Resp. SOF ¶¶ 14–15.[7]

In order to further verify an inmate's paperwork, the LIE must check MyJUSTIS, a court-based system that reflects information that was entered by the court. *See* Defs.' SOF ¶¶ 16–17; Pl.'s Resp. SOF ¶¶ 16–17. The LIE checks MyJUSTIS to confirm that a release order has been issued in the relevant case, and that there is no commitment order from another case for that inmate. *See* Defs.' SOF ¶¶ 16–17; Pl.'s Resp. SOF ¶¶ 16–17; *see also* Jones Dep. at 17:3–18:10. The LIE must also check the Washington Area Law Enforcement System ("WALES") (also known as eAgent) and National Crime Information Center ("NCIC") to make sure there are no outstanding active warrants for the inmate. Defs.' SOF ¶ 19; Pl.'s Resp. SOF ¶ 19.

Once this process is complete, a supervisory LIE is required to double check all of the LIE's work. Defs.' SOF ¶ 20; Pl.'s Resp. SOF ¶ 20. Then, the supervisor prepares a release authorization form. Defs.' SOF ¶ 21; Pl.'s Resp. SOF ¶ 21. While much of this work takes place at the jail, misdemeanor inmates are supposed to be released directly from D.C. Superior Court. Pl.'s SOF ¶ 50; Defs.' Resp. SOF ¶ 50.

## PROCEDURAL HISTORY

Plaintiff filed this lawsuit in D.C. Superior Court on November 14, 2014, *see* Compl. [Dkt. # 1-1], and defendants removed it to this Court on February 2, 2015. *See* Notice of Removal

---

7      In his statement of facts, plaintiff asserts that this process includes printing a hard copy of the release order before it can be scanned into Paperclips. *See* Pl.'s SOF ¶ 42. While it is true that Brown did not specifically testify that the document gets printed, and defendants are quick to point that out in their response to plaintiff's statement of facts, *see* Defs.' Resp. SOF ¶ 42 ("There is no evidence that a hard copy of the release order gets printed before it is scanned into[P]aperclips."), it is unlikely that something can be received on the computer and then later *scanned* into another document system without first being printed.

[Dkt. # 1].  Plaintiff amended his complaint on April 21, 2016 after the Court granted defendant William Smith's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Smith v. District of Columbia*, 149 F. Supp. 3d 128 (D.D.C. 2015); *see also* Am. Compl. [Dkt. # 36].

On December 8, 2016, defendants filed their first motion for summary judgment.  Defs.' Mot. for Summ. J. [Dkt. # 56]; Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. [Dkt. # 56].  In support of their motion, defendants asserted that the Department of Corrections did not receive a release order in case number 2012 CMD 007806 until April 10, 2014.  *Id.* at 1–2.

However, on February 8, 2017, defendants notified the Court that DOC had discovered that it had indeed received a copy of the release order for case number 2012 CMD 007806 on March 18, 2014, and that it was time stamped on March 18 at 9:33 PM.  Notice of Filing [Dkt. # 69].  In light of this revelation, the Court allowed the parties to undertake additional limited discovery, and the Court denied the pending cross-motions for summary judgment as moot.  *See* Min. Order (Feb. 21, 2017).

On March 31, 2017, defendants filed the pending motion for partial summary judgment on Counts I, II, and IV.  *See* Defs.' Mot.; Mem. of P. & A. in Supp. of Defs.' Mot. [Dkt. # 73] ("Defs.' Mem.").  Plaintiff opposed the motion and filed a cross-motion for summary judgment on all four counts.  *See* Pl.'s Cross-Mot.; Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. [Dkt. # 75-1] ("Pl.'s Cross-Mem.").  The motions are fully briefed.[8]

---

8      Defs.' Opp. to Pl.'s Cross-Mot. [Dkt. ## 82–83] ("Defs.' Reply"); Pl.'s Brief in Supp. of Pl.'s Cross-Mot. [Dkt. # 84] ("Pl.'s Cross-Reply").

## FACTS RELATED TO PLAINTIFF'S OVERDETENTION

Although the parties agree on the general procedure for processing a release order, the circumstances surrounding the processing of the two release orders in this case have not been definitively established.

Plaintiff appeared in Superior Court on two misdemeanor cases before the same judge, case numbers 2012 CMD 007806 and 2014 CMD 00452, on March 18, 2014. The Superior Court's Court View database reveals that an order to release plaintiff was entered into the system, and "sent" to the D.C. jail, in case number 2012 CMD 007806 at 1:26 PM, and in case number 2014 CMD 00452 at 1:28 PM. *See* Court View Case No. 2014 CMD 00452; Court View Case No. 2012 CMD 007806. Plaintiff was ordered to return to court on April 9, 2014 in both cases. *See* Court View Case No. 2014 CMD 00452; Court View Case No. 2012 CMD 007806.

The record that has been provided to the Court does not include testimony from a U.S. Marshal, or other evidence, concerning what was done with the paper copies of the release orders that were supposed to travel with plaintiff to the cell block and then into the hands of an LIE at the DOC's office in the courthouse. But the record does include one copy of a release order signed by a Deputy U.S. Marshal on March 18, 2014 in case number 2012 CMD 007806. *See* Ex. 5 to Pl.'s Cross-Mot. [Dkt. ## 75-11, 79] ("Institutional File") at 30.

It is undisputed that DOC both received and processed the release order for case number 2014 CMD 004452 on March 18, 2014. Defs.' SOF ¶ 22; Pl.'s Resp. SOF ¶ 22. There is no direct evidence indicating what steps, if any, were taken by the LIE located at the courthouse. Jack Jones, an LIE who works in the Records Office at the D.C. jail, Defs.' SOF ¶ 25; Pl.'s Resp. SOF ¶ 25, testified that he processed this release order. Jones Dep. at 36:22–37:22. He knew that he did so

because his hand-written initials appear in the upper left-hand corner of the document.  *Id.*; *see also* Institutional File at 35.

How Jones went about processing this order is somewhat unclear.  He testified that he wrote "PS" on the document with his initials to indicate that he had both printed and scanned the order.  Jones Dep. at 53:14–20; *see also* Institutional File at 35.  *But see* Jones Dep. at 37:10–14 (explaining that the "P" stands for "posted," and "S" for "scanned").  But he did not specify at what point in the process he printed it out, or what system he then scanned it into.  Further, he admitted that he failed to time stamp the release order, notwithstanding the DOC policy that required him to time stamp every document he processed.  *Id.* at 53:2–54:17.  And the document he worked with that bears his initials does not include the signature of a U.S. Marshal.  *Id.* at 43:1–7; *see also* Institutional File at 35.  There is no evidence in the record regarding whether Jones checked the various external systems, such as MyJUSTIS, as he was required to do.

Turning to the order in case number 2012 CMD 007806, the parties agree that DOC received the release order on March 18, 2014 because it bears a time stamp for March 18 at 9:33 PM.  Defs.' SOF ¶ 23; Pl.'s Resp. SOF ¶ 23; Release Order Case No. 2012 CMD 007806; *see also* Brown Mar. 2017 Dep. at 20:1–22; *id.* at 33:14–3 (testifying that she knows DOC received the order because of the time stamp).  But one cannot discern from the document whether it was time stamped by a Department of Corrections LIE at Superior Court, or by an LIE at the Records Office located at the jail.  *Compare* Brown Mar. 2017 Dep. at 22:4–20; *id.* at 33:4–6 (testifying that the first step to processing a release order is to time stamp it, and then to input the data into TMS, which occurs at the courthouse), *with* Jones Dep. at 53:2–54:17 (testifying that LIE's were required to time stamp release orders when they were received at the jail).

It is also unclear whether the release order in the 2012 case was ever uploaded to TMS. Robilyn Brown, a supervisory LIE, testified that she did not believe it was, since the information contained in the release order never made its way into JACCS. Brown Mar. 2017 Dep. at 23:2–8 (testifying that uploading the document into TMS was not "done with respect to this document" because she "did a JACCS audit, and it wasn't in there, the information wasn't uploaded into JACCS"); *id.* at 34:7–16; *see also* Ex. C to Pl.'s Cross-Mot. [Dkt. # 75-33] ("Myrick Mar. 2016 Dep.") at 54:10–55:6 (testifying that DOC has no "transaction" dated for March 18, and that all documents "received from D.C. Superior Court . . . would be uploaded within TMS so that the staff could maintain processing of that document").

But, it is undisputed that the release order from case number 2012 CMD 007806 did ultimately make its way into plaintiff's institutional paper file. *See* Pl.'s SOF ¶ 19; Defs.' Resp. SOF ¶ 19; *see also* Brown Dec. 2015 Dep. at 51:4–16 (acknowledging that the 2012 release order was contained in plaintiff's institutional file); Myrick Mar. 2016 Dep. 53:17–54:9 (testifying that the release for case number 2012 CMD 007806 was found within plaintiff's institutional file). However, the record does not establish how long it has been there. *See* Brown Mar. 2017 Dep. at 32:17–33:13 (testifying that she could not confirm if the release order had been in plaintiff's institutional file since March 18, 2014); Ex. 17 to Defs.' Reply [Dkt. # 82-7] ("Myrick Decl.") ¶ 7 ("Release orders are placed in an inmate's institutional file when they are received which may be at the time of issuance or sometime thereafter."); Myrick Mar. 2016 Dep. at 55:7–10 (agreeing that "all documents received from the D.C. Superior Court are also included in the inmate's institutional file").

Although plaintiff was scheduled to return to Superior Court on April 9, 2014, he failed to appear because DOC did not transport him there. Ex. A to Pl.'s Cross-Mot. [Dkt. # 75-24] ("Smith

Dep.") at 60:8–61:6. As a result, the Superior Court judge issued a bench warrant. *See* Court View Case No. 2014 CMD 00452; Court View Case No. 2012 CMD 007806. Plaintiff was brought to the courthouse the next day for a status hearing, and two more release orders were issued. *See* Ex. 3 to Pl.'s Cross-Mot. [Dkt. # 75-9]; Ex. 4 to Pl.'s Cross-Mot. [Dkt. # 75-10]; *see also* Institutional File at 5–6, 29, 33 (release orders from both cases that were signed by the judge and U.S. Marshal and dated on April 10); *see id.* at 30 (release order from case number 2012 CMD 007806 that includes the U.S. Marshal signature from March 18, but is time stamped on April 10).

Plaintiff was released from custody on April 10, 2014. Defs.' SOF ¶ 24; Pl.'s Resp. SOF ¶ 24. After he was released, no investigation took place; no report concerning his overdetention was created, Pl.'s SOF ¶¶ 13–14; Defs.' Resp. SOF ¶¶ 13–14; *see* Myrick Nov. 2015 Dep. at 70:21–71:3; and no employee was disciplined. *See* Myrick Nov. 2015 Dep. at 37:15–22. Plaintiff is not counted in the 2014 overdetention statistics contained in the reports submitted as evidence in this case. *See* Ex. 9 to Pl.'s Cross-Mot. [Dkt. # 75-15] ("Second Overdetention Report"); Ex. 10 to Pl.'s Cross-Mot. [Dkt. ## 75-16, 81] ("Third Overdetention Report"). These circumstances do not comport with the standards announced by the DOC's Correctional Program Administrator, Jeanette Myrick. Defs.' SOF ¶ 31; Pl.'s Resp. SOF ¶ 31; *see also* Myrick Nov. 2015 Dep. at 36:18–21; *id.* at 37:2–14.

Myrick is responsible for overseeing the daily operations of the Records Office and for ensuring that inmates are released and documents are received and processed. Pl.'s SOF ¶ 11; Defs.' Resp. SOF ¶ 11. She supervises three correctional program officers, six supervisors, eight lead legal instruments examiners, and approximately eighteen legal instruments examiners – including Jack Jones. *See* Myrick Nov. 2015 Dep. at 27:7–16. Myrick testified that as part of her responsibilities, it is her practice to prepare an overdetention report after each

instance of overdetention, Pl.'s SOF ¶ 12; Defs.' Resp. SOF ¶ 12; Myrick Nov. 2015 Dep. at 17:17–18:11, and to transmit those reports to the deputy director. Myrick Nov. 2015 Dep. at 18:15–17. She also testified that after she learns of an overdetention, employees are often disciplined. *Id.* at 36:18–21.

During discovery, Myrick produced an overdetention report detailing the overdetentions that have occurred at the DOC between October 2010 and October 2014. *See* Third Overdetention Report. Plaintiff's overdetention was not included in the total, but the report revealed that there were seventy-two others in that time period; thirty-two of which were attributed to "staff error," which is generally not specified. *Id.* Some of the staff errors identified in the Third Overdetention Report are described in more detail in the Second Overdetention Report, which was reported to the D.C. Council. *See* Second Overdetention Report.[9]

For example, both reports include inmates who were released a few days late because their "sentence[s] [were] computed in error." *Compare* Second Overdetention Report at 3, *with* Third Overdetention Report at 24; *compare* Second Overdetention Report at 8, *with* Third Overdetention Report at 2; *compare* Second Overdetention Report at 6, *with* Third Overdetention Report at 20. Both also identify inmates who were released late because "good time credit [was] not applied to [their] sentence[s]." *Compare* Second Overdetention Report at 3, *with* Third Overdetention Report at 24; *compare* Second Overdetention Report at 6, *with* Third Overdetention Report at 23; *compare* Second Overdetention Report at 5, *with* Third Overdetention Report at 16.

---

9       Plaintiff suggests that the overdetention reports may not be reliable since defendant produced "three different iterations . . . that contain vastly different data on DOC overdetentions." Pl.'s Cross-Mem. at 8. While the reports are somewhat different, the requests that led to their production asked for data from different time periods, and some requests asked for defendant to exclude certain sorts of overdetentions or certain time frames, so the variations do not necessarily indicate that they are unreliable.

Further, the reports reveal a number of reasons other than DOC staff error for the detention of inmates past their release dates. For example, both reports identify inmates who were detained a few days past their release dates because the WALES program indicated the existence of an outstanding warrant. *Compare* Second Overdetention Report at 9, *with* Third Overdetention Report at 11; *compare* Second Overdetention Report at 9, *with* Third Overdetention Report at 16. Once DOC personnel determined that the detainee was not the correct wanted person, the inmate was processed and released. *See, e.g.*, Third Overdetention Report at 11, 16. Other overdetentions were attributed to errors made by court staff and not DOC personnel. *Compare* Second Overdetention Report at 8–9, *with* Third Overdetention Report at 8–9; *compare* Second Overdetention Report at 9, *with* Third Overdetention Report at 9–10.

**PREVIOUS OVERDETENTION CASES AGAINST THE DISTRICT OF COLUMBIA**

This case arises against a backdrop of previous litigation against the District of Columbia involving alleged overdetention at the D.C. jail.

In 2002, a class of inmate plaintiffs sued the District of Columbia. They alleged that officials at the D.C. jail unlawfully strip searched and overdetained inmates who returned to the jail after receiving release orders from the court. *See Bynum v. District of Columbia*, 257 F. Supp. 2d 1 (D.D.C. 2002) (denying defendants' motion to dismiss the case). In 2006, the court approved a settlement between the parties. *Bynum v. District of Columbia*, 412 F. Supp. 2d 73, 83 (D.D.C. 2006). As part of the settlement, DOC agreed to implement major changes such as the completion of an Inmate Processing Center, which would provide adequate processing facilities for intake and release. *Id.* Funds allocated to the center would be used "to improve or assist in processing inmates for release and to reduce incidents of over-detention." *Id.*

As the *Bynum* case neared settlement, DOC adopted a policy of diverting in-custody defendants who had been ordered released or who were otherwise entitled to release to a holding facility on the grounds of D.C. General Hospital where they would be processed, which meant that inmates were not returned to the jail population and would not be subjected to strip searches. *See Barnes v. District of Columbia*, 242 F.R.D. 113, 115 (D.D.C. 2007) (describing the *Bynum* litigation). But inmates who were entitled to release still slipped through the cracks, and some were returned to the D.C. jail and subjected to the same search and detention procedures that were at issue in the *Bynum* case. *See id.*

Therefore, in 2006, a new group of plaintiffs filed suit challenging the DOC's system. *Id.* at 116. The *Barnes* case was based on the same legal theories as the *Bynum* case, and the parties reached a settlement in 2013. *See Barnes v. District of Columbia*, 38 F. Supp. 3d 131 (D.D.C. 2014) (modifying court's final order approving settlement).

The judge in the *Barnes* litigation observed that the District had made little or no improvements to its "paper-bound and Byzantine release process," as it was supposed to do after the *Bynum* case settled. *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 279–80 (D.D.C. 2011) (observing that "a move to a paperless system to process releases" was "either rejected by the DOC or remain[ed], to this day, caught in a whirlpool of delays"). However, the court recognized that the DOC took a "significant step toward reducing the number and duration of overdetentions" by implementing the "courthouse release" program in 2008, which released inmates charged with misdemeanors directly from Superior Court. *Id.* at 280.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

The mere existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

**ANALYSIS**

I.    **The Court will deny in part and grant in part the motions for summary judgment on Count I for Section 1983 liability.**

In Count I, plaintiff claims that the District and two DOC employees are liable under 42 U.S.C. § 1983 for the unconstitutional deprivation of his liberty.  *See* Am. Compl. ¶¶ 25–36. Defendants maintain that plaintiff has not suffered a constitutional violation.  Defs.' Mem. at 6– 11.  The District also argues that it is entitled to summary judgment because plaintiff has not produced sufficient evidence to support municipal liability under section 1983, and the individual defendants contend that they are entitled to qualified immunity.  *Id.* at 4–14.  Plaintiff has also moved for summary judgment on this count.  Pl.'s Cross-Mem. at 17–36.

A.    **Municipal Liability Under Section 1983**

Section 1983 of the Civil Rights Act provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

To establish that a municipality is liable under section 1983, a plaintiff must prove both (1) "a predicate constitutional violation" and (2) "that a custom or policy of the municipality caused the violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), citing *Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992).

A municipality cannot be held liable for the unconstitutional conduct of its employees based on a theory of *respondeat superior*.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (noting that "while

Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*") (emphasis in original) (citation omitted). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edits or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

As a result, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011), quoting *Monell*, 436 U.S. at 691; *see also Monell*, 436 U.S. at 694 (noting that the policy must be "the moving force of the constitutional violation"). The D.C. Circuit has explained:

> [T]here are a number of ways in which a "policy" can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution . . .; the action of a policy maker within the government . . .; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom" . . .; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Baker*, 326 F.3d at 1306 (internal citations omitted). Each prong of the test "is separate and serves different purposes." *Id.*

### 1. There is a genuine dispute of material fact as to whether plaintiff has established a predicate constitutional violation.

In their motion for summary judgment, defendants argue that plaintiff has not established the predicate for a section 1983 action: a constitutional violation. *See* Defs.' Mem. at 6–9. The amended complaint alleges that plaintiff was deprived of "his constitutional right to liberty and deprived . . . of this liberty without due process of law as required by the Fifth Amendment" when

he was detained for twenty-three days after he was ordered to be released. Am. Compl. ¶ 26; *see also* Pl.'s Cross-Mem. at 17–18 (arguing that his overdetention "establishes the predicate constitutional violation"). Given the evidence that has been adduced in this case, the Court finds that plaintiff has come forward with sufficient evidence to create a genuine issue of material fact on whether the conduct in this case was so egregious that it violated his due process rights under the Fifth Amendment.

The Fifth Amendment states that "[n]o person . . . shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V.[10] "In order to establish [the] predicate constitutional violation, neither District of Columbia policy makers nor employees need be implicated. All that is being established . . . is that there is some constitutional harm suffered by the plaintiff, not whether the municipality is liable for that harm." *Baker*, 326 F.3d at 1306.

 "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). But there is no bright-line rule that detaining an inmate who is entitled to release for a particular length of time is *per se* unconstitutional. *See Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 275–76 (D.D.C. 2011) ("Temporarily retaining custody over an inmate who is entitled to release . . . is not per se unconstitutional, . . . [but] inmates' due process rights may be violated if they are not released within a reasonable time after the reasons for their detentions have ended.") (citations omitted); *Berry v. Baca*, 379 F.3d 764, 771 (9th Cir. 2004) ("Courts have not settled on any concrete number of permissible hours of delay in the context of post-release detentions."); *Lewis v. O'Grady*, 853

---

10      Usually, due process claims by government officials are analyzed under the Due Process Clause of the Fourteenth Amendment, which applies to states. *See Butera v. District of Columbia*, 235 F.3d 637, 646 n.7 (D.C. Cir. 2001). "While the District of Columbia is not a state, it is subject to the Due Process Clause of the Fifth Amendment." *Id.*

F.2d 1366, 1370 (7th Cir. 1988) (observing that administrative tasks incident to a prisoner's release may require the prisoner to remain detained for a period of time, but concluding that the reasonableness of the eleven-hour overdetention was a jury question); *Davis v. Hall*, 375 F.3d 703, 718–19 (8th Cir. 2004) (concluding that the jury must determine if the plaintiff's fifty-seven day overdetention rose to the level of a constitutional due process violation). *But see Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) (holding that the plaintiff established a prima facie case at trial that defendant violated his constitutional rights because "[d]etention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process").

In the context of detention after arrest pending a probable cause determination, the Supreme Court has held that a detention greater than forty-eight hours may rise to the level of a constitutional violation. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). When considering whether to adopt this standard in the context of detaining inmates once the basis for confinement has ended, some courts have observed that forty-eight hours, or even less, may be the appropriate benchmark for finding a constitutional violation. *See, e.g.*, *Barnes*, 793 F. Supp. 2d at 276 ("[C]ourts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin*."); *Brass v. County of Los Angeles*, 328 F.3d 1192, 1200 (9th Cir. 2003) ("One might conclude that when a court orders a prisoner released – or when, for example, a prisoner's sentence has been completed – the outer bounds for releasing the prisoner should be less than 48 hours."). The detention here extends well beyond that threshold, so there is no serious dispute that plaintiff's right to liberty was abridged.

The defense points to case law that holds, though, that the question "is not simply whether a liberty interest has been infringed, but whether the extent or nature of the restraint . . . is such as to violate due process." *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982). In *Youngberg,* the Court recognized that "[i]n determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance the liberty of the individual and the demands of an organized society," *id.* (internal citation omitted); "[a]ccordingly, whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 321. Here, of course, defendants have not suggested that there could be a legitimate state interest in holding an accused after a judge has ordered his release. But defendants argue that since the obvious infringement of plaintiff's liberty is only potentially attributable to negligence on their part, the deprivation does not rise to the level of a constitutional violation for section 1983 purposes. *See* Defs.' Mem. at 8, 14.

The Supreme Court has made it clear that a plaintiff must show more than mere negligence to establish a violation of his substantive due process rights. "We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government . . . . Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1988) (internal citations omitted); *see also United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" ) (internal citations omitted).

Applying these principles, the *Lewis* Court ruled that parents of a motorcycle passenger killed during a high-speed chase by the police had not made out a section 1983 claim.

> We have . . . rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.

523 U.S. at 848–49; *see also Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of governmental officials to deprive a person of life, liberty or property.") (emphasis in original). But the Court also recognized that while the principles may be easy to apply at either end of the culpability spectrum, "[w]hether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence . . . is a matter for closer calls." *Lewis*, 523 U.S. at 849 (internal citations omitted). The Court reasoned that since deliberate indifference to the rights of detainees may suffice to establish liability under the Eighth Amendment, deliberately indifferent conduct may also satisfy the fault requirement for claims under the Due Process Clause. *Id.* at 849–50. But since "deliberate indifference that shocks in one environment may not be so patently egregious in another," *id.* at 850, the determination of whether conduct in a particular case is sufficiently egregious to violate the Constitution "demands an exact analysis of circumstances." *Id.*

The *Lewis* Court then contrasted "the markedly different circumstances of normal pretrial custody" with the exigent circumstances that surround a high-speech chase.

> As the very term "deliberate indifference" implies, the standard is sensibly employed only when actual deliberation is practical, and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare.

523 U.S. at 851 (internal citation omitted). The Court observed, though, that even in the prison context, indifference in emergency circumstances such as a riot might not give rise to a

constitutional violation, and a much higher standard would apply. *Id.* at 852–53. As the Court explained:

> [L]iability for . . . inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.

*Id.* at 853. For these reasons, the Court concluded that split-second choices made during a race on city streets – even if they were flawed – failed to meet the shock-the-conscience test. *Id.* at 855.

The lesson one can draw from *Lewis* is that a showing of deliberate indifference can support a finding of a substantive due process violation in a "normal custody" situation. *See Barnes*, 793 F. Supp. 2d at 277 (observing that, in the prison setting, deliberate indifference can rise to a constitutionally shocking level and form the basis of a due process violation). In this case, it is undisputed that plaintiff was detained for twenty-three days after he was ordered to be released. *See* Defs.' SOF ¶¶ 3, 24; Pl.'s Resp. SOF ¶¶ 3, 24. It is also not disputed that DOC is supposed to be in possession of a commitment order, a return order, or a release order before it receives an individual into custody, Pl.'s SOF ¶ 37; Defs.' Resp. SOF ¶ 37, but there was no commitment order in existence when plaintiff returned from Superior Court on March 18, 2014. *See* Court View Case No. 2014 CMD 00452; Court View Case No. 2012 CMD 007806 (ordering him released in both cases); *see generally* Institutional File.

Further, plaintiff has presented evidence that once he arrived back at the D.C. jail, he told the correctional officer, "I'm supposed to be released, what's going on?" Smith Dep. at 51:16–22. Smith testified that the officer continued to process him, and another DOC staff member told him, "if you're here, you're supposed to be here . . . you're not going anywhere." *Id.* at 52:6–53:15. Defendants argue that this evidence should be ignored because it "amounts to nothing more than self-serving statements that cannot defeat the [d]efendants' claim for summary judgment." Defs.'

Reply at 20–21. However, that is no longer the law in this Circuit. *See Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) ("It is . . . beyond question as a general proposition that parties, like other fact witnesses, are legally competent to give material testimony. Indeed, in many kinds of cases, parties are the key, or even sole witness."). And defendants have not come forward with any evidence to create a genuine dispute on this issue.

Moreover, according to Jeanette Myrick, the Correctional Program Administrator, case managers and correctional officers have "a duty to report allegations of overdetentions when they learn of them," Myrick Decl. ¶ 6, and this is a primary means by which the institution becomes aware of such problems. Myrick Nov. 2015 Dep. at 26:3–9. Yet, there is no evidence in the record that any DOC staff member, including either of the correctional officers present at the time plaintiff returned to the jail, reported plaintiff's inquiry or undertook any further investigation during the

twenty-three days in which each could deliberate and "make unhurried judgments." *Lewis*, 523 U.S. at 853.[11]

And, there is no evidence that it took twenty-three days to complete any necessary administrative tasks or that there was any other reasonable basis for the delay.

Therefore, the Court concludes that plaintiff has come forward with sufficient evidence to create a genuine issue of material fact on whether the conduct in this case was so egregious that it violated his due process rights under the Fifth Amendment. Therefore, the Court will not enter summary judgment in favor of defendants on the basis that plaintiff has not established a predicate constitutional violation. What remains is to determine whether plaintiff can establish the other

---

11    The Court acknowledges that it would not be feasible for DOC staff to investigate every complaint by an inmate that he was being wrongfully detained. The Supreme Court recognized that such claims may be voiced quite often in *Baker v. McCollan*, a case involving a plaintiff who was arrested pursuant to a valid warrant, and then detained despite his protests of mistaken identity. 443 U.S. 137, 143–45 (1979) ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."). The Court held "that a detention of three days over a New Year's weekend does not and could not amount" to deprivation of the plaintiff's constitutional rights, but observed that "detention pursuant to a valid warrant . . . in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'" *Id.* at 145–46.

But the key factor in the *Baker* Court's decision was that the plaintiff had been arrested pursuant to a facially valid warrant, and he did not challenge its validity. *See id.* at 143–44. Here, defendant has not presented any evidence that it acted pursuant to a facially valid order of any kind, and it is undisputed that "DOC will not take a prisoner without a commitment order, return order, or release." Pl.'s SOF ¶ 37; Defs.' Resp. SOF ¶ 37; *see also* Myrick Nov. 2015 Dep. at 71:16–72:3 (affirming that "[i]t is DOC policy to: prior to accepting custody of an inmate, staff determines that the inmate is legally committed to the facility").

Furthermore, in determining whether to draw the inference that defendants were deliberately indifferent to plaintiff's right to liberty, the jury can also consider the fact that plaintiff's name does not even appear in any of the overdetention reports.

elements needed to hold either the District or the individual defendants liable for the alleged constitutional deprivation.

##### 2.    There is a question of fact as to whether a District of Columbia custom or policy caused plaintiff's overdetention.

The District of Columbia can only be held liable for the constitutional violation if its employees acted according to a city "policy or custom" that was "the moving force" behind the violation. *Monell*, 436 U.S. at 694. The D.C. Circuit has identified four ways in which a plaintiff can demonstrate that a municipality is liable under section 1983: (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306 (internal citations omitted).

Defendant argues that even if plaintiff has established a predicate constitutional violation, the elements of *Monell* have not been satisfied. Defs.' Mem. at 12–14. Plaintiff bases his cross-motion on three theories: (1) that express municipal policies caused the constitutional violation in this case; (2) defendant has customs or practices that have become tantamount to express policies that caused his overdetention; and (3) that DOC's failure to train or supervise its employees showed "deliberate indifference" to the risk of violating his constitutional rights. *See* Pl.'s Cross-Mem. at 17–31. The Court finds that there are genuine issues of material fact concerning the existence of a practice involving the inconsistent handling of paperwork and whether such a custom or practice caused plaintiff's overdetention, and therefore, this aspect of the section 1983 claim must be presented to the jury.

### a. Express Municipal Policies

The Supreme Court observed in *Monell* that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 690. Plaintiff posits that DOC has "policies to conceal the overdetention problem," but he has failed to put forward any evidence of the existence of these policies. Therefore, summary judgment for plaintiff is inappropriate on this theory of liability.

First, plaintiff asserts that "DOC's policy that the Records Office should not report instances of overdetention [wa]s the cause of Mr. Smith's prolonged, unconstitutional overdetention." Pl.'s Cross-Reply at 7. The evidence reveals that there is no written policy in place that requires DOC staff to report suspected overdetention, *see* Myrick Nov. 2015 Dep. at 35:3–17; Myrick Decl. ¶ 4, but plaintiff has not produced any evidence of the existence of a policy that directs DOC staff *not* to report instances of overdetention.

Plaintiff's theory is that the absence of a policy to report overdetentions amounts to a policy not to report them. But even that theory is not supported by the evidence. At least one Legal Instrument Examiner testified that he would report overdetentions to his supervisor upon learning of them. Ex. 9 to Defs.' Mot. [Dkt. # 73-11] at 39:6–40:3.[12] And there is evidence in the record that all employees in the Records Office are trained to report possible overdetention when they become aware of it, Myrick Decl. ¶ 4, and that case managers and correctional officers have a duty to make such reports. Myrick Nov. 2015 Dep. at 25:17–26:9; Myrick Decl. ¶¶ 4–6.

---

12    The parties cite to various portions of Fred Thompson's deposition. *See* Ex. 9 to Defs.' Mot. [Dkt. # 73-11]; Ex. F to Pl.'s Cross-Mot. [Dkt. # 75-28] (together, "Thompson Dep."). The Court's citation to Thompson's testimony encompasses all of the portions of the transcript cited by the parties.

Second, plaintiff contends that "DOC's policy which has no oversight mechanism in place to ensure the complex release system is followed, resulted in the overdetention of Mr. Smith." Pl.'s Cross-Mem. at 21. Plaintiff points to the fact that DOC does not have a check-out sheet, log, or a computer system to determine when an employee accesses a prisoner's institutional file. Brown Mar. 2017 Dep. at 35:12–36:19; *see* Pl.'s Cross-Reply at 7. But the absence of those particular mechanisms does not establish a lack of any oversight or the existence of an express policy that avoids oversight and fosters overdetention, and there is considerable evidence about layers of review involved in the processing of release orders.[13]

Because there is no evidence in the record that either claimed express policy existed, or that either policy caused plaintiff's overdetention, the Court will deny summary judgment in favor of plaintiff on this theory of liability.

### b. Custom or Practice

"[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997), citing *Monell*, 436 U.S. at 690–91; *see also Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) ("Or a policymaker could knowingly ignore

---

13    Plaintiff cites to Local Rule 7(b) and argues that the District conceded this argument by not opposing it in its reply. Pl.'s Cross-Reply at 7. The Court observes that the District did indeed fail to address plaintiff's argument that it had a policy not to monitor staff compliance with the release order process. However, the D.C. Circuit recently held that "[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016). The court underscored that "[t]he District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" *Id.*, quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015). On the record before the Court, even without defendant's opposition, the Court concludes that plaintiff is not entitled to summary judgment on this theory.

a practice that was consistent enough to constitute custom."), citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Plaintiff identifies three practices that he maintains have taken on the force of an official policy that caused his overdetention. *See* Pl.'s Cross-Mem. at 9–14. The Court concludes that there is a question of fact as to the existence of one of the District's alleged practices and whether it caused the deprivation of plaintiff's liberty.

### 1. The District's Alleged Practice of Failing to Review Court View

Plaintiff contends that DOC's practice of failing to consult the Court View database when processing release orders caused his overdetention. Pl.'s Cross-Mem. at 22–23.

According to a written DOC policy cited by plaintiff, "Records Office Legal Instruments Examiners shall obtain and review printouts from . . . COURT VIEW . . . to determine if there are any outstanding . . . charges preventing release, prior to an inmate's release from the custody of the DOC." *See* Ex. 6 to Pl.'s Cross-Mot. [Dkt. # 75-12] at 9. Also, when completing the release authorization form, the LIE must certify that "CourtView review [was] completed." *See* Institutional File at 1, 7. And each LIE must also complete an "Inmate Release Check List," on which the LIE must check and initial next to the step "Review CourtView Open Cases." *Id.* at 8.

Plaintiff highlights evidence that DOC staff members have not had access to Court View since early 2013. *See* Myrick Nov. 2015 Dep. at 46:8–20 (testifying that the policy that states that an LIE must review a print out of Court View "is not accurate"); Jones Dep. at 19:21–20:5 (confirming that staff "no longer have access to COURT VIEW"). He argues that this department-wide omission resulted in his overdetention. Pl.'s Cross-Mem. at 22.

However, defendant has produced evidence that LIE's had access to all of the information contained in Court View; they simply accessed it through a different system called MyJUSTIS. *See* Brown Dec. 2015 Dep. at 27:1–11 (noting that the names of the specific programs in the policy are not correct, and that "COURT VIEW is now MyJUSTIS"). Jones explained that MyJUSTIS

"reflects the data that's in the COURT VIEW System": "COURT VIEW is the Court's main system. Because we no longer have access to COURT VIEW, JUSTIS is able to – they share – COURT VIEW shares information with JUSTIS for us to look into each case with each individual inmate." Jones Dep. at 19:21–20:5. And plaintiff does not dispute that "MyJUSTIS is a court-based system that reflects information that was inputted by the Court." Defs.' SOF ¶ 17; Pl.'s Resp. SOF ¶ 17.

Jones described the operation of MyJUSTIS in his deposition:

> Q. So after you verify the document, you stated you go into the system and you run *all* checks. What system are you referring to?
>
> A. I'm referring to JUSTIS, JACCS matrix system, and we have eAgent, which runs our NCIC checks.
>
> Q. What's JUSTIS?
>
> A. JUSTIS tracks each court appearance of each inmate and what was discussed during that court appearance.
>
> Q. So what do you check for when you check the JUSTIS system?
>
> A. In JUSTIS, we are checking to make sure that there is a release order, that there is not another case that has been – the inmate has been charged with.
>
> Q. So if you receive a release order, the JUSTIS system should reflect that there was a release order issued that day in court; is that correct?
>
> A. That's correct.
>
> Q. And you stated you check to see if there's any other cases for the inmate. What do you do when you perform that check?
>
> A. I open each individual case to make sure the inmate has not been committed on that charge.

Jones Dep. at 16:19–17:21.

Plaintiff asserts that even if MyJUSTIS contains the same information as Court View, "the mere fact that DOC written policies are in contradiction with its established practices demonstrates the dysfunctional nature of the Records Office." Pl.'s Cross-Reply at 12. Whether that is an

accurate assessment or not, it is a far cry from identifying a custom or practice that led to plaintiff's detention. DOC's failure to update its written policy to substitute the name of the currently available technology is not a basis for section 1983 liability. Plaintiff has failed to come forward with evidence that would enable a reasonable juror to conclude that the District had a custom or practice of ignoring the important information contained in the court's database, and therefore, summary judgment for plaintiff is inappropriate on this theory.

### 2. The District's Alleged Practice of Receiving Court Orders Through Multiple Non-Electronic Means

Plaintiff contends that DOC has maintained a practice of receiving and processing release orders that have been faxed, emailed, and/or hand delivered to the jail, even though it is supposed to be operating under a paperless system, and that this practice has taken on the force of an official policy that resulted in his overdetention. Pl.'s Cross-Mem. at 23. While plaintiff has not come forward with enough undisputed evidence to support the entry of judgment in his favor on this theory as a matter of law, he has pointed to enough to withstand a motion for summary judgment against him. There is a genuine dispute of material fact as to whether DOC has a practice of receiving release orders by multiple means, and if so, whether this allegedly haphazard system led to plaintiff's overdetention.

The DOC's procedure for processing release orders is supposed to be almost entirely electronic after the Marshal delivers a copy of the court's signed paper order to the LIE at the courthouse. *See* Defs.' SOF ¶¶ 4–10, 12; Pl.'s Resp. SOF ¶¶ 4–10, 12; *see also* Pl.'s SOF ¶ 31; Defs.' Resp. SOF ¶ 31 ("As a result of the Bynum lawsuit, DOC agreed to 'move to a paperless system to process releases.'"); Defs.' Reply at 6–7 ("[M]isdemeanants are processed by a system that does not rely upon the transport of a paper order to the jail for processing."). Once the LIE receives the release order, he or she uploads the document into TMS. Defs.' SOF ¶ 12; Pl.'s Resp.

SOF ¶ 12.  After the release order is uploaded in TMS, an LIE located in the Records Office at the D.C. jail will access the document from TMS and begin processing the inmate's release by performing actions in accordance with the system's directions.  *See* Defs.' SOF ¶ 12; Pl.'s Resp. SOF ¶ 12; *see also* Brown Dec. 2015 Dep. 16:18–21; *id.* at 19:11–20.  This is supposed to include checking external digital systems such as MyJUSTIS to ensure that all of the information is accurate and that the release order matches with the commitment order.  Defs.' SOF ¶¶ 14, 21; Pl.'s Resp. SOF ¶¶ 14, 21.

Plaintiff argues that notwithstanding the evidence related to the existence of this protocol, DOC in fact receives court-ordered releases through four different channels, and that this "chaotic policy" has resulted in DOC's receipt of release orders that are not processed, including his own. Pl.'s Cross-Mem. at 24.  Plaintiff points to evidence that reveals that DOC may indeed receive multiple copies of the same order through various methods, including via fax, email, hand delivery from the Marshals at the courthouse, or in connection with transport from the Superior Court.  *See, e.g.*, Myrick Nov. 2015 Dep. at 73:1–3 (testifying that the Records Office can receive orders via "fax, email, [and] staff"); Brown Dec. 2015 Dep. at 17:7–13 (testifying that the Records Office can receive orders via email, fax, or hand delivery from a marshal to the LIE in the courthouse); *id.* at 16:1–13 (testifying that the Records Office can receive documents from "transport"); *id.* at 18:1–19:10 (acknowledging that the Records Office can receive four copies of the same document).  And supervisory LIE Robilyn Brown testified that the processing of a release order can be "triggered" when the LIE receives "it from any one of those four" methods.  Brown Dec. 2015 Dep. at 18:1–9.

However, Brown also testified that hand delivery from a Marshal to the LIE at the Superior Court, and then the uploading of the order by the LIE into TMS, is the "most common way" that

an LIE at the Records Office at the jail would receive the order. Brown Dec. 2015 Dep. at 18:10–19:10. And there is also some evidence that any additional copies were only provided to the Records Office for quality assurance purposes. *See id.* at 14:14–15:3; *id.* at 15:17–16:6 (testifying that faxed and emailed copies of release orders are received by "[q]uality assurance at the D.C. Superior Court," and that hand delivered copies arrive from transport at the end of the day as a "double-check to make sure all the documents were transported").

Based on the evidence adduced by both parties, the Court concludes that a question of fact exists as to whether DOC has a practice of receiving release orders in multiple ways, including in paper form.

But even if plaintiff can establish that such a practice exists, he must also "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. That is, the District's practice must be the "moving force" behind the alleged constitutional violation. *See Monell*, 436 U.S. at 694

A policy is deemed to be the "moving force" behind a constitutional injury if the

> conduct is a substantial factor in bringing about harm . . . . The defendant may be held liable for harm that is "foreseeably attributable" to his conduct as well as for unforeseeable harm attributable to his conduct, unless it appears that the chain of events is "highly extraordinary in retrospect."

*Parker v. District of Columbia*, 850 F.2d 708, 714 (D.C. Cir. 1988), quoting *Morgan v. District of Columbia*, 824 F.2d 1049, 1062–63 (D.C. Cir. 1987).

Plaintiff has put forward little evidence on the issue of causation. In his memorandum, he simply offers the conclusory argument that "DOC's failure to have a uniform, standard policy of receiving and processing release orders resulted in Mr. Smith's overdetention." Pl.'s Cross-Mem. at 24; *see also* Pl.'s Cross-Reply at 9 ("The District's broken system of receiving release orders from the Superior Court is the direct and proximate cause of the District's overdetention of Mr.

Smith for 23 days after it received the release order."). When plaintiff's expert, Cameron Lindsay, was questioned about DOC's processing procedures, he could not describe the system in place. Ex. 16 to Defs.' Reply [Dkt. # 83-6] at 33:1–7.[14] The expert could explain that "any time you're utilizing paper, that's a very cumbersome process[;] . . . emails can be missed, faxes can be inadvertently discarded or not printed, et cetera." *Id.* at 57:16–21. But he never specifically linked the receipt of a paper release order in plaintiff's case to his overdetention. Therefore, the Court cannot find that plaintiff has established causation as a matter of law, and it will deny his motion for summary judgment on Count I on this theory.

Whether defendant is entitled to judgment is a closer question. There is evidence in the record to suggest that while the release order for case number 2012 CMD 007806 was never uploaded into TMS as it should have been, *Brown Mar. 2017 Dep.* at 23:2–8; *id.* at 34:7–16; *Myrick Mar. 2016 Dep.* at 54:10–55:6, it was time stamped as received by DOC at 9:33 PM on March 18, 2014. Defs.' SOF ¶ 23; Pl.'s Resp. SOF ¶ 23. And it was placed in plaintiff's institutional file. Pl.'s SOF ¶ 19; Defs.' Resp. SOF ¶ 19.

But there is no indication that anyone paid any attention to it. Indeed, the first time the defense moved for summary judgment, the Court was told that the Department of Corrections had not "received" it, even though it was in plaintiff's file. *See* Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. [Dkt. # 56] at 1–2; *Brown Dec. 2015 Dep.* at 51:4–16 (acknowledging that the release order for case number 2012 CMD 007806 was contained within plaintiff's institutional file). Myrick insisted that it had not been "received" since it was not time stamped, *see Myrick Nov. 2015 Dep.* at 69:7–14, and she advanced the faulty and circular proposition that

---

14    The parties cite to various portions of Lindsay's deposition. *See* Ex. 12 to Defs.' Mot. [Dkt. # 73-14]; Ex. 16 to Defs.' Reply [Dkt. # 83-6] (together, "Lindsay Dep."). The Court's citation to Lindsay's testimony encompasses all of the portions of the transcript cited by the parties.

since the release was not processed on March 18, 2014, it must not have been received then.  *Id.* at 71:3–10.  DOC did not admit that it had "received" a copy of the release order in case number 2012 CMD 007806 until after the motion had been fully briefed.  *See* Notice of Filing [Dkt. # 69].  Why not?

It is impossible to ignore the fact that even after all of this time, the defense has not yet been able to put together a simple chronology of what took place in this case and what went wrong.[15]  Did the Marshal walk plaintiff to the cell block with one piece of paper or two?  Why was one order input into TMS but not the other?  How did the second order end up in plaintiff's file if TMS only included, and Jones only processed, one?  Why was plaintiff transported back to the jail at all?  Why does the record include both time stamped and not time stamped versions of the same documents, or versions that are both signed and not signed by a Deputy Marshal?  The unsystematic and inconsistent handling of release orders in this case has certainly impeded the parties from ascertaining the facts, and the Court is reluctant to find, on this woefully deficient record, that no juror could conclude that a haphazard process of receiving orders, through a variety of means and in a variety of formats, and at different stages in the proceedings, did not contribute to the fact that some of them were ignored, and that the ball was dropped at at least one, and possibly more, steps along the way.  So the District's motion for summary judgment will be denied as to this aspect of Count I as well.

---

15     *See, e.g.*, Brown Dec. 2015 Dep. at 51:17–22 ("Q:  So do you know which case Mr. Smith was being detained on when you completed the release authorization form?  A:  I'm still not sure.").

### 3. The District's Alleged Practice of not Releasing Misdemeanants From Court

Plaintiff also argues that DOC has a practice of not following its policy to release misdemeanants directly from the courthouse, and that a failure to follow this policy resulted in his overdetention. Pl.'s Cross-Mem. at 24. This overlaps somewhat with the paperwork theory.

In its statement of facts, the District asserted that "misdemeanor inmates are released directly from D.C. Superior Court," and it supported this statement with deposition testimony from defendant Myrick. *See* Defs.' SOF ¶ 11. In response, plaintiff stated that the fact was disputed because he "was not released directly from the Court." Pl.'s Resp. SOF ¶ 11. That is clearly correct. But plaintiff has not pointed to any evidence in the record that would support his theory that this omission was part of a larger problem, and that DOC has so consistently failed to follow its own policy that it is its custom or practice to do so, and the practice led to the error in his case.[16]

Therefore, the Court will deny summary judgment for plaintiff on this theory.

### c. Deliberate Indifference on the Part of the District

#### 1. No reasonable juror could conclude that the District was deliberately indifferent to the need of training it staff so as to cause plaintiff's overdetention.

Plaintiff contends that the District failed to train its staff adequately on how to process release orders, and that this lack of training caused his overdetention. Pl.'s Cross-Mem. at 24–26. Defendant maintains that because it provided staff with training relating to processing release

---

16      The evidence in the record supports an inference that plaintiff was not released directly from court because one of his release orders was not processed.

orders, no reasonable juror could conclude that its indifference to the need for training caused plaintiff's overdetention. Defs.' Mem. at 13–14. The Court agrees.

"[A] government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," but the municipality will only be held liable in "limited circumstances" because its "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Therefore, a municipality's failure to train its employees must amount to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.*, quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (internal edits omitted). It is at that point that the shortcoming of properly training employees can be thought of as a city's "policy or custom" that is actionable under the statute. *See id.*

To rise to the level of deliberate indifference, the plaintiff must provide proof that the "municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61, quoting *Brown*, 520 U.S. at 410. "[W]hen a city's policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 62, citing *Brown*, 520 U.S. at 407. Usually, "[a] pattern of similar constitutional violations by untrained employees is . . . 'necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.*, quoting *Brown*, 520 U.S. at 409. However, there are rare circumstances in which "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of

violations." *Id.* at 64. Finally, plaintiff bears the burden of proving that the lack of training actually caused the violation in question. *See Harris*, 489 U.S. at 391.

Here, the evidence provided by both parties indicates that there is no question that DOC staff received *some* training on how to process release orders, and plaintiff has not come forward with evidence connecting any gaps in that training to a series of similar constitutional deprivations that should have notified DOC of a problem.

It is undisputed that when an LIE is first hired, each one participates in a forty-hour training session, which includes training on "topics directly related to the work performed by legal instrument examiners such as intakes, court returns, how to process releases, [and] sentence computations." Defs.' SOF ¶¶ 28–29; Pl.'s Resp. SOF ¶¶ 28–29; *see also* Myrick Nov. 2015 Dep. at 32:1–33:2 (describing the forty hours of "specialized training" as including training on "procedures on processing the [sentencing] computations, the releases, pretrial documents, and any other document that will hold an inmate within custody"); Thompson Dep. at 9:6–18 (stating that when he first became a LIE, "it was like the other people that was already there training us, showing us different things, and we had manuals that we had to look at ourselves to really learn ourselves"); Jones Dep. at 10:1–5 (acknowledging that LIE's "are taught the basics of each part of [their] job," and then they "pretty much do the work and [they] learn further into it by doing the work"). LIE's also receive training manuals that outline those procedures. Myrick Nov. 2014 Dep. at 33:3–15; Thompson Dep. at 9:6–18. But there is no additional regular training in release procedures, even for supervisors. *See* Myrick Nov. 2015 Dep. at 33:16–34:2 (clarifying that "the staff in [the training] that are supervisors were LIEs, so they've already been through the basic training"); *id.* at 29:5–30:22 (describing annual training on topics related to first aid and human resources); Thompson Dep. at 12:16–13:19 (same); Jones Dep. at 9:7–22 (same).

Furthermore, there is no evidence that LIE's were unaware of the appropriate procedures for processing inmates. Rather, each LIE and supervisor who testified about the process, including Jones, revealed an accurate understanding of the procedure. *See, e.g.*, Jones Dep. at 12:2–21:14; *id.* at 36:4–21; *id.* at 39:8–14; *id.* at 53:2–13; *id.* at 54:10–13; Brown Dec. 2015 Dep. at 14:7–21:19; *id.* at 23:1–22; Brown Mar. 2017 Dep. at 29:2–32:2.

Plaintiff argues, though, that the District was on notice of a significant overdetention problem, and that its failure to implement additional training amounts to deliberate indifference that caused the error in plaintiff's case. *See* Pl.'s Cross-Mem. at 25–26; Pl.'s Cross-Reply at 14. But, that is not the proper inquiry. Plaintiff is required to come forward with evidence of known constitutional violations that revealed a flaw in the perpetrators' training and put DOC on notice of a need to revise or supplement its instructions to its personnel.

Plaintiff has endeavored to prove that the District was "on notice of the significant overdetention problem," rather than that the District was on notice that *its failure to train* DOC staff was causing its employees to overdetain inmates in violation of their constitutional rights as required by *Connick*. 563 U.S. at 61. He points to two prior lawsuits: the *Bynam* case filed in 2002, and the *Barnes* case, filed in 2006. Both concerned inmates being held too long after they were ordered released by a court or their sentences expired, and some inmates being returned to jail and strip searched while their releases were being processed. *See Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 267, 283 (D.D.C. 2011) ("Therefore the overdetention problem and the strip search problem are interrelated, the one leading to the other."); *Bynam v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C. 2006). Plaintiff argues that those lawsuits put the District on notice of unconstitutional detentions, and that because the "DOC has not provided any training to its staff on processing release orders," it has acted deliberately with indifference to citizens'

rights. Pl.'s Cross-Mem. at 25. But, those cases dealt with large classes of plaintiffs alleging unconstitutional overdetention tied to a strip search policy, and they did not specifically deal with the mishandling of release orders or the training DOC records examiners received in 2014. So knowledge of those cases does not necessarily prove that the District was aware, in 2014, of a training problem.

Plaintiff also points to the overdetention reports, which contain brief explanations for the causes of incidents of overdetention between the years of 2010 and 2014. *See* Second Overdetention Report; Third Overdetention Report. But they also do not provide a basis for a reasonable jury to conclude that the District had notice of a pattern of likely unconstitutional conduct attributable to training. The causes of the overdetentions varied from "IT system issues," to "warrant in WALES," to "mistake in sentencing computation," to "staff error," and there is evidence that DOC staff received training on how to process release orders in order to prevent errors. *See* Second Overdetention Report; Third Overdetention Report; *see also Robinson v. Pezzat*, 818 F.3d 1, 13 (D.C. Cir. 2016) (concluding that reports of dog shootings did not provide a basis for a jury to conclude that the District had notice of a pattern of likely unconstitutional conduct adequate to prove deliberate indifference where many of the reports indicated that officers shot dogs for reasons that were not unconstitutional, such as when they were being attacked, and because the police department gave officers training about how to identify and control dangerous dogs).

Moreover, no reasonable juror could conclude that it was a lack of training that caused plaintiff's overdetention. "[F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury." *See Harris*, 489 U.S. at 391. That means that the allegedly inadequate training must be the "moving force" behind the alleged constitutional

violation.  *See Monell*, 436 U.S. at 694.  Thus in the case at hand, plaintiff must prove that the deficiency in training caused Jones to improperly process plaintiff's release order, which resulted in the overdetention.  *See Harris*, 489 U.S. at 391.

Plaintiff's expert testified that he "would like to see" the DOC implement training similar to that offered by the Federal Bureau of Prisons ("BOP").  Lindsay Dep. at 61:11–62:16.  He described the BOP's nine-month training program, which includes completing modules demonstrating proficiency in particular areas.  *Id.*  However, Lindsay did not identify deficiencies in DOC's training with respect to release orders in particular, and he did not connect any differences between his preferred training program and DOC's to what took place in this case. "Without more, . . . a reasonable jury could only speculate that the lack of some unspecified training contributed to" plaintiff's overdetention.  *Lane v. District of Columbia*, 72 F. Supp. 3d 215, 223 (D.D.C. 2014) (concluding that the plaintiff had not proven that a lack of training caused an officer to use deadly force).  Moreover, there is no evidence that Jones did not know the proper procedure for how to process release orders.

"In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  *Harris*, 489 U.S. at 392.  But more is necessary to establish municipal liability.  "And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."  *Id.* at 391.  Because plaintiff has not presented sufficient evidence to establish that the District's standard training on processing release orders is deficient, or how the lack of additional training was connected to plaintiff's detention, the Court will grant summary judgment for the District on this theory of liability.

##### 2. No reasonable juror could conclude that the District was deliberately indifferent to the need of supervising it staff so as to cause plaintiff's overdetention.

A municipality can be held liable "upon a showing of deliberate indifference exhibited by a pattern of inadequate . . . supervision and discipline of [officials] provided there is a causal connection between such inadequacies and the risk of harm to others." *Parker*, 850 F.2d at 712. Plaintiff argues that the District's failure to supervise its employees or to implement adequate monitoring controls to prevent overdetention amounts to deliberate indifference to the constitutional rights of inmates. Pl.'s Cross-Mem. at 27–29. Specifically, he maintains that the lack of any "oversight controls to verify if an employee completes a step in its lengthy release order process," combined with the non-existence of a "system to identify staff members that commit errors," resulted in his unconstitutional overdetention. *Id.* at 28.

It is undisputed that a supervisory LLIE double checks all work completed by a LIE. Defs.' SOF ¶ 20; Pl.'s Resp. SOF ¶ 20. Supervisors also use the TMS and JACCS systems to monitor employee performance. Myrick, the Correctional Program Administrator, testified that supervisors use TMS to monitor staff productivity and to hold them accountable for accomplishing certain tasks throughout the day. Myrick Mar. 2016 Dep. at 25:9–26:5. And Brown, a supervisory LLIE, testified that she can perform an audit in the JACCS system to identify the individual who stamped a specific release order and who then entered the information into JACCS. *See* Brown Mar. 2017 Dep. at 24:13–21; *id.* at 25:12–17.

And with regard to actions supervisors take once they learn of overdetentions, Myrick testified that once an overdetention is reported, she prepares a report and then disciplines the employees who made the error. Myrick Nov. 2015 Dep. at 35:22–36:21; *id.* at 17:17–18:11.

Plaintiff argues that because "DOC had actual notice that staff error has resulted in unconstitutional overdetentions," its failure to do more to supervise its employees amounted to deliberate indifference and caused plaintiff's overdetention. Pl.'s Cross-Mem. at 27.

To prove that the District was on notice that staff error was resulting in unconstitutional overdetentions, plaintiff points to the overdetention reports in the record. Pl.'s Cross-Mem. at 27. However, the reports reflect that overdetentions resulted from a number of issues such as "staff error," "other court discrepancy," "inadequate handling of documents," "IT system issues," "sentence computation error," "Warrant in WALES," and "good time credit was not applied." *See* Second Overdetention Report; Third Overdetention Report. Based on all of the reasons leading to the overdetentions, in addition to the evidence that supervisors did have an active role at the DOC, no reasonable juror could conclude that the reports put the District on notice of a pattern of likely unconstitutional conduct adequate to prove deliberate indifference. *See Robinson*, 818 F.3d at 13.

Plaintiff also focuses heavily on Myrick's failure to follow what she testified was her standard practice: she did not create an overdetention report in this case, and she did not discipline any employee in connection with plaintiff's overdetention. This shows, says plaintiff, that the District "turned a blind eye" toward staff errors and failed to provide adequate supervision. Pl.'s Cross-Mem. at 2. While these facts are troubling and unexplained, the District cannot be held liable for Myrick's failures under a *respondeat superior* theory. *Monell*, 436 U.S. at 690. And, this one example is not enough to demonstrate deliberate indifference on the part of the District, particularly in light of evidence in the record that other DOC staff members who made similar errors resulting in overdetentions were disciplined. *See* Second Overdetention Report; Myrick Nov. 2015 Dep. at 35:22–36:21. More often than not, the employee received some sort of disciplinary action such as counseling, suspension, or reprimand. *See* Second Overdetention

Report; Myrick Nov. 2015 Dep. at 35:22–36:21. Therefore, plaintiff has not demonstrated that the District was deliberately indifferent to a pattern of inadequate supervision that caused plaintiff's overdetention. The District is therefore entitled to summary judgment on this theory of liability as well.[17]

## B.    Individual Liability Under Section 1983

Both individual defendants argue that summary judgment in their favor is appropriate on plaintiff's section 1983 claim because they are entitled to qualified immunity. *See* Defs.' Mem. at 5–10.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Thus, the doctrine "gives government officials breathing room to make reasonable but mistaken

---

17    Even if the District's allegedly deficient supervision rose to the level of deliberate indifference, no reasonable juror could find that the deficiency was "the moving force" behind plaintiff's overdetention either. *See Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 379 (D.D.C. 2014) (observing that while the suggestion of better investigations and more stringent discipline would discourage officers from using excessive force, a "more lax discipline system does not demonstrate that MPD's practices were '*the* moving force' behind this specific incident") (citation omitted). At most, the supervision policies and monitoring controls in place made it difficult to identify the person or persons responsible for plaintiff's overdetention since there was no program in existence to "identify errors by staff." *See* Myrick Mar. 2016 Dep. at 26:22–27:8. Plaintiff concedes as much in his cross-motion by admitting that the "result of DOC's failure to supervise its staff [was that] DOC [wa]s unable to determine how it received the March 18, 2014 release orders contained in its institutional file for Mr. Smith." Pl.'s Cross-Mem. at 28. Moreover, plaintiff has not come forward with concrete examples of what additional supervision could have prevented the overdetention. Plaintiff seems to suggest a need for a system that would identify errors by the staff, which Myrick admits does not exist. *See* Myrick Mar. 2016 Dep. at 26:22–27:8. But he does not explain what sort of system could ascertain what took place when an order was not entered into the system.

judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *see also Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. A defendant's entitlement to qualified immunity is a question of law, but factual disputes can preclude a finding of summary judgment. *Pitt v. District of Columbia*, 491 F.3d 494, 509 (D.C. Cir. 2007).

The fact that the Court already concluded that there is a basis for the jury to find that plaintiff's Fifth Amendment rights were violated does not mean that defendants Myrick and Jones clearly should have known they were violating them when they acted or failed to act. *See Elkins v. District of Columbia*, 690 F.3d 554, 568 (D.C. Cir. 2012) (concluding that the plaintiff's Fourth Amendment rights were violated when officers seized belongings not included in the warrant, but that the defendant, who was a junior member of the search team and was unaware of the terms of the warrant, was entitled to qualified immunity because her "actions, though mistaken, were not unreasonable"); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

An individual's conduct will rise to the level of a substantive due process violation if his or her conduct is so egregious that *it* shocks the conscience. *See Lewis*, 523 U.S. at 846–47. The Supreme Court has described this conduct as falling somewhere between negligence and intentional conduct, and it includes recklessness or acting with deliberate indifference toward

inmates. *See id.* at 846–53 ("We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). Therefore, the question before the Court is whether the individual defendants' actions can be said to shock the conscience.

### 1. Jack Jones is entitled to qualified immunity.[18]

Defendant Jones processed plaintiff's release order on March 18, 2014 in case number 2014 CMD 004452. Jones Dep. at 36:22–39:18. Although he admitted that he failed to time stamp the order as he was required to do, *id.* at 53:14–54:17, he correctly described the procedure for how to process release orders, including the fact that he was required to review MyJUSTIS for release orders and/or additional cases committing the inmate. *Id.* at 17:3–18:21; *id.* at 36:4–21.

Plaintiff posits that since he was indeed detained, "either Jones did check JUSTIS and intentionally refused to process the release order in case no. 2012 CMD 007806, or Mr. Jones

---

18    Defendants argue that the Court should grant their motion for summary judgment on their qualified immunity defense as conceded pursuant to Local Civil Rule 7(b) because plaintiff "failed to address this legal argument" and only made conclusory statements. Defs.' Reply at 16. The Court finds that defendants' attempt to have this argument be treated as conceded is completely disingenuous. Plaintiff addresses defendants' qualified immunity defense over the span of multiple pages, *see* Pl.'s Cross-Mem. at 32–36, and just because plaintiff may not have responded to one particular sentence in defendants' brief, no authority supports a finding of summary judgment on that basis. More importantly, the law in this Circuit precludes a Court from granting motions for summary judgment as conceded. *See Winston & Strawn, LLP*, 843 F.3d at 506–08 ("[Rule 56] does not in any way endorse an approach pursuant to which the District Court may grant judgment 'as conceded' simply because a nonmoving party fails to respond."). The Court notes that plaintiff is also at fault, attempting to make the same argument in his cross-reply that because defendants "failed to put forth any argument in response to [p]laintiff's motion pertaining to [d]efendant Myrick, [d]efendants therefore concede that [p]laintiff's Motion for Summary Judgment as to [d]efendant Myrick must be granted." Pl.'s Cross-Reply at 17. Both parties briefed the issue of qualified immunity and made their respective arguments, and that is what the Court will consider.

failed to check JUSTIS as he was required to do." Pl.'s Cross-Mem. at 34. He then concludes that because Jones failed to process the release order properly, he acted with deliberate indifference and therefore violated his constitutional rights. *Id.* ("As such, Jones acted with deliberate indifference to the rights of Mr. Smith by failing to process the release order."). But plaintiff does not point to any evidence that would show that Jones's omission was anything other than a mistake; there is no evidence that he had a history of committing these types of errors, or that he acted with an attitude of indifference toward his job duties.

There is evidence to support an inference that Jones's actions or omissions contributed in some way to plaintiff's overdetention.[19] But the relevant question here is whether Jones's alleged mistakes were so egregious and shocking that they can be found to be a violation of the Fifth Amendment. Based on the facts presented, no reasonable juror could find that Jones's failure to process the order properly in the course of his duties was anything more than a mistake that led to an unfortunate result. Because this is the sort of behavior that qualified immunity is meant to protect, the Court concludes that Jones is entitled to qualified immunity.

### 2. Jeanette Myrick is entitled to qualified immunity.

A government officer may be held liable "for constitutional wrongs engendered by his failure to supervise or train subordinates adequately." *Haynesworth v. Miller*, 820 F.2d 1245, 1259 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006). This theory of liability is based "on the principle that in some contexts failure of an official to safeguard against constitutional transgressions by those under his control constitutes an actionable wrong under . . . Section 1983." *Id.* at 1259–60. Defendant Myrick argues that she cannot be held liable

---

19      But there is also evidence to suggest that the second release order never made its way into TMS to come to Jones's attention the way the first order did, and that error cannot be attributed to him.

under a theory of supervisory liability because she acted reasonably, and not with deliberate indifference, and is therefore entitled to qualified immunity. *See* Defs.' Mem. at 9.

Myrick works for the D.C. Department of Corrections as the Correctional Program Administrator. Defs.' SOF ¶ 31; Pl.'s Resp. SOF ¶ 31. She is the highest ranking person in the Inmate Records Office, *see* Pl.'s SOF ¶ 10; Defs.' Resp. SOF ¶ 10, and she supervises three correctional program officers, six supervisors, eight lead legal instruments examiners, and approximately eighteen legal instruments examiners – including Jack Jones. *See* Myrick Nov. 2015 Dep. at 27:7–16. Myrick is responsible for overseeing the daily operations of the Inmate Records Office and for ensuring that inmates are released and documents are received and processed. Pl.'s SOF ¶ 11; Defs.' Resp. SOF ¶ 11. She is also responsible for preparing an overdetention report after each instance of overdetention, Pl.'s SOF ¶ 12; Defs.' Resp. SOF ¶ 12; Myrick Nov. 2015 Dep. at 17:17–18:11, and then transmitting those reports to the deputy director. Myrick Nov. 2015 Dep. at 18:15–17.

Plaintiff argues that because of Myrick's position, she was "aware of the significant history of unconstitutional overdetentions at the D.C. Jail," and that she "has failed to implement any policies or training to prevent overdetentions," essentially "turning a blind eye to the overdetention problem." Pl.'s Cross-Mem. at 32. But he has not provided the Court with any evidence to prove that Myrick's actions were sufficiently egregious to shock the conscience, or that her conduct caused the infringement of plaintiff's right to liberty in this case.

There is no evidence in the record that Myrick was personally involved in processing plaintiff's paperwork, or that she was aware, or should have been aware, of Jones's alleged failure to check the MyJUSTIS database, or otherwise process plaintiff's release order properly. What plaintiff points to is Myrick's conduct after plaintiff was released: her failure to create an

overdetention report, Pl.'s SOF ¶¶ 13–14; Defs.' Resp. SOF ¶¶ 13–14, and her failure to discipline any employees for plaintiff's overdetention. *See* Myrick Nov. 2015 Dep. at 37:15–22. But these omissions obviously did not cause plaintiff's detention and cannot supply the basis for section 1983 liability.

Accordingly, Myrick is entitled to qualified immunity, and the Court will grant summary judgment on plaintiff's section 1983 claim in favor of the individual defendants.

## II. The Court will grant summary judgment in favor of plaintiff on his false imprisonment claim in Count II against the District.

Both parties have moved for summary judgment on plaintiff's false imprisonment claim.[20] False imprisonment is "the restraint by one person of the physical liberty of another without consent or legal justification." *Faniel v. Chesapeake and Potomac Tel. Co. of Md.*, 404 A.2d 147, 150 (D.C. 1979). To prove a claim of false imprisonment, a plaintiff must demonstrate that (1) the detention or restraint is against one's will within boundaries fixed by the defendant, and (2) the restraint is unlawful. *Id.*

"To constitute imprisonment, the restraint of [plaintiff's] freedom of movement by [defendant] must have been total." *Id.* at 151. "The evidence must establish a restraint against the plaintiff's will, as where she yields to force, to the threat of force or to the assertion of authority." *Id.* at 151–52.

---

[20] Although plaintiff brought his claim for false imprisonment against all three defendants, he appears to only seek to hold the District liable for this claim. *See* Pl.'s Cross-Mem. at 36–37 (titling the section in his brief, "The Undisputed Facts Show That the District of Columbia is Liable for Falsely Imprisoning Mr. Smith."); *see also* Pl.'s Cross-Reply at 19 (stating that the "District [f]alsely [i]mprisoned Mr. Smith" and asking the Court to grant his "motion for summary judgment on the liability portion of his false imprisonment claim"). Defendants maintain that plaintiff has not provided evidence to prove how the actions of Myrick or Jones "contributed to [plaintiff's] claim for false imprisonment." Defs.' Reply at 21. They argue that "at the very least, . . . the Court should grant summary judgment to Jack Jones and Jeanette Myrick on Count II." *Id.* Since plaintiff has provided no evidence that defendants Jones or Myrick were personally involved in his detention, the Court will grant summary judgment on this count in their favor.

Further, a detention is presumed to be unlawful once a plaintiff alleges that he was imprisoned without process. *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C. 1973). The burden then shifts to the defendant to justify the restraint as lawful. *Id.* That is because the lack of justification for the imprisonment is not part of a plaintiff's affirmative case, but rather an element of a defense to be raised and proved by the defendant. *See Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978), citing *Clarke*, 311 A.2d at 511.

The undisputed facts demonstrate that plaintiff was restrained against his will within the walls of the D.C. jail for twenty-three days. And, because plaintiff has not only come forward with allegations, but with actual evidence, that he was held because a court order releasing him was not processed, *see* Defs.' SOF ¶¶ 22–24; Pl.'s Resp. SOF ¶¶ 22–24, the burden shifts to the District to come forward with evidence to prove the legality of the restraint. But, of course, defendant has not done so; it does not dispute that plaintiff was detained in error despite the fact that a judge had ordered his release. *See* Defs.' SOF ¶¶ 3, 22–24; Pl.'s Resp. SOF ¶¶ 3, 22–24.

Instead, the District contends that "because no [d]efendant intended [p]laintiff to be unlawfully detained against his will, [p]laintiff's claim fails as a matter of law." Defs.' Reply at 20. But defendant's focus on intent is misplaced and unpersuasive. Although false imprisonment is classified as an intentional tort, the case law clearly states that "neither malice nor wrongful intent are controlling considerations in an action for false arrest or false imprisonment." *Clarke*, 311 A.2d at 511. In other words, there is no requirement that any person must have carried out a deliberate plan to unlawfully detain someone.

To forestall a finding of summary judgment against it, defendant must show that the twenty-three day detention of plaintiff was in some way lawful. The District has not, and cannot,

make such a showing. Therefore, the Court finds it appropriate to award summary judgment in favor of plaintiff on Count II against the District of Columbia.

### III. The Court will deny plaintiff's motion for summary judgment on his negligence claim in Count III without prejudice.

In his cross-motion, plaintiff contends that "the District has conceded its liability on negligence, entitling [p]laintiff to summary judgment on his negligence claims." Pl.'s Cross-Mem. at 38. Plaintiff notes that although defendants initially moved for summary judgment on the negligence claim in December of 2016, they have not sought summary judgment on this claim in their revised motion. *Id.* at 38 & n.6.

But, making a strategic decision not to move for summary judgment on a particular count is not the same thing as conceding liability. And because plaintiff has predicated his motion on this count solely on the basis that it has been conceded, and he did not marshal the undisputed facts that make out the elements of the claim as required by Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h),[21] the Court will deny plaintiff's motion on the negligence count without prejudice.[22]

---

21 The Court notes that defendants have made statements endorsing a negligence theory in their pleadings. *See, e.g.* Defs.' Mem. at 8 ("At worst, the conduct of [d]efendant Jones in failing to undertake further investigation after processing the release in one case amounts to negligence."); *id.* at 14 ("[T]here is no evidence in the record to demonstrate that [p]laintiff's overdetention resulted from anything more than inadvertence or clerical error."); Defs.' Reply at 16 ("Defendant Jones argued in his motion for summary judgment that he could not be found culpable for a Fifth Amendment violation because, at worst, even if all facts relevant to this issue are construed in the light most favorable to the [p]laintiff, his alleged misconduct amounted to negligence . . . .").

22 Plaintiff asked "the court to instruct the jury to presume [d]efendants' negligence under the doctrine of *res ipsa loquitor*," if it denied the motion for summary judgment. Pl.'s Cross-Mem. at 38. However, the request for a jury instruction is premature at this stage of the proceedings.

**IV.    The Court will grant summary judgment in favor of the District on plaintiff's negligent supervision and training claim in Count IV.**[23]

In Count IV, plaintiff alleges that the District was negligent in failing to train LIE's how to process release orders, and in failing to supervise Jones in his performance of processing plaintiff's release order.  Am. Compl. ¶ 47.  The parties have both moved for summary judgment on this count.

Liability for negligent supervision and training arises when an "employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise [or train] the employee."  *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001), quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

As in any negligence action, to prevail on a claim of negligent supervision and training, a plaintiff "must establish by competent evidence a standard of care; that the defendant violated that standard; and that such violation proximately caused injury to the plaintiff."  *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990); *see also Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002) ("[A]n action for negligent supervision . . . requires proof that the employer breached a duty to plaintiff to use reasonable care in the supervision . . . of an employee which

---

23    Defendant argues that plaintiff's negligent supervision and training claim against the District is barred because plaintiff failed to comply with D.C. Code § 12-309.  *See* Defs.' Mem. at 18–19.  However, as plaintiff correctly notes in his opposition, *see* Pl.'s Cross-Mem. at 42, the Court already ruled in plaintiff's favor on this affirmative defense.  In granting plaintiff's motion for leave to file an amended complaint, the Court held that "plaintiff's May 7, 2014 letter was sufficient to alert the District 'of the approximate time, place, cause, and circumstances of the injury or damage' underlying his claims" in compliance with Section 12-309.  *See* Order [Dkt. # 35] at 2.  Defendant has explained that it raised the issue again to preserve it on appeal, *see* Defs.' Reply at 26 n.4, and in any event, the Court sees no reason to change its ruling.  Plaintiff's letter to the Mayor, *see* Ex. 13 to Defs.' Mot. [Dkt. # 73-15], provided sufficient notice by giving the District "facts that would allow it to comprehend through a reasonable investigation the circumstances underlying the claim."  *Enders v. District of Columbia*, 4 A.3d 457, 468 (D.C. 2010).

proximately caused harm to plaintiff.").  Ordinarily, the applicable standard of care is based on the traditional reasonable person standard, which the jury can ascertain without the aid of expert testimony.  *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009).  Expert testimony to establish the standard of care is only necessary "if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average lay person."  *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000), quoting *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995).

The District maintains that plaintiff's claim fails as a matter of law because he has not proven the necessary standard of care by way of the expert testimony provided.  Defs.' Mem. at 15–18.  Plaintiff argues that expert testimony is not necessary since the standard of care for the type of training and supervision necessary is "well within the ken of a layperson."  Pl.'s Cross-Mem. at 41.  And, plaintiff asserts that his "security expert articulated the relevant standards of care to assist the understanding of the trier of fact."  *Id.*

The first question the Court must resolve, then, is whether expert testimony is required in this case.  The Court has determined that it is.

Typically, expert testimony is required "in negligence cases . . . which involve issues of safety, security and crime prevention."  *Varner v. District of Columbia*, 891 A.2d 260, 267 (D.C. 2006).  D.C. courts "have repeatedly held that the standard of care owed by the District of Columbia to persons in its custody is a matter beyond the ken of the average juror that requires expert testimony."  *Clark v. District of Columbia*, 708 A.2d 632, 634–35 (D.C. 1997) (requiring expert testimony to establish standard of care applicable to District officials operating juvenile detention center); *see also Carmichael*, 577 A.3d at 314 (finding that "expert testimony was essential" to establish whether prison officials acted reasonably to secure the safety of an inmate);

*Toy v. District of Columbia*, 549 A.2d 1, 7 (D.C. 1988) (concluding that expert testimony was needed to establish the standard of care for how officers were supposed to respond when they found an inmate hanging in his cell).

Since the purpose of expert testimony is to avoid jury findings based on speculation, *see Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996), and because the decision whether to require expert testimony "is confided to the sound discretion of the trial court," *Varner*, 891 A.2d at 266, the Court concludes that expert testimony is required to establish the standard of care in this case, which involves the intricacies of running a correctional facility that houses inmates awaiting trial and manages daily interactions with a busy court.

To prevail at trial on his claim, plaintiff must prove that defendant deviated from the standard of care governing the supervision and training of the personnel who process release orders.

> The expert must clearly articulate and refer to a standard of care by which the defendant's actions can be measured. Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable governmental facilities or to some standard nationally recognized by such units.

*Arnold & Porter*, 756 A.2d at 433, quoting *Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998) (internal edits omitted).

Thus, to meet his burden to prove a national standard of care in this case, plaintiff is required to show either that other prisons adhere to a specific standard of care which is nationally recognized, or that the actual practices followed by comparable prisons regarding supervision and training constitute a national standard of care. *See Arnold & Porter*, 756 A.2d at 433–34.

To establish the standard of care, plaintiff supplied the expert report and deposition testimony of Cameron Lindsay, who has served in various positions at federal and state prison facilities across the country. *See* Ex. 17 to Pl.'s Cross-Mot. [Dkt. # 75-23] ("Expert Report").

Lindsay explicitly refers to his time as Warden at the Brooklyn Detention Center because it was a "pre-trial/pre-sentencing facility that processed releases twenty-four hours per day." *Id.* at 1.

With regard to the standard of care for training persons such as legal instruments examiners in prison facilities, Lindsay referred to the Federal Bureau of Prisons ("BOP") Employee Developmental Manual. Expert Report at 6.

> For example, the BOP has the Employee Development Manual which establishes a comprehensive employee training program, the requirement of an annual training plan, and stringent record keeping requirements on employee training. In addition, the BOP requires that all staff complete a five-day orientation and training program. BOP further requires that employees in the Correctional Systems Department (formally known as "Receiving and Discharge" and BOP equivalent of the DOC's Records Office), must successfully complete training modules within nine months of appointment. A minimum score of 75% must be achieved to pass each module.

*Id.* Lindsay also testified that LIE's in the Federal Bureau of Prisons "undergo a rigid regimen of training." Lindsay Dep. at 61:11–62:16 (describing how LIE's "undergo nine months of intense training, [and] they have to complete a certain number of modules demonstrating proficiency in that discipline").

But the expert failed to connect this evidence of what the federal government requires to what is done at the state and local pretrial facilities across the United States, and he provided no evidence from which one can conclude that the BOP protocol is in fact the national standard of care for jails. Lindsay admitted that he was only familiar with the training individuals received at "the institution where [he] served" – meaning the Brooklyn Detention Center. *See* Lindsay Dep. at 109:8–16. And he acknowledged that he did not know how that facility compared to the D.C. jail in terms of the number of detainees processed. *Id.* at 14:5–24; *id.* at 55:4–11. He did not even review the training manuals DOC provided to its LIE's. *Id.* at 97:10–24.

Therefore, the evidence plaintiff has presented is insufficient to establish a national standard of care. *See, e.g.*, *District of Columbia v. Moreno*, 647 A.2d 396, 400 (D.C. 1994) (finding that references to the "American Correctional Association Standards," without any information about specific comparable facilities, was insufficient to establish the standard of care); *Messina*, 663 A.2d at 539 (finding insufficient expert testimony where expert presented "no evidence of the extent to which municipalities or other school systems actually complied, or even attempted to comply, with the [purported] guidelines"); *Toy*, 549 A.2d at 8 (concluding that expert testimony did not establish national standard of care where expert "gave no indication of how many police departments throughout the country [had] this type of emergency equipment available" except for naming one police department where he had been the police commissioner); *see also Briggs v. WMATA*, 481 F.3d 839, 847 (D.C. Cir. 2007) (observing that an expert must either show that the standard has been "promulgated, or is generally known," or must show "that it has been accepted as controlling in facilities and enterprises that are similar to defendants' facilities or enterprises") (internal edits omitted) (citation omitted).

Since the "failure to prove a standard of care is fatal" to a negligence cause of action, *Carmichael*, 577 A.2d at 314, the Court will grant summary judgment in favor of the District on Count IV.[24]

---

24     The Court reaches the same conclusion with regard to the standard of care needed for plaintiff to maintain a negligent supervision claim since plaintiff's expert only makes references to the sort of controls that are in place within the BOP without giving any specific examples or comparing specific BOP facilities with the D.C. jail. *See* Expert Report at 7 ("BOP has very structured controls in place to ensure late releases do not occur."); *id.* at 7 ("The BOP conducts on a continual basis scheduled, informal, but well-documented, internal (intra-facility) audits known as Operational Reviews throughout the year. This is done in addition to Program Reviews which, are essentially a week-long formal audit[] conducted by the Central Office in the BOP."); Lindsay Dep. at 61:11–62:16 (explaining that LIE's are "continually involved in what they call perpetual audits," and "operational reviews" that are "conducted by the central office staff").

## CONCLUSION

For the foregoing reasons, both parties' motions for summary judgment are denied in part and granted in part.

The claims against the individual defendants in Count I, section 1983, and in Count II, false imprisonment, will be dismissed. The only count remaining against the individual defendants is plaintiff's negligence claim in Count III.

Judgment will be entered in favor of plaintiff on Count II, false imprisonment, against the District of Columbia.

Two counts will go forward against the District: the portion of Count I that predicates a section 1983 action on DOC's alleged practice of receiving court orders through multiple means, and Count III alleging the common law claim of negligence.

Judgment will be entered in favor of the District on all other aspects of Count I, and on Count IV, negligent supervision and training.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 30, 2018