## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREGORY SMITH,

      Plaintiff,

        v.

DISTRICT OF COLUMBIA, *et al.*

      Defendants.

Civ. No 1:15-cv-00161-ABJ

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Brendan J. Klaproth (D.C. Bar No. 999360)
Jesse C. Klaproth (Bar No. PA0063)
KLAPROTH LAW PLLC
406 5th Street NW, Suite 350
Washington, D.C. 20001
Tel:    202-618-2344
Fax:    202-618-4636
Email   bklaproth@klaprothlaw.com
        jklaproth@klaprothlaw.com


David Akulian (D.C. Bar No. 1005750)
LAW OFFICE OF DAVID AKULIAN
406 5th  St. NW #201
Washington, D.C. 20001
Tel:       888-847-9859
Email: info@notguiltyindc.gov

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.  **STANDARD OF REVIEW** ...................................................................................1

II.  **PROPOSED FINDINGS OF FACT** .........................................................................1

    A.  DOC's Practice of Receiving and Processing Release Orders ...............................2

    B.  Receipt by Hand Delivery – U.S. Marshal to DOC ................................................4

    C.  Receipt by Fax and Email – Quality Assurance......................................................4

    D.  Release Orders Delivered by DOC's Transport.......................................................7

    E.  Gregory Smith's Overdetention ..............................................................................8

    F.  The District has not Produced Any TMS Data for the 2012 Case .........................12

    G.  The District did Not Investigate Plaintiff's Overdetention or Prepare an
        Overdetention Report .............................................................................................14

    H.  Previous Overdetention Cases Against the District of Columbia ..........................16

III.  **CONCLUSIONS OF LAW** ......................................................................................18

    A.  Mr. Smith Suffered a Constitutional Violation ......................................................19

    B.  The District of Columbia Had a Custom and Practice of Receiving
        Release Orders by Fax, Email, or Hand Delivery ..................................................19

    C.  The District's Custom of Receiving Release Orders by Fax, Email, and
        Hand Delivery Caused the Violation of Mr. Smith's Constitutional Rights .........20

        1.  *The District's Practice of Receiving Release Orders by Fax, Email, and
            Hand Delivery is a "Substantial Factor" in Plaintiff's Overdetention* ..........20

        2.  *Plaintiff's Overdetention was "Foreseeable" and
            Not "Highly Extraordinary"* ......................................................................25

    D.  Plaintiff Has Proven by a Preponderance of the Evidence that the District
        was Deliberately Indifferent ..................................................................................28

IV.  **CONCLUSION** .......................................................................................................31

Pursuant to the Court's Order issued on February 26, 2019 and pursuant to FED. R. CIV. P. 52(a), Plaintiff Gregory Smith ("Mr. Smith" or "Plaintiff") hereby submits his Proposed Findings of Fact and Conclusions of Law. These Proposed Findings of Fact and Conclusions of Law follow the Court's February 25, 2019 bench trial on Plaintiff's claim under 42 U.S.C. § 1983 against the District of Columbia.  As set forth below, Plaintiff proved by a preponderance of the evidence that his constitutional rights were violated as a result of the custom and practice of District of Columbia's Department of Corrections ("DOC") of receiving release orders through multiple non-electronic means.

## I.      STANDARD OF REVIEW

"The party who makes a claim has the burden of proving it." D.C. Std. Civ. Jury Instr. No. 2-8. "This burden of proof means that the plaintiff must prove every element of his claim by a preponderance of the evidence." *Id.*  "To establish a fact by a preponderance of the evidence is to prove that it is more likely so than not so." *Id.* "In other words, a preponderance of the evidence means that the evidence produces in your mind the belief that the thing in question is more likely true than not true."

"If, after considering all of the evidence, the evidence favoring the plaintiff's side of an issue is more convincing," and causes the trier of fact "to believe that the probability of truth favors the plaintiff on that issue, then the plaintiff will have succeeded in carrying the burden of proof on that issue." *Id.* "The term 'preponderance of the evidence' does not mean that the proof must produce absolute or mathematical certainty." *Id.*

## II.     PROPOSED FINDINGS OF FACT

1.      On March 15, 2014, the DOC received commitment orders in two different D.C. Superior Court misdemeanor cases, 2012 CMD 007806 (the "2012 case") and 2014 CMD

004452 (the "2014 case"), ordering that Plaintiff be committed to the custody of the DOC until further order of the Court.  *See* Exs. P-5,[1] P-12, P-13, and P-28(a) at ¶¶ 1-2.[2]

2.      On March 18, 2014, Plaintiff was transported from D.C. jail to Superior Court, and a judge ordered him to be released in both cases. *See* Exs. P-28(a) at ¶ 3 and P-29 at ¶ 4.

3.      DOC received and processed the release order for the 2014 case on the same day. *See* Ex. P-28(a) at ¶ 22.

4.      Although the DOC received the release order in the 2012 case on March 18, 2014, the order was not processed. *See*. Exs. P-29 at ¶ 5, P-28(a) at ¶ 23.

5.      DOC did not release Plaintiff from custody on March 18, 2014.  *See* Ex. P-29 at ¶ 5.

6.      Plaintiff was held at the D.C. jail until April 10, 2014. *See* Exs. P-12, P-13, and P-28(a).

**A.      DOC's Practice of Receiving and Processing Release Orders**

7.      Misdemeanor inmates are to be released directly from the D.C. Superior Court. Ex. P-28(a) at ¶ 11; Myrick Dep. (Nov. 2015) at 53:21-55:16

8.      But under the courthouse release program, an inmate's release must be processed by 3:30 p.m., otherwise the inmate is returned to the DC Jail. Tr. (Feb. 25, 2019) 70:15-71:18.

9.      DOC is required to release an inmate within five hours of receiving the inmate from custody from the U.S. Marshal.  Tr. (Feb. 25, 2019) at 71:24-72:11; *see also* D.C. Code § 24-211.02a ("For an inmate ordered released pursuant to a court order, the inmate shall be released within 5 hours of transfer from the custody of the United States Marshals Service into

---

[1]      The commitment orders are located at GSmith DC 000053 and 000057.

[2]      Exhibit P-28(a) was filed with the Court as ECF No. 105.1.

the custody of the Department of Corrections…provided, that the Department of Corrections has

the obligation to release inmates by 10:00 p.m.").

10.     After a Superior Court judge authorizes an inmate's release during a court

appearance, the courtroom clerk generates a release order and prints two copies, both of which

are signed by the judge, the clerk, and the U.S. Marshal in charge of the prisoner. Polonchuk

Dep. at 14:1-15:05.[3]

11.     Whether the U.S. Marshal signs the release order has no impact on DOC's

ability to process the release. Tr. (Feb. 25, 2019) at 42:01-06.

12.     The clerk maintains the court's copy and is responsible for submitting it to the

scanning department at the D.C. Superior Court, where the release order is then scanned into a

computerized database called Court View. Polonchuk Dep. at 15:8-21.

13.     The Marshal retains the second copy and takes the release order and the prisoner to

the main cellblock in the courthouse. Ex. P-28(a) at ¶¶ 6, 9, and 10.

14.     DOC's widespread practice in 2014 was to receive release orders from the Court

by fax, email, or hand delivery. *See* Myrick Dep. (Nov. 2015) at 20:14-22:01, 24:02-5 (testifying

as a corporate representative on behalf of the District); *Id.* 73:1-3; *see also* Tr. (Feb. 25, 2019) at

22:17-23; *Id.* at 29:10-12.

15.     Receipt of a release order by any one of these methods, triggers a Legal

Instrument Examiner ("LIE") or supervisory LIE to begin processing the release order. Brown

Dep. (Dec. 2015) 18:01-03.

---

[3]     All citations to "Dep." shall refer to the portions of the deposition transcripts Plaintiff designated to be read into the record.

**B.      Receipt by Hand Delivery – U.S. Marshal to DOC**

16.      With respect to the hand delivery method, the Marshal hand delivers the release order to an LIE or Lead Legal Instrument Examiner ("LLIE") located at a Department of Corrections satellite office within the courthouse, and the DOC employee then uploads the document into a database called the Transaction Management System ("TMS"). Brown Dep. (Dec. 2015) 14:14-18:15; Ex. P-28(a) at ¶ 12; Tr. (Feb. 25, 2019) at 36:01-37:09.

17.      Once the release order is uploaded in TMS, an LIE located in the Records Office at the D.C. jail itself will access the document in TMS and begin processing the inmate's release by performing the series of actions specified by the system.  Tr. (Feb. 25, 2019) at 36:01-37:09; *see also* Ex. P-17

**C.      Receipt by Fax and Email – Quality Assurance**

18.      It was also DOC's "widespread practice" in 2014 to receive release orders from Quality Assurance, an office located in the D.C. Superior Court, by email and fax. Tr. (Feb. 25, 2019) at 48:18-49:13; *Id.* 32:08-16 (defense counsel explaining receipt by fax); Brown Dep. (Dec. 2015) at 14:18-15:03.

19.      As part of the release process, a LIE must review the inmate's institutional file "to see what other cases he has in his record, if he has any other cases." Tr. (Feb. 25, 2019) at 42:07-15.

20.      The "face sheet that's located in the institutional file" informs the LIE if a prisoner is being held on multiple cases. *Id.* at 42:13-44:01.

21.      When a prisoner is held on more than one case, such as Plaintiff, the LIE must "check the case that is – remains open, according to the file" in the My JUSTIS computer program. *Id.* at 44:16-23.

22.     Checking My JUSTIS is a necessary step when processing a release. Brown Dep

(Dec. 2015) at 24:09-25:05.

23.     "My JUSTIS reflects the information that's input by Courtview." Tr. (Feb. 25,

2019) 44:24-45:01.

24.     My "JUSTIS tracks each court appearance of each inmate and what was discussed

during that court appearance." Jones Dep. at 16:19-17-21.

25.     When the LIE checks My JUSTIS, the LIE is "looking to see whether [the

inmate] was brought up in front of the judge on the case, and whether they seen him on it or not,

what was the outcome for that date, if there is an outcome." Tr. (Feb. 25, 2019) at 45:21-46:04.

26.     If My JUSTIS indicates that the inmate was ordered to be released, then the LIE

prints the release order from the computer "if there's an image" and processes the prisoner's

release. *Id.* at 48:01-14.

27.     If there is no image in My JUSTIS, then the LIE contacts Quality Assurance to

obtain a copy of the release order by fax or email. *Id.* 48:17-49:19.

28.     This process of receiving release orders by fax or email from Quality Assurance

"was part of the widespread practice in place in 2014" and "an appropriate way to authorize a

release." *Id.* at 49:21-50:02; *see also* Defs.' SOF at ¶ 27 ("Jack Jones knows the procedure for

processing a release order.") [ECF No. 73-1].

29.     In this case, the District has conceded that My JUSTIS is an acceptable practice to

receive release orders.  Defs.' Reply at 6-7 [ECF No. 83] ("LIEs are able to access release orders

through an e-system known as MyJustis which provides access to the information contained on

the Superior Court's e-system CourtView.  Thus, misdemeanants are processed by a system that

does not rely upon the transport of a paper order to the jail for processing.").[4]

30.     The inherent problem with this practice of processing release orders is that "My

JUSTIS was not always accurate."  Tr. (Feb. 25, 2019) at 50:11-17.

31.     According to Supervisory Legal Instrument Examiner Robilyn Brown, My

JUSTIS was not reliable because "it's not live time. It's not live." *Id.* at 80:05-12.

32.     According to Brown, My JUSTIS "would contain inaccurate information"

because "we can get documents…and MyJUSTIS will not reflect it and then, maybe a day later,

it will be in My JUSTIS, like a backlog." Brown Dep. (Dec. 2015) at 25:06-16.

33.     Based on Jack Jones' experience, "there would be a one- to two-day delay in that

information updated" in My JUSTIS. Tr. (Feb. 25, 2019) at 50:11-17.

34.     So, in 2014, it was a "widespread practice" "to rely on My JUSTIS in verifying

whether or not a prisoner should be released." *Id.* at 51:11-52:05.

35.     And prior to Mr. Smith's overdetention, Jones was aware of "My JUSTIS not

being updated" and "had experienced that on other occasions, where it was not updated." *Id.*

36.     In fact, the District memorialized this known system failure in its written policies:

---

[4]     The Court relied upon the District's representation in its summary judgment decision.
*Smith v. Dist. of Columbia,* 306 F. Supp. 3d 223, 250 (D.D.C. 2018). So, the District should be
judicially estopped from arguing that My JUSTIS is not an acceptable method of receiving
release orders. *Comcast Corp. v. F.C.C.,* 600 F.3d 642, 647 (D.C. Cir. 2010); *see also
New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (this rule "prevents a party from prevailing
in one phase of a case on an argument and then relying on a contradictory argument to prevail in
another phase.").

16. **RELEASE CLEARANCE**

   a. Records Office Legal Instruments Examiners shall obtain and review printouts from National Crime Information Center (NCIC), COURT VIEW, WALES II and JACCS to determine if there are any outstanding warrants or charges preventing release, prior to an inmate's release from the custody of the DOC. The inmate's institutional file shall be reviewed in its entirety to effectuate the release.

   b. The Legal Instruments Examiner shall review source documents in the inmate's institutional record because data available through the criminal court computerized check may not be current based upon a one to two day delay in the updating data from court proceedings.

Ex. P- 6 at 9; *see also* Tr. (Feb. 25, 2019) at 52:09-25 (the "computerized check" refers to My JUSTIS).

37.    The District knew that My JUSTIS did not always contain accurate or reliable information when the LIE processed a prisoner release, but with that knowledge did not require that the LIE check the inmate's institutional file the "next day" or "go back two days later to check My JUSTIS to see whether or not the docket was updated on that 2012 case." Tr. (Feb. 25, 2019) at 63:20-64:09; *Id.* at 81:08-18.

**D.    Release Orders Delivered by DOC's Transport**

38.    In addition to receiving release orders by fax, email, and hand delivery, DOC's transport brought all the documents at the end of the day to the D.C. Jail. Brown Dep. (Dec. 2015) 17:19-18:03; Tr. (Feb. 25, 2019) 62:04-11.

39.    As a result, the Records Office could potentially receive four copies of the same release order. Brown Dep. (Dec. 2015) 17:19-18:03

40.    If the Records Office received a release order "later on that evening" from transport, DOC will file it in the inmate's institutional file "because it has the actual judge's signature in ink...on the document." Jones Dep. 40:14-41:10; Tr. (Feb. 25, 2019) 79:15-20.

41.     Jones explained, "That way, in case one [release order] may fall out, but it is there, but it not the policy to put two copies [of the release order] in [the institutional file]." *Id*

42.     Robilyn Brown testified that the release orders received by DOC's transport at the end of the day was a "double-check to make sure all the documents were transported." Brown Dep. (Dec. 2015) 15:17-16:13.

43.     Once the Records Office receives a release order from DOC's transport at the end of the evening, the release order "will be input in TMS for processing." Tr. (Feb. 25, 2019) at 175:15-21; *see also* Brown Dep. (March 2017) at 22:04-07.

**E.     Gregory Smith's Overdetention**

44.     On March 18, 2014, the Plaintiff appeared in Superior Court on two misdemeanor cases (the 2012 case and the 2014 case) before the same judge. *See* Exs. P-12 and P-13.

45.     The Superior Court's Court View database reveals that an order to release plaintiff was entered into the system, and "sent" to the D.C. jail, in the 2012 case at 1:26 PM, and in the 2014 case at 1:28 PM. *Id.*

46.     Plaintiff was ordered to return to court on April 9, 2014 in both cases. *Id.*

47.     Although Mr. Smith was ordered to be released pursuant to two court orders, the DOC did not release Mr. Smith from custody until April 10, 2014. S*ee* Myrick Dep. (November 23, 2015) 69:2-11 (acknowledging Mr. Smith was not released on March 18, 2014 despite being ordered released on March 18, 2014); *See* Ex. P-29 (Def.'s Resp. SOF at ¶ 5).

48.     When Mr. Smith arrived back at the D.C. Jail on March 18, 2014, he told a correction officer, "I'm supposed to be released, what's going on?" Ex. P-29 (Def.'s Resp. SOF at ¶ 6)

49.     The corrections officer responded by getting "real nasty and aggressive and…continued to process" Mr. Smith. The DOC staff then stated, "if you're here, you're supposed to be here…you're not going anywhere." DOC staff continued, "if you're here, they know you're here" and DOC does not "make mistakes." *See also* Ex. P-29 (Def.'s Resp. SOF at ¶ 7).

50.     DOC received and processed the release order for the 2014 case on March 18, 2014.  Ex. P-28(a) (Defs.' SOF at ¶ 22 [ECF No. 105.1]).

51.     DOC received the release order for the 2012 case on March 18, 2019. Ex. P-1; *see also* Tr. (Feb. 25, 2019) at 78:13-79:08.

52.     The release order for the 2012 case was timestamped at 9:33 p.m. on March 18, 2019. *Id.*

53.     Jones was involved with processing the release order for Gregory Smith on March 18, 2014. Tr. (Feb. 25, 2019) at 34:20-34:25.

54.     The release order for the 2014 case was entered into the TMS system at 5:22 p.m. on March 18, 2014. *See* Ex. P-17.

55.     Jones received the release order in the 2014 case "around 6:50 p.m." on March 18, 2014 and began working on it. Tr. (Feb. 25, 2019) at 39:01-0; 53:05-12; *see also* Ex. P-17.

56.     Jones next reviewed the face sheet located in Mr. Smith's institutional file and determined that Mr. Smith was held on two cases. Tr. (Feb. 25, 2019) at 42:07-44:12.

57.     Jones then reviewed My JUSTIS "to see what happened on that case," the 2012 case. *Id.* at 45:02-07.

58.     But when Jones looked at My JUSTIS, the system did not show that Mr. Smith had been released in the 2012 case. *Id.* at 53:13-16.

59.     According to Jones, "there were no docket entries for 3-18-14" in My JUSTIS when he looked at the system. *Id.* at 61:08-15.

60.     Jones explained that when a LIE looks at My JUSTIS, "you read everything carefully, just to make sure, and you double check before you finish completing the process in JUSTIS." *Id.* at 54:24-54:02.

61.     Jones confirmed that the following entries were not contained in the My JUSTIS system when he reviewed it as part of the practice of processing Mr. Smith's release in the 2014 case:

| 03/18/2014 | CRMER - Event Resulted - Release Status: | Event Resulted - Release Status: PR-PSA. Defendant is released and further status is set at defense request. The following event: Misdemeanor Initial Status Hearing scheduled for 03/18/2014 at 9:30 am has been resulted as follows: Result: Hearing Held Judge: MCKENNA, JULIET J Location: Courtroom 220 GREGORY P SMITH (Defendant (Criminal)); ; DAVID AKULIAN (Attorney) on behalf of GREGORY P SMITH (Defendant (Criminal)); Judge JULIET J MCKENNA |

....

| 03/18/2014 | RELORDCRM - Release Order Filed | Release Order Filed Release Order - Jail Sent on: 03/18/2014 13:26:46.79 |

*Id.* at 55:01-08; *Id.* at 61:08-15; *see also* Ex. 14 at 2.

62.     If this information had been in the My JUSTIS system, Jones "next would be looking for an actual release document for that case."  Tr. (Feb. 25, 2019) at 55:09-11.

63.     If this information was contained in the My JUSTIS system at the time Jones looked at My JUSTIS, Plaintiff would have been "released from custody." Jones Dep. (Dec. 2015) at 55:16-22.

64.     Because the information for the 2012 case (the ordered release that day at 1:26 p.m.) was not in the My JUSTIS system, Jones closed out the case because he did not have a release for it. Tr. (Feb. 25, 2019) at 55:19-24.

65.     And although DOC did not possess a current commitment order that authorized DOC to take Plaintiff into custody, Plaintiff was input into DOC's system "as a prisoner return automatically." Tr. (Feb. 25, 2019) at 56:14-60:11

66.     The default when DOC does not have a commitment document or a release order for an inmate such as Plaintiff, he "is still held on the open charge" as it "reverts back to the original commitment order." Tr. (Feb. 25, 2019) at 60:06-11, 76:16-25. That is what happened to Plaintiff.

67.     The District does not know how it received the release order in the 2012 case, only that it was timestamped as received by the Records Office on March 18, 2014 at 9:33 p.m. Brown Dep. (March 2017) at 12:21-14:02, 18:19-19:06, 20:01-22:07, and 45:04-47:06; *see also* Myrick Dep. (Nov. 2015) at 70:16-71:10.

68.     My JUSTIS also contains a section in the computer system identifying "Offender Court Events." Ex. P-5 at GSmith DC 000038.[5]

69.     The original commitment documents in the District's possession stated, "Next Scheduled court appearance: **March 17, 2014** for **Misdemeanor Initial Status Hearing** at **9:30 am** in **Courtroom 220**." Ex. 5 at GSmith DC 000053, 000057 (the purpose of the return to court for the 2014 case was "**Detention Hearing**" at **9:00 am**).[6]

---

[5]     The My JUSTIS printout contained in Plaintiff's institutional file states that it was printed on April 10, 2014. It is reasonable to infer that "Offender Court Events" refers to the next court date for the inmate as it indicates Mr. Smith had a "Status Hearing" on April 24, 2014 in both the 2012 and 2014 cases.

[6]     The District offers no explanation as to why DOC did not transport Plaintiff to the Court on March 17, 2014 as ordered by the Court in the Commitment Orders. This information was contained in Plaintiff's institutional file. CourtView and My JUSTIS also show that DOC was ordered to return Plaintiff to Court on March 17, 2014. *See* Exs. P-12 at 2, P-13 at 3, and P-14 at 2.

### F.      The District has not Produced Any TMS Data for the 2012 Case

70.      The District has repeatedly stated throughout this litigation that TMS has no

relevance to processing release orders. Myrick Dep. (March 4, 2016) at 26:07-14 ("this is not a

system that process inmate releases."); *see also* Pl. Trial Ex. P-29 (Def.'s Resp. SOF at ¶¶ 71-73)

("the TMS system is not used to process releases" and "doesn't identify staff errors by staff").

71.      When asked the importance of an LIE placing Plaintiff's release order in the

queue of the TMS system, the District testified:

> ***Absolutely nothing to me***. It doesn't mean anything, it doesn't mean
> that Jack Jones put anything into the queue. This [TMS] is a
> managing system for the staff, therefore ***there's information in
> there that I cannot explain because it's just there.***

Myrick Dep. (March 2016) at 25:21-26 (emphasis added).

72.      At trial, defense counsel reiterated "the issue with TMS does not matter." Tr.

(Feb. 25, 2019) at 116:21.

73.      At trial, the Court also pointed out the District's unequivocal admission that the

TMS system was irrelevant to processing release orders:

> THE COURT:  I thought you told me TMS is irrelevant with the envelope that
> comes from the bus.
>
> MS. CULLEN: That's right.

Tr. (Feb. 25, 2019) at 141:03-05; *see also id.* at 158:24-25 ("the defense keeps telling me TMS is

irrelevant at that point.").

74.      Plaintiff made repeated efforts to obtain the TMS data relating to the 2012 case,

which included taking a "second deposition pursuant to Rule 30(b)(6) in relation to the retention

and preservation of the TMS data." *Smith v. Dist. of Columbia*, 319 F.R.D. 40, 47 (D.D.C. 2016)

(detailing Plaintiff's efforts to obtain TMS data).

75.     Initially, "the District sent Plaintiff an email stating '[w]e have been advised that the TMI [sic] information you requested does not exist.'" *Smith v. Dist. of Columbia*, 319 F.R.D. 40, 44 (D.D.C. 2016).

76.     But at the Rule 30(b)(6) deposition, the District testified that it *did* have TMS data relating to the 2012 case.  *See* Myrick Dep. (March 2016) at 22:5-13.

77.     Despite having TMS data relating to the 2012 case, the District failed to produce the data or prepare its designated witness to testify about the data, as the Court explained:

> Ms. Myrick was the designated witness on the subject of the TMS data, and once again, Ms. Myrick failed to bring, or even search for, the TMS data related to case number 2012 CMD 7806. When asked why she did not review the requested material Ms. Myrick stated "I had no reason to."

*Smith v. Dist. of Columbia*, 319 F.R.D. 40, 49 (D.D.C. 2016).

78.     Because of these discovery violations, the Court ruled that because:

> the District has not provided Plaintiff with the TMS data relating to case number 2012 CMD 7806, the District shall be precluded only from using TMS data related to case number 2012 CMD 7806 in any motion, at a hearing, or at trial.

*Smith v. Dist. of Columbia*, 319 F.R.D. 40, 50 (D.D.C. 2016).

79.      In conclusion, (1) Myrick testified in discovery that the TMS "is not a system that process inmate releases;" (2) she failed to produce any TMS data relating to the 2012 case; and (3) was unable to testify about the TMS data relating to the 2012 case.

80.     Despite all of this, the District called its only witness, Jeanette Myrick, at trial to elicit testimony concerning the TMS system.  *See* Tr. (Feb. 25, 2019) 171:01-176:21.  This is a violation of the Court's order which precluded it "from using TMS data relating to case number 2012 CMD 7806…at trial." *See* Order (December 6, 2016) [ECF No. 53]; *see also* Mem. Op. (December 6, 2016) [ECF No. 54].

13

81.     Yet, at trial, Myrick also praised the benefits of TMS in reducing prisoner overdetentions and its use in processing prisoner releases, including those received from DOC's transport.  Tr. (Feb. 25, 2019) at 171:08-20; 174:17-175:2.

**G.      The District did Not Investigate Plaintiff's Overdetention or Prepare an Overdetention Report**

82.     Jeanette Myrick is/was the "highest-ranking person in the Inmates Records Office." Myrick Dep. (Nov. 2015) 28:1-3.

83.     Myrick was responsible for "oversee[ing] the day-to-day operations of the Inmate Records Office and…to make sure that inmates are released…[and] other documents received are processed."  Myrick Dep. (Nov. 2015) at 26:20-27:6.

84.     As part of her job, Myrick claims to prepare a report for each instance of overdetention at the D.C. Jail. Myrick Dep. (Nov. 2015) at 18:9-11.

85.     Myrick did not, however, prepare an overdetention report in relation to Gregory Smith's 23-day overdetention.  Myrick Dep. (Nov, 2015) at 25:1-4.

86.     Similarly, no DOC employee prepared an overdetention report for Mr. Smith's overdetention. Myrick Dep. (Nov. 2015) at 25:5-8.

87.     Ms. Myrick did not investigate whether DOC received the March 18, 2014 release orders by fax, email, or physical delivery.  Myrick Dep. (Nov. 2015) at 73:1-12.

88.     Ms. Myrick did not investigate whether DOC received any emails containing the release order. Myrick Dep. (Nov. 2015) at 73:1-12.

89.     Ms. Myrick did not check a fax log to determine when the March 18, 2014 release was received.  Myrick Dep. (Nov. 2015) at 73:1-12.

90.     Finally, Ms. Myrick did not interview any staff members to determine if DOC staff had received the March 18, 2014 release order.  Myrick Dep. (Nov. 2015) at 73:1-12.

91.     The District does not know how it received the release order issued in the 2012 case on March 18, 2014.  Myrick Dep. (Nov. 2015) at 96:03-10; Myrick Dep. (March 2016) at 26:22-27-3.

92.     During the course of this litigation, the District has defended this case on the basis that it was authorized to detain Mr. Smith through April 10, 2014. Ex. P-23 at Interrog. Ans. No. 7.

93.     The District of Columbia testified, through its corporate representative, that "***the Department of Corrections was not – did not have this document, this releasing document***" for the 2012 case.  Myrick Dep. (Nov. 2015) 67:01-72:03 (emphasis added).

94.     When asked whether it was possible that DOC received the release order in the 2012 case but did not record it, the District testified, "No, not my office….I believe if the Inmate Records would have received this document that it would have been processed." *Id.* at 71:3-10.

95.     The District did not amend its answer to interrogatories admitting that on March 18, 2014, it received the release order for the 2012 case until December 11, 2018—**4.5 years after Mr. Smith's overdetention** and 2.5 months before trial. *See* ECF No. 101-1.

96.     But ultimately, the District is certain that **"[a]ll employees of the Department of Corrections…processed the release of Gregory Smith pursuant to the policies of the Department of Corrections**." Myrick Dep. (March 2016) 63:10-64:04 (emphasis added).

97.     And no employee "has been disciplined in relation to the overdetention of Gregory Smith. Myrick Dep. (Nov. 2015) 37:15-19.

98.     As of the date of trial, the District has still not prepared an overdetention in relation to its overdetention of Mr. Smith. Tr. (Feb. 25, 2019) 190:09-19.

H.      **Previous Overdetention Cases Against the District of Columbia**

99.     This case arises against a backdrop of previous litigation against the District of Columbia involving alleged overdetention at the D.C. jail. *Bynum v. District of Columbia*, 257 F. Supp. 2d 1, 1 (D.D.C. 2002); *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 77 (D.D.C. 2013).

100.    As a result of Bynum, DOC agreed to institute reforms to prevent prisoner overdetention, such as a courthouse release program, monitoring of overdetentions, the building of a new inmate processing facility, and a move to a paperless system to process releases. *See* Ex. P-29 at Def.'s Resp. SOF at ¶ 22.

101.    In the *Barnes* litigation, the Court observed that the District had made little or no improvements to its "paper-bound and Byzantine release process," as it was supposed to do after the *Bynum* case settled. *Smith v. D.C.*, 306 F. Supp. 3d 223, 233-40 (D.D.C. 2018) (citing to *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 279-80 (D.D.C. 2011) (observing that "a move to a paperless system to process releases" was "either rejected by the DOC or remain[ed], to this day, caught in a whirlpool of delays")).

102.    In May 2008, the District commissioned a report prepared by Karen Schneider titled, *Review of Paperflow Process between the Superior Court, the U.S. Marshall Service and the Department of Corrections*. *See generally* Ex. P-7 (hereinafter "Paperflow Report").

103.    According to the Paperflow Report, "the purpose [was] to review the transfer of court-generated paperwork among these agencies focusing on how the process can become before efficient so as to avoid erroneous release and potential overdetention of inmates." *Id.* at GSmith DC 00081.

104.     The Paperflow Report states, "The District's system to transfer commitment and release orders from the Court to the DOC for processing is a very lengthy, cumbersome, paper-driven process involving multiple agencies." *Id.*

105.     The Paperflow Report states, "When an order is issued in a courtroom, it travels through seven hands – the courtroom clerk, to the Deputy US Marshal (Deputy), to the USMS staff at the Jail Board post, to the DOC transport team officers, to the Receiving & Discharge (R&D) officer at the DC Jail, to the DC Jail Records office staff in R&D – before reaching the DC Jail Records office where it is processed." *Id.*[7]

106.     The Paperflow Report concludes, "it is not surprising that paperwork has gotten lost or has not been received at the Jail in a timely fashion. Unfortunately, lost or delayed paperwork potentially can lead to serious consequences—either the overdetention or the erroneous release of an inmate." *Id.*

107.     The Paperflow Report further concludes, "during the course of the paperwork transfer process, there are numerous opportunities for errors, which can lead to the missing or late delivery of paperwork to the Jail." *Id.* at GSmith DC 000087.

108.     The Paperflow Report further concludes, "[i]t is a chaotic process, especially at the end of the day when numerous courtrooms are closing and a significant number of inmates are being returned to the Jail." *Id.*

109.     The District testified that one of the causes of prisoner overdetention prior to Plaintiff's overdetention was "system failure." Myrick Dep. (Nov. 2015) 19:20-20:4.

---

[7]     According to Myrick, this cumbersome paper-driven process is still in place. Tr. (Feb. 25, 2019) at 172:12-173:15, 173:18-174:06. Though its unclear from the question and response which time-period Myrick was referring to, when asked about the practice in place prior to, and after, the implementation of TMS, Myrick described a lengthy paper-driven process where a release order must past through the hands of multiple individuals in order to be processed. *Id.*

110.    The District described "system failure" as "[t]hat something happened with our electronic system and the information may not have taken on the release date or information that I have."  *Id.*

## III.   CONCLUSIONS OF LAW

As the Court correctly noted in its Memorandum Opinion on summary judgment, "[t]o state a claim for relief against a municipality under section 1983, a plaintiff must satisfy two requirements: she must plead 'a predicate constitutional violation' and that 'a custom or policy of the municipality caused the violation.'" *Blue v. Dist. of Columbia*, 811 F.3d 14, 18 (D.C. Cir. 2015); *see also Smith v. Dist. of Columbia*, 306 F. Supp. 3d 223, 241 (D.D.C. 2018).  The second element can be established if a plaintiff can show that the predicate constitutional was caused by one of the following four prongs:

> (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,' " or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."

*Id.* at 18-19 (*citing Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

Plaintiff proceeded under *Baker*'s third prong, so in order to prevail at trial, he must prove the following elements: (1) constitutional violation; (2) the existence of a custom or practice; and (3) custom or practice caused his constitutional injury.  As discussed more fully below, Plaintiff has proven each of these elements by a preponderance of the evidence. Accordingly, judgment should be entered in favor of Plaintiff.

## A.    Mr. Smith Suffered a Constitutional Violation

The Court has already found that Mr. Smith suffered a constitutional violation as a result of the 23-day overdetention. *See* Tr. 31:7-11 (Feb. 28, 2019) [ECF No. 113]; *see also* FED. R. CIV. P. 52(a) ("findings and conclusions may be stated on the record after the close of evidence").  Thus, the first element of Plaintiff's municipal liability claim against the District is satisfied.

## B.    The District of Columbia Had a Custom and Practice of Receiving Release Orders by Fax, Email, or Hand Delivery

"An act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 404 (1997); *see also Warren v. District of Columbia,* 353 F.3d 36, 39 (D.C. Cir. 2004) ("Or a policymaker could knowingly ignore a practice that was consistent enough to constitute custom."); *see also Connick v. Thompson,* 563 U.S. 51, 61, 131 S. Ct. 1350, 1359 (2011) ("Official municipal policy includes…practices so persistent and widespread as to practically have the force of law").

The Supreme Court explained the reason why a municipality can be liable for a "custom" even if it is not a formally approved policy by a decisionmaker:

> Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.

*Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–168 (1970).

Here, Plaintiff has proved by a preponderance of the evidence that the District has a widespread custom of receiving release orders by fax, email, or hand delivery. *See* Myrick Dep. (Nov. 2015) at 73:1-3 (testifying as a corporate representative on behalf of the District).  The District further conceded this fact at trial. Tr. (Feb. 25, 2019) at 22:17-23. This concession was unequivocal:

> …we are conceding that we had a practice of receiving release orders by fax, email, and hand delivery, non-electron – some of which were non-electronic means. We are conceding that.

*Id.* at 29:10-12.[8]

Thus, Plaintiff has proved the District had a custom and practice of receiving release orders by fax, email, and hand delivery.

### C.     The District's Custom of Receiving Release Orders by Fax, Email, and Hand Delivery Caused the Violation of Mr. Smith's Constitutional Rights

#### 1.     The District's Practice of Receiving Release Orders by Fax, Email, and Hand Delivery is a "Substantial Factor" in Plaintiff's Overdetention

In order to establish liability against a municipality under 42 U.S.C. § 1983, a plaintiff must also "demonstrate a direct causal link between the municipal action and the deprivation of federal rights. *Brown*, 520 U.S. at 404; *see also Smith v. Dist. of Columbia,* 306 F. Supp. 3d 223, 250 (D.D.C. 2018). The "official policy [or custom] must be the "moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326 (1981); *see also Monell*, 436 at 694. A practice or custom is the "moving force" of the constitutional violation if the "conduct is a substantial factor in bringing about harm…" *Parker v. District of Columbia*, 850 F.2d 708,

---

[8]     *Best v. Dist. of Columbia*, 291 U.S. 411, 415 (1934) (a court has the inherent power to direct a verdict based upon an admission by counsel during opening statement); *Scahill v. Dist. of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (concession by counsel during argument is binding on party).

714 (D.C. Cir. 1988) (quoting *Morgan v. Dist. of Columbia*, 824 F.2d 1049, 1062 (D.C. Cir.

1987); *see also White v. United States,* 780 F.2d 97, 106 (D.C.Cir.1986) (quoting

RESTATEMENT (SECOND) OF TORTS § 435; *see also Smith v. Dist. of Columbia*, 306 F.

Supp. 3d 223, 251 (D.D.C. 2018).  This is not a high bar for Plaintiff to clear.

Indeed, under the well-established law in this Circuit,[9] a plaintiff need not prove that a

municipality's custom or practice was the sole, singular cause of the constitutional injury; but

rather, it need only be a "substantial factor in bringing about the harm."  *Parker*, 850 F.2d at 714;

*Morgan*, 824 F.2d 1062. It is not even necessary for the Plaintiff to prove that the

constitutional injury was "foreseeable" as a result of the municipality's custom or practice. *Id.*  In

the absence of foreseeability, causation is also established provided the "chain of events" was not

a "highly extraordinary" result of the defendant's conduct.  *Id.*

In *Morgan*, the plaintiff sued the District of Columbia under 42 U.S.C. § 1983 claiming

that his Eighth Amendment right was violated when he was injured in a prison fight. *Morgan*,

824 F.2d 1049. The plaintiff in *Morgan* claimed that the District was deliberately indifferent to

the prisoner's Eight Amendment rights due to the overcrowding of the prison, and that the

overcrowding caused the assault on the plaintiff.  *Id.*  The jury returned a verdict in favor of the

plaintiff on his 42 U.S.C. § 1983 claim. *Id.* at 1055. On appeal, the District argued that its

conduct was not the proximate cause of the plaintiff's injuries. *Id.* at 1062. The D.C. Circuit

rejected this argument holding that "a reasonable person could conclude that overcrowding in

prisons is a substantial factor in bringing about fighting among inmates." *Id.* at 1063. In finding

---

[9]     *Parker* and *Morgan* are both cases brought under 42 U.S.C. § 1983 where the D.C.
Circuit **upheld** the factfinder's finding that the plaintiff sufficiently proved causation by a
preponderance of the evidence.  *Parker*, 850 F.2d at 714; *Morgan*, 824 F.2d at 1062. *Parker* and
*Morgan* applied the proximate cause standard articulated in *White* and used in general negligence
cases brought under D.C. law. *Id.*; *see also White*, 780 F.2d at 106.

that the plaintiff adequately proved causation, the court did not require exact certainty or that the

plaintiff prove a singular cause. In fact, the D.C. Circuit did not even consider, as part of its

analysis, the circumstances involving the specific attack on the plaintiff.  Instead, the Court

reasoned that "a reasonable juror could find it to be more likely than not that one or more of the

many ramifications of the District's deliberate practice of overcrowding the Jail played a

substantial part" in the attack. *Id.* In addition, the court found that the "assault was foreseeable."

*Id.* But more importantly, the D.C. Circuit found that "even if we were to hold that [the

plaintiff's] injuries were unforeseeable, we find nothing 'highly extraordinary' that the District's

conduct resulted in the assault." *Id.*

    *Morgan* illustrates the low burden a plaintiff carries to prove causation. In its proximate

cause analysis, the Circuit did not weigh whether the evidence of the circumstances leading up to

the assault (e.g. a sexual advance by one prisoner that the plaintiff rebuffed) against the District's

overarching deliberate indifference of overcrowding.  Instead, *Morgan* simply asked the question

whether the assault was foreseeable due to the overcrowding conditions. *Id.* at 1063. Or if it was

not foreseeable, was the assault "highly extraordinary."  *Id.*

    Here, Plaintiff has easily satisfied his burden that, more likely than not, the District's

practice of receiving release orders by fax, email, and hand delivery was a substantial factor in

bringing about his harm. And, it was foreseeable that the District's practice of receiving release

orders by multiple, non-electronic methods would cause unconstitutional overdetentions.

    Under the District's widespread practice in March 2014, DOC received prisoner release

orders by fax, email, and hand delivery. Tr. (Feb. 25, 2019) at 48:18-49:13 (the release order is

emailed by Quality Assurance); 32:07-16 (defense counsel explaining receipt by fax); Brown

Dep. (Dec. 2015) at 14:18-15:03 (Quality Assurance faxes and emails release orders to the

Records Office). Ultimately, DOC could receive four copies of the same release order: (1) via hand delivery by the U.S. Marshal at the courthouse (which would then be uploaded into TMS by the LLIE at the courthouse); (2) fax and/or email from Quality Assurance; and (3) by hand delivery via DOC's transport from the courthouse each evening.  Brown Dep (Dec. 2015) 14:14-18:09. If any one of these three methods worked, then Plaintiff would have been released. Each method failed.

Only one of the release orders (the 2014 case) was sent from the LLIE stationed at the courthouse through TMS to the LIE (Jack Jones) at the jail. *See* Exs. P-17, P-27 at Interrog. No. 9; Tr. (Feb. 25, 2019) at 36:09-40:03.[10] Nonetheless, whenever a prisoner like Plaintiff was being held on more than one case, Jones, as the LIE at the jail, was required to check My JUSTIS to determine the status of all of the prisoner's cases.  Tr. (Feb. 25, 2019) at 44:16-45:01; Jones Dep. (Dec. 14, 2015) at 26:21-27:19.  The job of the LIE is to verify that the documents they receive are consistent with the Court System. Brown Dep. (Dec. 2015) at 25:2-5.  To do so, the LIE was required to check My JUSTIS. Brown Dep. (Dec. 2015) at 24:9-11; 24:17-19. If My JUSTIS does not show a release order being issued, then the prisoner will return to jail as a "prisoner return." Tr. (Feb. 25, 2019) at 56:14-60:11. If My JUSTIS indicates that a release order has been

---

[10]     The District called its only witness, Jeanette Myrick, at trial to elicit testimony concerning the TMS system.  *See* Tr. (Feb. 25, 2019) 171:01-176:21.  This is a violation of the Court's order which precluded it "from using TMS data relating to case number 2012 CMD 7806…at trial." *See* Order (December 6, 2016) [ECF No. 53]; *see also* Mem. Op. (December 6, 2016) [ECF No. 54].

Accordingly, the Court should disregard the District's attempt to shoehorn precluded evidence into the trial, as it both violates this Court's preclusion Order and is also extremely prejudicial to Plaintiff as the District has testified that is has TMS data relating to the 2012 case but has not produced it. Nonetheless, even if the Court accepts Myrick's trial testimony, the Court should give that testimony little to no weight as it completely contradicts the District's position taken through its Rule 30(b)(6) designee, throughout discovery, and even at trial up to the point of Myrick's actual trial testimony.

issued, then the LIE would obtain a copy of the release order via an image from My JUSTIS or by contacting Quality Assurance and obtaining the order via fax or email. Tr. (Feb. 25, 2019) at 48:01-49:19.

In Plaintiff's case, there is no question that he was ordered released in both of his cases and that My JUSTIS eventually reflected that he was ordered released. Tr. (Feb. 25, 2019) at 55:01-08; 61:08-15; Exhibit P-14 at 2. However, at the time Jones was viewing My JUSTIS, the information regarding Plaintiff's release was not there. Tr. (Feb. 25, 2019) at 55:01-08, 61:08-15. Had it been there, then Jones could either access the 2012 case order from MY JUSTIS or contact Quality Assurance to obtain the Order via fax or email. Tr. (Feb. 25, 2019) at 48:01-49:19; 55:01-1.  In either case, Plaintiff would have been released.  But that did not occur because My JUSTIS worked on a one to two-day delay in updating its data. Tr. (Feb. 25, 2019) at 50:11-17, 51:11-52:25; Brown Dep. (Dec. 2015) at 24:20-25:16.  The fact that My JUSTIS was unreliable because it worked on a one to two-day delay was widely known and even memorialized in the District's written policy. Exhibit P-6 at 9; *see also* Tr. (Feb. 25, 2019) at 52:09-25 (the "computerized check" in the written policy refers to My JUSTIS).

Because Plaintiff's release, which was ordered at 1:26 p.m. that same day, was not reflected in My JUSTIS, Plaintiff was input as a "prisoner return automatically" despite the DOC having no commitment order or other authorization to hold the prisoner. Tr. (Feb. 25, 2019) at 55:19-24, 56:14-60:11. Had Jones seen the information in My JUSTIS reflecting that Plaintiff was ordered released on the 2012 case on March 18, 2014, Plaintiff would have been "released from custody." Jones Dep. (Dec. 2015) at 55:16-22.

Plaintiff was not released from custody, but the physical release order would have still been delivered by DOC's transport (along with all other orders entered that day). Brown Dep.

(Dec. 14, 2015) at 15:13-16:3. This is presumably how the DOC came into possession of the 2012 Release Order. Though the District has never been able to explain how, when or who received the physical copy of the release order. Brown Dep. (March 2017) 12:21-14:02, 18:19-19:06. Nonetheless, the end-of-the-day delivery was not a method to process a release, but instead used as "double-check" to make sure DOC had all the court orders issued that day and "because it has the actual judge's signature in ink." Brown Dep. (Dec. 2015) at 16:1-13; Jones Dep. 40:21-41:10. That is how, like here, the DOC could possess a release order, but a prisoner like Plaintiff could still be detained.

This hodgepodge of methods for determining an individual's freedom is the very outcome that the *Paperflow Report* forewarned would occur and would result in prisoner overdetentions. *See* Ex. P-7 at GSmith DC 00081. It is for this reason that the District was unaware that it even possessed the release order until February 2017, let alone had a mechanism to process the batch release orders received each evening. In reality, Plaintiff's overdetention was not due to an error attributable to staff, this was a failure of the practice employed by the DOC in 2014 for receiving and processing release orders. That practice failed Plaintiff and was, by a preponderance of the evidence, a substantial factor in causing his overdetention.

### 2. *Plaintiff's Overdetention was "Foreseeable" and Not "Highly Extraordinary"*

It was foreseeable to the District that its practice of receiving release orders by fax, email, and hand delivery would result in Mr. Smith's constitutional injury. Prior to Mr. Smith's overdetention, the District experienced numerous prisoner overdetentions. *Bynum v. District of Columbia*, 257 F. Supp. 2d 1, 1 (D.D.C. 2002); *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 77 (D.D.C. 2013); *see also* Exs. P-8, P-9, and P-10.  The problem causing these

overdetentions was the cumbersome, paper-driven process used by the District in receiving release orders, which was still in use at the time of Mr. Smith's overdetention.

The *Paperflow Report* establishes that it was foreseeable (and known) to the District that its practice of receiving release orders by fax, email, and hand delivery would result in prisoner overdetentions.   The purpose of the *Paperflow Report* was to determine how the process of the "transfer of court-generated paperwork" "can become more efficient so as to avoid erroneous release and potential overdetention of inmates." Ex. P-7.   The report describes the process by which the Records Office receives release orders by fax and hand delivery. Ex. P-7 at GSmith at 000081, 000084-000087.   The Paperflow Report further concluded, "during the course of the paperwork transfer process, there are numerous opportunities for errors, which can lead to the missing or late delivery of paperwork to the Jail….[i]t is a chaotic process, especially at the end of the day when numerous courtrooms are closing and a significant number of inmates are being returned to the Jail." *Id.* at GSmith DC 000087.   The *Paperflow Report* states, "[t]he District's system to transfer commitment and release orders from the Court to the DOC for processing is a very lengthy, cumbersome, paper-driven process involving multiple agencies….[so] it is not surprising that paperwork has gotten lost or has not been received at the Jail in a timely fashion. Unfortunately, lost or delayed paperwork potentially can lead to serious consequences—either the overdetention or the erroneous release of an inmate." *Id.* GSmith DC 00081.

Three years after the *Paperflow Report,* the judge in the *Barnes* litigation still "observed that the District had made little or no improvements to its 'paper-bound and Byzantine release process,' as it was supposed to do after the Bynum case settled. *Smith v. Dist. of Columbia*, 306 F. Supp. 3d 223, 240 (D.D.C. 2018) (quoting *Barnes v. District of Columbia*, 793 F.Supp.2d 260, 279–80 (D.D.C. 2011). In *Barnes*, the court observed that "a move to a paperless system to

process releases" was "either rejected by the DOC or remain[ed], to this day, caught in a whirlpool of delays". *Barnes* 793. F. Supp. 2d at 279-280.

Thus, it was not only foreseeable, but also known, to the District that its practice of receiving release orders by fax, email, and hand delivery would result in prisoner overdetentions. This is especially true in light of the fact that the District had agreed to move to a paperless system to process release to prevent prisoner overdetentions but failed to do so. *See* Pl. Trial Ex. P-29 at Def.'s Resp. SOF at ¶ 22. Because unconstitutional overdetentions were foreseeable as a result of the District's practice by which it received release orders, Plaintiff has proven, more likely than not, that his overdetention was caused by the District's practice.

Finally, as informed by *Morgan*, Plaintiff need not even show that his injury foreseeable. It is enough for Plaintiff to show that his overdetention was not a highly extraordinary result of the District's practice of receiving release orders from multiple, non-electronic means.  As the Court commented at trial, "there is no question that [Plaintiff has] proved that system" failed him. Tr. (Feb. 25, 2019) at 159:06-10.  And there is no dispute that Mr. Smith's overdetention was not caused by staff error, because "all employees of the Department of Corrections…processed the release of Gregory Smith pursuant to the policies of the Department of Corrections." Myrick Dep. (March 2016) at 63:10-64:04 (testifying as a corporate representative on behalf of the District). Further, no DOC employee was disciplined as a result of the District's overdetention of Mr. Smith. Myrick Dep. (Nov. 2015) at 37:15-19; *see also* Tr. (Feb. 25, 2019) at 65:01-66:01.  So, it was not staff error that caused Mr. Smith's overdetention,[11] it was the District's practice of receiving release orders by fax, email, and hand

---

[11]     Importantly, Plaintiff is not seeking to hold the District liable for any act of its employees under a theory of *respondeat superior*. To the contrary, all the evidence presented at trial shows that the overdetention was caused by the District's practices, which permit a circumstance, such

delivery. Because the District's practice of receiving release orders by fax, email and hand delivery is a haphazard, cumbersome, and paper-driven process, the overdetention of Mr. Smith is not highly extraordinary.

Plaintiff has proven by a preponderance of the evidence that the District's practice and custom was a substantial factor in, and thus the moving force behind, his overdetention. Thus, judgment should be entered in favor of Plaintiff on his 42 U.S.C. § 1983 claim against the District.

### D. Plaintiff Has Proven by a Preponderance of the Evidence that the District was Deliberately Indifferent

Under *Baker's* fourth prong,[12] a plaintiff can also establish a "policy or custom" for purposes of *Monell*, if the government fails "to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306. "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Id.* at 1307. To prove "deliberate indifference," a plaintiff must prove "that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Deliberate

---

as this, where DOC can physically possess two signed release orders, yet detain the inmate nonetheless due to the total dysfunction of their practice for receiving and processing release orders.,

[12]    At trial, the District incorrectly argued that Plaintiff was required to prove "deliberate indifference" under *Baker*'s third prong. The District is mistaken. A plaintiff is only required to prove that the District "failed to respond to a need" "in such a manner as to show 'deliberate indifference'…," under *Baker*'s the fourth prong. *Blue*, 811 F. 3d at 19. "Section 1983 plaintiffs have several ways to allege a municipal policy, each with its own elements." Id. at 20. The District's attempt to import a "deliberate indifference" element into the custom or practice theory of *Monell* liability has no basis in existing, well-settled law, and the Court should reject the District's invitation to create a new, unrequired element under the third prong of *Baker*. Nevertheless, as set forth herein, Plaintiff also proved that the District was deliberately indifferent.

indifference can be shown through "actual or constructive notice" that a municipality's failure to respond to a need, will result in constitutional violations. *Id.* at 61.  For instance, "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61.[13]

Although it is unnecessary for Plaintiff to prove deliberate indifference under *Baker*'s third prong, Plaintiff has nonetheless proven that the District was deliberately indifferent.  As discussed above, Plaintiff has established by a preponderance of the evidence, that the District had actual and constructive knowledge that its failure to address the known problems with its paperflow process for release orders would result in unconstitutional overdetentions.  The District knew of the risks associated with its practice of receiving and processing release orders as early as May 2008 when the *Paperflow Report* was published.  The District's practice of receiving release orders from the Court "is a very lengthy, cumbersome, paper-driven process" with "numerous opportunities for errors." Ex. P-7 at GSmith DC 00081, 00087.  And as a result, release orders have "gotten lost or [have] not been received at the Jail in a timely fashion." *Id.* at GSmith DC 00081.  The *Paperflow Report* explicitly puts the District on notice that this "can lead to serious consequences," including the "overdetention…of an inmate." *Id.* Despite knowing the flaws in the manner in which the District received release order from the court, the District

---

[13]    Deliberate indifference is required in failure to train and/or failure to supervise cases because "the deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.   The "deliberate indifference" requirement in these cases is obvious because these theories of liability seek to hold a municipality liable under 42 U.S.C. § 1983 for the constitutional violations caused by conduct by employees rather than a custom or practice. Deliberate indifference is necessary under the fourth prong of *Baker* to avoid turning *Monell* liability into "*respondeat superior* liability on municipalities." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989).

continued to receive release orders in multiple, non-electronic methods, such as fax and hand delivery.  This constitutes deliberate indifference.

In addition, prior to Mr. Smith's overdetention, the District knew that the My JUSTIS computer program had a "one to two day delay in the updating data from court proceedings." Ex. P-6 at 9; *see also* Tr. (Feb. 25, 2019) at 52:09-25 (the "computerized check" refers to My JUSTIS). Myrick confirmed that this delay resulted in at least one overdetention prior to Mr. Smith's overdetention. Myrick Dep. (Nov. 2015) 19:20-20:4. The fact that the District relied upon a computer system to process releases that it knew contained unreliable, untimely data places the District on constructive notice, at a minimum, that this practice could result in overdetentions.  The fact that this "system failure" did result in a prisoner overdetention prior to March 2014, placed the District on actual notice that the practice would result in prisoner overdetentions.  This too constitutes deliberate indifference.

Finally, during Mr. Smith's overdetention, he repeatedly complained to DOC that the court had ordered his release. Ex. P-29 (Def.'s Resp. SOF at ¶¶ 6-7).  Despite this knowledge of the overdetention, the District continued its unlawful detention of Mr. Smith without any legal authority to do so.  And the reason is obvious, there is no policy requiring DOC staff to report overdetentions.  Tr. (Feb. 25, 2019) at 187:15-189:23; Myrick Dep. (Nov. 2015) 34:20-36:08.  To this day, Myrick still has not prepared an overdetention report for Mr. Smith.  Tr. (Feb. 25, 2019) at 190:09-19. The fact that judgment has been entered against the District of Columbia for falsely imprisoning Mr. Smith and the District still has not performed any investigation into the cause of Mr. Smith's overdetention, amounts to a deliberate indifference.  This is especially true  in light of the fact that the District's failure to prepare an overdetention report with respect to Mr. Smith is a clear violation of the D.C. Code. *See* D.C. Code § 24-211.02a(d)(2) (DOC "shall provide to

the Council on a quarterly basis, a list of all inmates who have been released in violation of this section").

Knowledge of a problem; failing to address or even acknowledge the known problem; and failing to remedy the known problem constitutes deliberate indifference. Accordingly, Plaintiff has established by a preponderance of the evidence that the District was deliberately indifferent.

## IV.    CONCLUSION

Plaintiff has proven that, more likely than not, the District's practice of receiving release orders by fax, email, and hand delivery was a substantial factor that caused the violation of his constitutional rights. Thus, Plaintiff requests that judgment be entered in his favor as to his 42 U.S.C. § 1983 claim against the District.

Dated:  April 4, 2019                                    Respectfully submitted,


                                                         KLAPROTH LAW PLLC

                                                         */s/ Brendan J. Klaproth*
                                                         Brendan J. Klaproth (D.C. Bar No. 999360)
                                                         Jesse C. Klaproth (D.C. Bar No. PA0063)
                                                         406 5th Street NW, Suite 350
                                                         Washington, DC 20001
                                                         Tel:  202-618-2344
                                                         Fax:  202-618-4636
                                                         Email: Bklaproth@klaprothlaw.com

                                                         LAW OFFICE OF DAVID AKULIAN

                                                         */s/ David Akulian*
                                                         David Akulian #1005750
                                                         406 5th St. NW #201
                                                         Washington, D.C. 20001
                                                         Tel: 202-505-2113
                                                         info@NotGuiltyInDC.com
                                                         *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused to be served a true and correct copy of the foregoing through the court's electronic filing system on counsel of record for all parties in this case.

Dated: April 4, 2019                    /s/ Brendan J. Klaproth