## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
GREGORY SMITH,                  )
                                )
                Plaintiff,      )
                                )
        v.                      )        Civil Action No. 15-0161 (ABJ)
                                )
DISTRICT OF COLUMBIA, et al.,   )
                                )
                Defendants.     )
_____)
```

### FINDINGS OF FACT

Based on its review of the testimony at the trial, *see* February 25, 2019 Transcript of Bench Trial ("Tr.") [Dkt. 112], and the exhibits and deposition excerpts submitted by the parties, the Court hereby adopts the parties' Proposed Statements of Fact as set forth below,[1] with any omissions, revisions, or additions made by the Court noted in bold font, for purposes of its ruling on Count One.

The conclusions of law that flow from these facts will be stated on the record at the hearing on December 22, 2020; the Court will not repeat its factual conclusions at that time. The fact that the Court has adopted any proposed factual assertion does not signify that the Court deemed it to be relevant; it signifies only that the SOF correctly states the evidence in the record.

**Plaintiff's Proposed Statements of Fact – Dkt. 11**

1.      On March 15, 2014, the DOC received commitment orders in two different D.C. Superior Court misdemeanor cases, 2012 CMD 007806 (the "2012 case") and 2014 CMD 004452 (the "2014 case"), ordering that Plaintiff be committed to the custody of the DOC until further order of the Court.  *See* Exs. P-5, P-12, P-13, and P-28(a) at ¶¶ 1-2.

---

1       The headings used below were supplied by the parties in their respective submissions and are repeated here for the parties' convenience; they are not meant to convey findings made by the Court.

2.      On March 18, 2014, Plaintiff was transported from D.C. jail to Superior Court, and a judge ordered him to be released in both cases. *See* Exs. P-28(a) at ¶ 3 and P-29 at ¶ 4.

3.      DOC received and processed the release order for the 2014 case on the same day. *See* Ex. P-28(a) at ¶ 22.

4.      Although the DOC received the release order in the 2012 case on March 18, 2014, the order was not processed. *See*. Exs. P-29 at ¶ 5, P-28(a) at ¶ 23.

5.      DOC did not release Plaintiff from custody on March 18, 2014.  *See* Ex. P-29 at ¶ 5.

6.      Plaintiff was held at the D.C. jail until April 10, 2014. *See* Exs. P-12, P-13, and P-28(a).

**A. DOC's Practice of Receiving and Processing Release Orders**

7.      Misdemeanor inmates are to be released directly from the D.C. Superior Court. Ex. P-28(a) at ¶ 11; Myrick Dep. (Nov. 2015) at 53:21-55:16

8.      But under the courthouse release program, an inmate's release must be processed by 3:30 p.m., otherwise the inmate is returned to the DC Jail. Tr. (Feb. 25, 2019) 70:15-71:18.

9.      DOC is required to release an inmate within five hours of receiving the inmate from custody from the U.S. Marshal.  Tr. (Feb. 25, 2019) at 71:24-72:11; *see also* D.C. Code § 24-211.02a ("For an inmate ordered released pursuant to a court order, the inmate shall be released within 5 hours of transfer from the custody of the United States Marshals Service into the custody of the Department of Corrections…provided, that the Department of Corrections has the obligation to release inmates by 10:00 p.m.").

10.      After a Superior Court judge authorizes an inmate's release during a court appearance, the courtroom clerk generates a release order and prints two copies, both of which are signed by the judge, the clerk, and the U.S. Marshal in charge of the prisoner. Polonchuk Dep. at 14:1-15:05.

11.      Whether the U.S. Marshal signs the release order has no impact on DOC's ability to process the release. Tr. (Feb. 25, 2019) at 42:01-06.

12.      The clerk maintains the court's copy and is responsible for submitting it to the scanning department at the D.C. Superior Court, where the release order is then scanned into a computerized database called Court View. Polonchuk Dep. at 15:8-21.

13.     The Marshal retains the second copy and takes the release order and the prisoner to the main cellblock in the courthouse. Ex. P-28(a) at ¶¶ 6, 9, and 10.

14.     DOC's widespread practice in 2014 was to receive release orders from the Court by fax, email, or hand delivery. *See* Myrick Dep. (Nov. 2015) at 20:14-22:01, 24:02-5 (testifying as a corporate representative on behalf of the District); *Id.* 73:1-3; *see also* Tr. (Feb. 25, 2019) at 22:17-23; *Id.* at 29:10-12.

15.     Receipt of a release order by any one of these methods, triggers a Legal Instrument Examiner ("LIE") or supervisory LIE to begin processing the release order. Brown Dep. (Dec. 2015) 18:01-03.

**B.  Receipt by Hand Delivery – U.S. Marshal to DOC**

16.     With respect to the hand delivery method, the Marshal hand delivers the release order to an LIE or Lead Legal Instrument Examiner ("LLIE") located at a Department of Corrections satellite office within the courthouse, and the DOC employee then uploads the document into a database called the Transaction Management System ("TMS"). Brown Dep. (Dec. 2015) 14:14-18:15; Ex. P-28(a) at ¶ 12; Tr. (Feb. 25, 2019) at 36:01-37:09.

17.     Once the release order is uploaded in TMS, an LIE located in the Records Office at the D.C. jail itself will access the document in TMS and begin processing the inmate's release by performing the series of actions specified by the system.  Tr. (Feb. 25, 2019) at 36:01-37:09; *see also* Ex. P-17

**C.  Receipt by Fax and Email – Quality Assurance**

18.     It was also DOC's "widespread practice" in 2014 to receive release orders from Quality Assurance, an office located in the D.C. Superior Court, by email and fax. Tr. (Feb. 25, 2019) at 48:18-49:13; Brown Dep. (Dec. 2015) at 14:18-15:03. **[Omitted the citation to a statement of defense counsel, which is not evidence.]**

19.     As part of the release process, a LIE must review the inmate's institutional file "to see what other cases he has in his record, if he has any other cases." Tr. (Feb. 25, 2019) at 42:07-15.

20.     The "face sheet that's located in the institutional file" informs the LIE if a prisoner is being held on multiple cases. *Id.* at 42:13-44:01.

21.     When a prisoner is held on more than one case, such as Plaintiff, the LIE must "check the case that is – remains open, according to the file" in the My JUSTIS computer program. *Id.* at 44:16-23.

22.     Checking My JUSTIS is a necessary step when processing a release. Brown Dep (Dec. 2015) at 24:09-25:05.

23.     "My JUSTIS reflects the information that's input by Courtview." Tr. (Feb. 25, 2019) 44:24-45:01.

24.     My "JUSTIS tracks each court appearance of each inmate and what was discussed during that court appearance." Jones Dep. at 16:19-17-21.

25.     When the LIE checks My JUSTIS, the LIE is "looking to see whether [the inmate] was brought up in front of the judge on the case, and whether they seen him on it or not, what was the outcome for that date, if there is an outcome." Tr. (Feb. 25, 2019) at 45:21-46:04.

26.     If My JUSTIS indicates that the inmate was ordered to be released, then the LIE prints the release order from the computer "if there's an image" and processes the prisoner's release. *Id.* at 48:01-14.

27.     If there is no image in My JUSTIS, then the LIE contacts Quality Assurance to obtain a copy of the release order by fax or email. *Id.* 48:17-49:19.

28.     This process of receiving release orders by fax or email from Quality Assurance "was part of the widespread practice in place in 2014." *Id.* at 49:21-50:02. **[Omitted the quote concerning Jack Jones which does not support the SOF, and the characterization that this "was an appropriate way to authorize release" as "appropriate" is vague, and the Court did not accept that aspect of the testimony at the time.]**

29.      LIEs are able to access release orders through an e-system known as MyJustis which provides access to the information contained on the Superior Court's e-system CourtView. Defs.' Reply at 6-7 [ECF No. 83] **[Omitted the language "**In this case, the District has conceded that My JUSTIS is an acceptable practice to receive release orders**[,]" as the word "acceptable" is vague, and the assertion is not consistent with the record. Also omitted the language "**Thus, misdemeanants are processed by a system that does not rely upon the transport of a paper order to the jail for processing[,]**" since that conclusion in Def's Reply Brief was based on several sentences and not just the immediately preceding sentence related to MyJustis.]**

30. **[OMIT. The Court will not adopt conclusory proposed Pl SOF 30: "**The inherent problem with this practice of processing release orders is that "My JUSTIS was not always accurate." Tr. (Feb. 25, 2019) at 50:11-17. **as it is not fairly based on the cited testimony.]**

> **On the cited page of the transcript, Jones simply answered "correct"' when asked, "My Justis was not always accurate, isn't that correct?" and there is no testimony cited for the fact that there is a practice of processing orders from MyJustis or the conclusion its inaccuracy is an "inherent problem" with the practice of processing orders from MyJustis.**

> **Furthermore, plaintiff has taken much of the testimony about MyJustis out of context, citing it in support of vague statements that include the phrase "this practice of processing release orders." To what practice is the word "this" supposed to refer? Brown testified that MyJustis was checked to verify if someone for whom they'd received a release order through TMS could be released, not the source from which release orders were supposed to be received. In her 12/14/15 deposition at 18, she described the most typical way to receive release orders: the U.S. Marshal deliver the paper order to the LIE at the satellite office at Superior Court, who uploads it to TMS and reviews the order to make sure it contains all of the necessary information. He or she then checks the institutional file and JACCS and MyJustis is a means to *verify* that a prisoner can be released in a particular case. At page 28, Brown further explains that if the review of JACCS and the institutional file reveal there is another pending case in which an individual is being held, the process stops if the LIE did not receive a release order in the second case.**

> **At page 43 of the trial transcript, Jones said that after he gets a paper release in one case, he checks the institutional file. If it reflects the prisoner is being held in 2 cases, then he checks MyJustis. He made it clear that he would not know at that point whether the inmate had even been in court on both cases; he simply checked the database to see if there was an entry on that date in the second case. If there was an entry, he would print and process the image as he had the order from the first one, but if there was an entry and no image, he would have obtained it from Quality Assurance.**

31. According to Supervisory Legal Instrument Examiner Robilyn Brown, My JUSTIS was not reliable because "it's not live time. It's not live." *Id.* at 80:05-12.

32.     According to Brown, My JUSTIS "would contain inaccurate information" because "we can get documents…and MyJUSTIS will not reflect it and then, maybe a day later, it will be in My JUSTIS, like a backlog." Brown Dep. (Dec. 2015) at 25:06-16.

33.     Based on Jack Jones' experience, "there would be a one- to two-day delay in that information updated" in My JUSTIS. Tr. (Feb. 25, 2019) at 50:11-17.

34.     So, in 2014, it was a "widespread practice" "to rely on My JUSTIS in verifying whether or not a prisoner should be released." *Id.* at 51:11-52:05.

35.     And prior to Mr. Smith's overdetention, Jones was aware of "My JUSTIS not being updated" and "had experienced that on other occasions, where it was not updated." *Id.*

36.     DOC' written policy contains the following statement about the court's database:

16.  **RELEASE CLEARANCE**

a.    Records Office Legal Instruments Examiners shall obtain and review printouts from National Crime Information Center (NCIC), COURT VIEW, WALES II and JACCS to determine if there are any outstanding warrants or charges preventing release, prior to an inmate's release from the custody of the DOC. The inmate's institutional file shall be reviewed in its entirety to effectuate the release.

b.    The Legal Instruments Examiner shall review source documents in the inmate's institutional record because data available through the criminal court computerized check may not be current based upon a one to two day delay in the updating data from court proceedings.

Ex. P- 6 at 9; *see also* Tr. (Feb. 25, 2019) at 52:09-25 (the "computerized check" refers to My JUSTIS). **[Omitted the conclusory reference to a "known system failure;" the Court simply finds that the written policy contains the quoted language. It also notes that the language is contained in a paragraph that relates to ascertaining whether there are orders *preventing* release, and thus it seems to be aimed at avoiding erroneous release, not erroneous detention.**]

37.     The District did not require that the LIE check the inmate's institutional file the "next day" or "go back two days later to check My JUSTIS to see whether or not the docket was updated on that 2012 case." Tr. (Feb. 25, 2019) at 63:20-64:09; *Id.* at 81:08-18. **[Omitted the argumentative preference, "The District knew that My JUSTIS did not always contain accurate or reliable information when the LIE processed a prisoner release, but with that knowledge…."]**

**The Court notes that this SOF is of questionable relevance since there is no evidence to show that the LIE was on notice that plaintiff been in court that**

**day on the second case as well or that it was an LIE's source for obtaining release documents – it was checked as a back up.**

**D.  Release Orders Delivered by DOC's Transport**

38.    In addition to receiving release orders by fax, email, and hand delivery, DOC's transport brought all the documents at the end of the day to the D.C. Jail. Brown Dep. (Dec. 2015) 17:19-18:03; Tr. (Feb. 25, 2019) 62:04-11.

39.    As a result, the Records Office could potentially receive four copies of the same release order. Brown Dep. (Dec. 2015) 17:19-18:03

40.    If the Records Office received a release order "later on that evening" from transport, DOC will file it in the inmate's institutional file "because it has the actual judge's signature in ink…on the document." Jones Dep. 40:14-41:10; Tr. (Feb. 25, 2019) 79:15-20.

41.    Jones explained, "That way, in case one [release order] may fall out, but it is there, but it not the policy to put two copies [of the release order] in [the institutional file]."  *Id*

42.    Robilyn Brown testified that the release orders received by DOC's transport at the end of the day was a "double-check to make sure all the documents were transported." Brown Dep. (Dec. 2015) 15:17-16:13.

>    **Pl's SOFs 40-42 are incomplete and therefore somewhat misleading. They indicate that if DOC receives a paper order later in the evening, presumably from the transport bus, it will be filed in the inmate's institutional file (as would the print out from TMS, although if the LIE receives a copy of the order with a signature in ink, it need not save the TMS print out as well). But this suggests that all the LIEs do with paper orders received from the transport bus is place them in the institutional file.**
>
>    **The Brown testimony cites in Pl's SOFs 40-42 related to when the paper order is redundant: it is a paper copy of information that has already been received through TMS.**
>
>    **ADD: The following testimony concerning paper orders received at the end of the day is also included in the Court's findings of fact:**

Robilyn Brown at Tr. 81-84:

THE COURT: ... Let me just go back to the bus shows up, prisoners are on it, the transport people have paperwork.

THE WITNESS: Correct.

THE COURT: And one kind of paperwork they could have is a release order. Tell me everything that happens to the piece of paper from the time it arrives. Who does the bus driver give it to?

THE WITNESS: The bus driver brings it upstairs and gives it to an examiner in the records office.

THE COURT: All right. And what does the examiner in the records office do with it?

THE WITNESS: The examiner gives it to a supervisor and a supervisor can then designate it to a lead and they review each individual document in that last-load envelope.

THE COURT: ... And when they see the paper document, are they supposed to enter the information on the document into any particular computer system?

THE WITNESS: Yes. So if it's one case and it's already been updated and uploaded, then they check it off and they put that document in the individual's jacket and they move on to the next one, and so on. The same procedure follows each document.

THE COURT: ... So if, for instance, they get a document like this one, 2012, at 9 o'clock at night, are they supposed to just put it in the paper file or are they supposed to first go online and see if he's been released or if this has already been processed?

THE WITNESS: That's correct. They're supposed to follow up. Look in JACCS and coincide with the case number versus the data, you know, what's in JACCS, to make sure everything matches….

THE COURT: ... So the PDF come as an attachment to TMS, you print it out, you compare it to JACCS, you put it in the institutional file and then you also look in My JUSTIS just to see, does that guy have any more cases?

THE WITNESS: Any more cases, and to make sure this is an authentic release order.

THE COURT: Okay. So that's what happens if a PDF arrives for the first time through TMS. If a paper order arrives on the bus, then somebody's supposed to go through the same process -- they don't go to TMS because they already have the paper order, that's right?

THE WITNESS: That's correct.

THE COURT: But they're supposed to go to JACCS and see whether he's already been released on this order or this is new, you've never seen it before?

THE WITNESS: That's correct, it's a check-and balance supposedly done with the last load.

43.     Once the Records Office receives a release order from DOC's transport at the end of the evening, the release order "will be input in TMS for processing." Tr. (Feb. 25, 2019) at 175:15-21; *see also* Brown Dep. (March 2017) at 22:04-07.

**E.  Gregory Smith's Overdetention**

44.     On March 18, 2014, the Plaintiff appeared in Superior Court on two misdemeanor cases (the 2012 case and the 2014 case) before the same judge. *See* Exs. P-12 and P-13.

45.     The Superior Court's Court View database reveals that an order to release plaintiff was entered into the system, and "sent" to the D.C. jail, in the 2012 case at 1:26 PM, and in the 2014 case at 1:28 PM.  *Id.*

46.     Plaintiff was ordered to return to court on April 9, 2014 in both cases. *Id.*

47.     Although Mr. Smith was ordered to be released pursuant to two court orders, the DOC did not release Mr. Smith from custody until April 10, 2014. S*ee* Myrick Dep. (November 23, 2015) 69:2-11 (acknowledging Mr. Smith was not released on March 18, 2014 despite being ordered released on March 18, 2014); *See* Ex. P-29 (Def.'s Resp. SOF at ¶ 5).

48.     **[OMIT:** When Mr. Smith arrived back at the D.C. Jail on March 18, 2014, he told a correction officer, "I'm supposed to be released, what's going on?" Ex. P-29 (Def.'s Resp. SOF at ¶ 6)] **See comment below SOF 49.**

49.     **[OMIT:** The corrections officer responded by getting "real nasty and aggressive and…continued to process" Mr. Smith. The DOC staff then stated, "if you're here, you're supposed to be here…you're not going anywhere." DOC staff continued, "if you're here, they know you're here" and DOC does not "make mistakes." *See also* Ex. P-29 (Def.'s Resp. SOF at ¶ 7).]

**Plaintiff's proposed SOFs 48 and 49 cannot be adopted as a factual finding by the Court because plaintiff did not testify, and plaintiff did not seek to**

**introduce his deposition testimony either.  Plaintiff cites defendant's responses to the statements of fact he submitted in support of his Motion for Summary Judgment, but all the defense admitted at that time was the fact that plaintiff testified to that effect in his deposition. So the record reflects that he did so testify, but that admission by the defense does not establish the truth of the matter asserted.**

50.     DOC received and processed the release order for the 2014 case on March 18, 2014.  Ex. P-28(a) (Defs.' SOF at ¶ 22 [ECF No. 105.1]).

51.     DOC received the release order for the 2012 case on March 18, 2019. Ex. P-1; *see also* Tr. (Feb. 25, 2019) at 78:13-79:08.

52.     The release order for the 2012 case was timestamped **as received by the DOC** at 9:33 p.m. on March 18, 2019. *Id.*

53.     Jones was involved with processing the release order **in the 2014 case** for Gregory Smith on March 18, 2014. Tr. (Feb. 25, 2019) at 34:20-34:25.

54.     The release order for the 2014 case was entered into the TMS system at 5:22 p.m. on March 18, 2014. *See* Ex. P-17.

55.     Jones received the release order in the 2014 case "around 6:50 p.m." on March 18, 2014 and began working on it. Tr. (Feb. 25, 2019) at 39:01-0; 53:05-12; *see also* Ex. P-17.

56.     Jones next reviewed the face sheet located in Mr. Smith's institutional file and determined that Mr. Smith was held on two cases. Tr. (Feb. 25, 2019) at 42:07-44:12.

57.     Jones then reviewed My JUSTIS "to see what happened on that case," the 2012 case. *Id.* at 45:02-07.

**ADD the factual finding: The review of the institutional file and documents up to that point did not inform the LIE whether Mr. Smith had been in court in the 2012 case that day as well. Tr. at 45.**

58.     **[OMIT: The Court will not adopt Pl's Proposed SOF 58, "**But when Jones looked at My JUSTIS, the system did not show that Mr. Smith had been released in the 2012 case. *Id.* at 53:13-16." **as a definitive statement of what occurred.**]

Jones testified at Tr. 53:

Q. Now, when you looked at My JUSTIS for Mr. Smith on March 18th, 2014, did you see that he had been ordered released in the 7806, or the 2012 case?

A.  No.

THE COURT: And how do you know now that you didn't see it then? I mean, I know that there's been a lot of depositions and going back, but is it something you remember, or have you reviewed My JUSTIS and what was there at that date and time to be able to answer that question?

THE WITNESS: From -- this is just from general experience of working through JUSTIS. When you look, you read everything carefully, just to make sure, and you double check before you finish completing the process in JUSTIS, just to make sure you haven't missed anything. And I would have noticed it and caught it right my second look.

THE COURT: You're saying that the fact that you didn't do anything with respect to a release order in the older case is how you know that it must not have been there, because had it been there, you would have done something with it?

THE WITNESS: That is correct.

**Instead, the Court will find: Jones has no present recollection of what MyJustis showed when he accessed it on March 18, 2014,  but it was his testimony that it must not have included the release order from the 2012 case because if it had been there, he would have processed it.**

59.    **[OMIT:** According to Jones, "there were no docket entries for 3-18-14" in My JUSTIS when he looked at the system.  *Id.* at 61:08-15.**]**

> **Jones's testimony was less definitive – he stated at Tr. 61 that he did not remember whether there was a docket entry reflecting the fact that there was a hearing on 3-18 or not.**

**The Court will find: Jones does not remember seeing any docket entries in the 2012 case for 3-18-2014.**

60.    Jones explained that when a LIE looks at My JUSTIS, "you read everything carefully, just to make sure, and you double check before you finish completing the process in JUSTIS." *Id.* at 54:24-54:02.

61.    **[OMIT:** Jones confirmed that the following entries were not contained in the My JUSTIS system when he reviewed it as part of the practice of processing Mr. Smith's release in the 2014 case:

| 03/18/2014 | CRMER - Event Resulted - Release Status: | Event Resulted - Release Status: PR-PSA. Defendant is released and further status is set at defense request. The following event: Misdemeanor Initial Status Hearing scheduled for 03/18/2014 at 9:30 am has been resulted as follows: Result: Hearing Held Judge: MCKENNA, JULIET J Location: Courtroom 220 GREGORY P SMITH (Defendant (Criminal)); ; DAVID AKULIAN (Attorney) on behalf of GREGORY P SMITH (Defendant (Criminal)); Judge JULIET J MCKENNA |
|---|---|---|

....

| 03/18/2014 | RELORDCRM - Release Order Filed | Release Order Filed Release Order - Jail Sent on: 03/18/2014 13:26:46.79 |
|---|---|---|

*Id.* at 55:01-08; *Id.* at 61:08-15; *see also* Ex. 14 at 2.]

> **The Court has already found, with respect to Pl's Proposed SOF 58 above, that Jones has no present recollection of what MyJustis showed when he accessed it on March 18, 2014,  but it was his testimony that it must not have included the release order from the 2012 case because if it had been there, he would have processed it. It cannot adopt the proposed SOF that he "confirmed" that the specific entries were not there when he accessed the database because there was no testimony as to when they first appeared in the database.**

62.     **[OMIT:** If this information had been in the My JUSTIS system, Jones "next would be looking for an actual release document for that case." Tr. (Feb. 25, 2019) at 55:09-11.] **See comment below SOF 63.**

63.     **[OMIT:** If this information was contained in the My JUSTIS system at the time Jones looked at My JUSTIS, Plaintiff would have been "released from custody." Jones Dep. (Dec. 2015) at 55:16-22.]

**What Jones would have done if he had observed certain information in the MyJustis system is not a "fact" the Court can find; it finds simply that he testified as to what he believes he would have done.**

64.     **[OMIT:** Because the information for the 2012 case (the ordered release that day at 1:26 p.m.) was not in the My JUSTIS system, Jones closed out the case because he did not have a release for it. Tr. (Feb. 25, 2019) at 55:19-24.

**The Court notes that -- as was frequently the case given the imprecise nature of the questions that were asked -- Jones testified only to what he "would" do as opposed to what he did do:**

Once I reviewed this case and there was nothing there prompting a release, I would close out the case I did have a release for and arrange the jacket appropriately and close out the program, close out the system for his entry. Tr. at 55.

**Revised finding: Assuming that the release order for the 2012 case was not in the MyJustis system when he accessed it, Jones would have closed out the program, and closed out the system for his entry.**

**ADD these factual findings:**

**In order to take a prisoner into custody initially, DOC requires a commitment order from the court.**

**When an inmate returns from court, they should have a prisoner return or another commitment that brings them back into custody.**

**The only document Jones had was the release order in the 2014 case.**

**Jones Tr. 57-8**

65.     **[OMIT:** And although DOC did not possess a current commitment order that authorized DOC to take Plaintiff into custody, Plaintiff was input into DOC's system "as a prisoner return automatically." Tr. (Feb. 25, 2019) at 56:14-60:11**]**

> **This is not a fair summary of the testimony at Tr. 56 – 60: there was no definitive testimony about what in fact happened and how plaintiff was taken back into custody, and there is no exhibit to this effect. Counsel did ask the question and the witness did respond in the affirmative, but plaintiff is taking that exchange out of context; the witness then made it clear that he had not made such an entry into the DOC system, and that he was speculating that such an entry emanated from the court. Later the witness posited that plaintiff had simply been held on his original commitment order.**

66.     The default when DOC does not have a commitment document or a release order for an inmate such as Plaintiff, he "is still held on the open charge" as it "reverts back to the

original commitment order." Tr. (Feb. 25, 2019) at 60:06-11, 76:16-25. **[OMIT this additional conclusory language: "**That is what happened to Plaintiff[,]**" because the witness was only speaking hypothetically in the cited testimony.]**

67.    The District does not know how it received the release order in the 2012 case, only that it was timestamped as received by the Records Office on March 18, 2014 at 9:33 p.m. Brown Dep. (March 2017) at 12:21-14:02, 18:19-19:06, 20:01-22:07, and 45:04-47:06; *see also* Myrick Dep. (Nov. 2015) at 70:16-71:10.

68.    My JUSTIS also contains a section in the computer system identifying "Offender Court Events." Ex. P-5 at GSmith DC 000038.

69.    The original commitment documents in the District's possession stated, "Next Scheduled court appearance: March 17, 2014 for Misdemeanor Initial Status Hearing at 9:30 am in Courtroom 220." Ex. 5 at GSmith DC 000053, 000057 (the purpose of the return to court for the 2014 case was "Detention Hearing" at 9:00 am).

**F.  The District has not Produced Any TMS Data for the 2012 Case**

**[OMIT: Section F -- Pl's proposed SOFs 70-81 -- -will be excluded in its entirety.**

**These SOFs are argumentative and irrelevant to the issues at hand. Plaintiff continues to misconstrue the Court's ruling excluding the introduction of any TMS data *related to the 2012 case* as an order that the TMS system was off limits entirely. The Court previously pointed this out in its Minute Order dated June 10, 2019:**

**[T]he sanction imposed for the discovery violations in this case was a prohibition on the use of "TMS data related to case number 2012 CMD 7806 in any motion, at a hearing, or at trial." See [54] Order on [39] Plaintiff's Motion for Costs and Fees at 15. Indeed, the order specifically stated that "an order precluding the use of all TMS data would not be appropriate."**

**Since none of SOFs 70-81 are being adopted, they are not set forth in full.**

70.    The District has repeatedly stated throughout this litigation that TMS has no relevance to processing release orders....

71.    When asked the importance of an LIE placing Plaintiff's release order in the queue of the TMS system, the District testified ...

72.     At trial, defense counsel reiterated "the issue with TMS does not matter." Tr. (Feb. 25, 2019) at 116:21.

73.     At trial, the Court also pointed out the District's unequivocal admission that the TMS system was irrelevant to processing release orders …

> THE COURT:  I thought you told me TMS is irrelevant with the envelope that comes from the bus.
>
> MS. CULLEN: That's right.

Tr. (Feb. 25, 2019) at 141:03-05; *see also id.* at 158:24-25 ("the defense keeps telling me TMS is irrelevant at that point."). (**The Court notes that the quoted excerpts relate only to the processing paper orders from the last load envelope, and not "processing release orders.")**

74.     Plaintiff made repeated efforts to obtain the TMS data relating to the 2012 case …

75.     Initially, "the District sent Plaintiff an email stating '[w]e have been advised that the TMI [sic] information you requested does not exist.'" …

76.     But at the Rule 30(b)(6) deposition, the District testified that it *did* have TMS data relating to the 2012 case…

77.     Despite having TMS data relating to the 2012 case, the District failed to produce the data or prepare its designated witness to testify about the data ….

78.     Because of these discovery violations, the Court ruled that ….

79.     In conclusion, (1) Myrick testified in discovery that the TMS "is not a system that process inmate releases;" (2) she failed to produce any TMS data relating to the 2012 case; and (3) was unable to testify about the TMS data relating to the 2012 case.

80.     Despite all of this, the District called its only witness, Jeanette Myrick, at trial to elicit testimony concerning the TMS system….

81.     Yet, at trial, Myrick also praised the benefits of TMS in reducing prisoner overdetentions and its use in processing prisoner releases, including those received from DOC's transport.  Tr. (Feb. 25, 2019) at 171:08-20; 174:17-175:2.**]**

### G.  The District did Not Investigate Plaintiff's Overdetention or Prepare an Overdetention Report

82.     Jeanette Myrick is/was the "highest-ranking person in the Inmates Records Office." Myrick Dep. (Nov. 2015) 28:1-3.

83.     Myrick was responsible for "oversee[ing] the day-to-day operations of the Inmate Records Office and…to make sure that inmates are released…[and] other documents received are processed."  Myrick Dep. (Nov. 2015) at 26:20-27:6.

84.     It is part of Myrick's job to prepare a report for each instance of overdetention at the D.C. Jail. Myrick Dep. (Nov. 2015) at 18:9-11. **[Eliminated the argumentative phrasing that "Myrick *claims* to prepare a report …"]**

85.     Myrick did not prepare an overdetention report in relation to Gregory Smith's 23-day overdetention.  Myrick Dep. (Nov, 2015) at 25:1-4.

86.     No DOC employee prepared an overdetention report for Mr. Smith's overdetention. Myrick Dep. (Nov. 2015) at 25:5-8.

87.     **[OMIT Pl's Proposed SOFs 87-90 as argumentative and irrelevant:** Ms. Myrick did not investigate whether DOC received the March 18, 2014 release orders by fax, email, or physical delivery.  Myrick Dep. (Nov. 2015) at 73:1-12.

88.     Ms. Myrick did not investigate whether DOC received any emails containing the release order. Myrick Dep. (Nov. 2015) at 73:1-12.

89.     Ms. Myrick did not check a fax log to determine when the March 18, 2014 release was received.  Myrick Dep. (Nov. 2015) at 73:1-12.

90.     Finally, Ms. Myrick did not interview any staff members to determine if DOC staff had received the March 18, 2014 release order.  Myrick Dep. (Nov. 2015) at 73:1-12.**]**

91.     The District does not know how it received the release order issued in the 2012 case on March 18, 2014.  Myrick Dep. (Nov. 2015) at 96:03-10; Myrick Dep. (March 2016) at 26:22-27-3.

92.     During the course of this litigation, the District has defended this case on the basis that it was authorized to detain Mr. Smith through April 10, 2014. Ex. P-23 at Interrog. Ans. No. 7.

93.     The District of Columbia testified, through its corporate representative, that "the Department of Corrections was not – did not have this document, this releasing document" for the 2012 case.  Myrick Dep. (Nov. 2015) 67:01-72:03 (emphasis added).

94.     **[OMIT:** When asked whether it was possible that DOC received the release order in the 2012 case but did not record it, the District testified, "No, not my office….I believe if the Inmate Records would have received this document that it would have been processed." *Id.* at 71:3-10.**]**

95.     **Revised:** On December 11, 2018 -- 4.5 years after Mr. Smith's overdetention -- the District amended its answer to interrogatories admitting that it received the release order for the 2012 case on March 18, 2014. *See* ECF No. 101-1.

96.     **[OMIT – argumentative, not a statement of fact.** But ultimately, the District is certain that "[a]ll employees of the Department of Corrections…processed the release of Gregory Smith pursuant to the policies of the Department of Corrections." Myrick Dep. (March 2016) 63:10-64:04 (emphasis added).**]**

97.     **Revised:** No employee "has been disciplined in relation to the overdetention of Gregory Smith. Myrick Dep. (Nov. 2015) 37:15-19.

98.     **Revised:** As of the date of trial, the District had not prepared an overdetention report in relation to its overdetention of Mr. Smith. Tr. (Feb. 25, 2019) 190:09-19.


### H.  Previous Overdetention Cases Against the District of Columbia

**The statements in Section H below are very general, partial summaries of proceedings that are a matter of public record. To the extent the Court is relying on any aspects of those cases in its decision, it is relying on the decisions and settlement agreements themselves, not plaintiff's paraphrasing of what they contain.**

99.     This case arises against a backdrop of previous litigation against the District of Columbia involving alleged overdetention at the D.C. jail.  *Bynum v. District of Columbia*, 257 F. Supp. 2d 1, 1 (D.D.C. 2002); *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 77 (D.D.C. 2013).

100.     As a result of *Bynum*, DOC agreed to institute reforms to prevent prisoner overdetention, such as a courthouse release program, monitoring of overdetentions, the building of a new inmate processing facility, and a move to a paperless system to process releases.  *See* Ex. P-29 at Def.'s Resp. SOF at ¶ 22.

**The Court will adopt this SOF since it was not disputed at the time of the motion for summary judgment. The SOF appears to be based on a**

sentence in *Barnes* describing what had happened in *Bynum,* **but the best evidence of what was agreed to are the** *Bynum* **settlements marked as Plaintiff's Exhibits 22 and 23.**

101.    **[OMIT:** In the *Barnes* litigation, the Court observed that the District had made little or no improvements to its "paper-bound and Byzantine release process," as it was supposed to do after the *Bynum* case settled. *Smith v. D.C.*, 306 F. Supp. 3d 223, 233-40 (D.D.C. 2018) (citing to *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 279-80 (D.D.C. 2011) (observing that "a move to a paperless system to process releases" was "either rejected by the DOC or remain[ed], to this day, caught in a whirlpool of delays")).**]** **The** *Barnes* **opinion speaks for itself and the Court need not adopt plaintiff's characterization as a statement of fact.**

102.    In May 2008, the District commissioned a report prepared by Karen Schneider titled, *Review of Paperflow Process between the Superior Court, the U.S. Marshall Service and the Department of Corrections. See generally* Ex. P-7 (hereinafter "Paperflow Report").

**Plaintiff's Proposed SOFs 103-108 correctly recite sentences contained in the Schneider report; the Court will take up whether they bear on its decision when it issues its ruling on Count One.**

103.    According to the Paperflow Report, "the purpose [was] to review the transfer of court-generated paperwork among these agencies focusing on how the process can become before efficient so as to avoid erroneous release and potential overdetention of inmates." *Id.* at GSmith DC 00081.

104.    The Paperflow Report states, "The District's system to transfer commitment and release orders from the Court to the DOC for processing is a very lengthy, cumbersome, paper-driven process involving multiple agencies."  *Id.*

105.    The Paperflow Report states, "When an order is issued in a courtroom, it travels through seven hands – the courtroom clerk, to the Deputy US Marshal (Deputy), to the USMS staff at the Jail Board post, to the DOC transport team officers, to the Receiving & Discharge (R&D) officer at the DC Jail, to the DC Jail Records office staff in R&D – before reaching the DC Jail Records office where it is processed." *Id.*

106.    The Paperflow Report concludes, "it is not surprising that paperwork has gotten lost or has not been received at the Jail in a timely fashion. Unfortunately, lost or delayed

paperwork potentially can lead to serious consequences—either the overdetention or the erroneous release of an inmate." *Id.*

107.    The Paperflow Report further concludes, "during the course of the paperwork transfer process, there are numerous opportunities for errors, which can lead to the missing or late delivery of paperwork to the Jail." *Id.* at GSmith DC 000087.

108.    The Paperflow Report further concludes, "[i]t is a chaotic process, especially at the end of the day when numerous courtrooms are closing and a significant number of inmates are being returned to the Jail." *Id.*

109.    The District testified that one of the causes of prisoner overdetention prior to plaintiff's overdetention was "system failure." Myrick Dep. (Nov. 2015) 19:20-20:4.

110.    **Revised:** Myrick defined "system failure" as: "[t]hat something happened with our electronic system and the information may not have taken on the release date or information that I have."  *Id.*

> **Plaintiff's Proposed SOFs 109-110 quote Myrick's testimony accurately so the Court will adopt them as correct statements of what she said. But it finds the statements to be of limited utility since the definition of "system failure" is largely unintelligible, and the witness was not purporting to address the cause of the overdetention in this case.**

## Defendant's Proposed Statements of Fact – Dkt. 117

### A. DOC's Practice of Receiving and Processing Release Orders for Misdemeanants at the Time of Plaintiff's Overdetention

1.    When a D.C. Superior Court judge authorizes a release, the courtroom clerk is responsible for generating the release order. Polonchuk Dep. at 14:1-4.

2. The clerk then prints two copies for the judge's signature. The clerk also signs both copies. *Id.* at 14:13-15.

3. One copy is to be scanned into CourtView for the record and one copy is to be given to the Deputy U.S. Marshal. *Id.* at 14:16-19.

4. The Deputy U.S. Marshal would then sign the court copy of the release order and would give that copy back to the clerk and keep his copy. *Id.* at 15:1-5, 15:16-18.

5. The clerk is responsible for taking the Court's copy to the scanning department on the fourth floor at D.C. Superior Court for it to be scanned into CourtView. *See id.* at 15:8-21, 33:17-34:12.

6. The Deputy U.S. Marshal then takes the release order and prisoner to the main cellblock in D.C. Superior Court. *Id.* at 45:10-18.

7. In order to process a release order, a DOC legal instrument examiner (LIE) at Superior Court uploads the document into an electronic system known as Transaction Management System (TMS) for processing by Records Office staff at the D.C. Jail. 2/25/18 Trial Tr. (hereinafter "Trial Tr.") at 37:1-6.

8. When a LIE at the D.C. Jail receives a release order for processing through TMS, he would examine the document and pull the inmate's institutional file. *Id.* at 35:16-36:8, 75:16-18, 83:9-13.

9. The LIE then goes to the electronic system known as JACCS to locate the same charge and case number to ensure everything matches and closes out the case in JACCS. *Id.* at 41:10-12, 83:9-13.

10. A LIE is also required to check MyJUSTIS which reflects information that is input by CourtView. *Id.* at 44:19-25, 75:16-76:7.

11. If an inmate was held on two cases, the LIE would check MyJUSTIS for both cases to see if the inmate was brought before the judge on both cases. *Id.* at 45:21-46:4, 76:13- 15.

12. If MyJUSTIS revealed that the inmate was ordered released in the second case, the LIE would look for an image of the order, pull it, and process it. *Id.* at 46:5-47:7.

13. If MyJUSTIS revealed that the inmate was ordered released but did not show a copy of the order, the LIE would notify their supervisor and contact the Quality Assurance Branch of Superior Court to obtain a copy of the order for processing. *Id.* at 48:17-49:19, 77:1- 11.

14. Misdemeanor inmates can be released directly from D.C. Superior Court. *Id.* at 34:17-19.

15. **Revised:** In 2014, there was a cut-off time of **approximately** 3:30 p.m., after which inmates could not be released directly from Superior Court. *Id.* at 70:19-71:8.

16. If a release order was not received and processed by the cut-off time, the inmate would return back to the facility and would be released from the D.C. Jail. *Id.* at 71:9-15.

17.     Under this scenario, the U.S. Marshal would hand the release order to the DOC transportation officer in what is known as the last-load envelope. *Id.* at 74:23-25.

18.     The DOC transportation officer would then deliver the paperwork directly to the Records Office at the D.C. Jail. *Id.* at 81:23-82:3.

19.     DOC Records Office staff are required to review the documents and match the information with the information in JACCS. *Id.* at 82:4-8, 82:17-25.

20.     They are also required to input the document into TMS. 3/16/18 Brown Dep. at 22:4-7.

21.     This procedure occurs with multiple inmates on a daily basis. Trial Tr. at 74:6-11.

    **B.**  **Former Practices**

22.      Prior to the introduction of TMS, DOC had two records offices —one at the D.C. Jail, and one at the Correctional Treatment Facility (CTF). *Id.* at 174:7-13.

    **A witness did testify to this effect at Tr. 174. But the Jones testimony and defendant's other statements of fact reflect that there was an LIE at Superior Court in 2014 – that was how the release orders got uploaded into TMS.  So assuming that the term "records office" means a place where inmate files are stored, as opposed to where DOC processes records, the Court adopts the SOF.**

23.     Prior to TMS, the paperflow process of a release order from Superior Court to the DOC Records Office varied depending upon the location from which the inmate originated. *Id.* at 171:21-172:11.

24.     If an inmate came from the D.C. Jail, and a Superior Court judge issued a release order, the release order would pass from the D.C. Superior Court clerk, to a U.S. Marshal, to a DOC legal instruments examiner, to a DOC transportation officer, to a DOC receiving and discharge officer, who would either bring it to the Records Office or a Records Office staff member would pick up the document from the receiving and discharge officer. *Id.* at 172:12 - 173-11.

    **While this scenario is characterized as a "former practice," the Court notes that it is almost identical to what the witnesses explained would happened in 2014 if it was after 3:00 pm: the Superior Court clerk would provide the paper order to a U.S. Marshal – not the LIE on site; the order would be handed to a DOC transport officer, and then it would be passed to the receiving officer and finally the records office. Tr. 174-75.**

25.     If an inmate came from CTF, and a Superior Court judge issued a release

order, the release order would pass from the D.C. Superior Court clerk, to a U.S. Marshal, to a DOC legal instruments examiner, to a DOC transportation officer, to a DOC receiving and discharge officer, who would take it to the command center, and a CTF Records Office staff member would pick it up from the command center. *Id.* at 173:18-174:6.

> ### C.    The New System Markedly Improved the Release System and Markedly Reduced the Number of Overdetentions

26.    In July 2013, DOC began using TMS, an electronic system that manages both documents and staff. *Id.* at 171:8-16.

27.    **[OMIT:** The introduction of TMS made a tremendous difference in managing documents received by the Records Office and decreasing the number of overdetentions.**]** *Id.* at 171:8-20, 174:17-23 ("We had less chance of having overdetentions because we could control the documents. As the staff member would input the information into TMS, and the staff in the inmate record office could directly handle the information. They could process the document *immediately*." (emphasis added)).

> **Def's Proposed SOF 27 will be revised because the adjective "tremendous" is a judgment and not a factual statement, and it is vague. Also, the paraphrasing in the SOF makes it seem as if Myrick, the witness, testified as a factual matter that TMS made "a tremendous difference in managing documents … *and* in decreasing the number of detentions," but the only question she was asked was why DOC began utilizing the program, not what happened, and she did not characterize the impact on overdetention with any sort of adjective.**

> Tr. at 171:
> Q. And why did you start using it?

> A. Because it made a tremendous difference in managing the documents we received in the record office, and it helped to not have overdetentions.

**Revised SOF: DOC began using TMS to improve the management of documents received in the records office and to help reduce overdetention.**

28.    Once a release order is uploaded into TMS by the LIE at Superior Court, an LIE at the Records Office could view and process the release order. *See id.*; 36:9-14, 38:20-23, 40:17-18.

29.    **Revised:** After adopting TMS, the number of overdetentions in 2013, and until the time of Plaintiff's release orders in March 2014, decreased from prior years. Pl.'s Ex. 8 at 3-6. **[OMITTED "markedly," which is a judgment, not a fact.]**

### D.   Plaintiff's Overdetention

30.   On March 18, 2014, a DOC legal instrument examiner at Superior Court uploaded Plaintiff's release order for Case No. 2014 CMD 4452 into TMS at approximately 5:30 p.m. Trial Tr. at 37:10-25, 39:20-24; Pl.'s Ex. 17.

31.   LIE Jack Jones processed the release order for Case No. 2014 CMD 4452 at the D.C. Jail at approximately 6:50 p.m. on March 18, 2014. Trial Tr. at 53:5-9.

32.   The release order for Case No. 2012 CMD 7806 was received by the DOC Records Office at 9:33 p.m. on March 18, 2014. *Id.* at 78:25 – 79:4, 79:9-14; 3/16/17 Brown Dep. at 21:15-20.

33.   **[OMIT:** This order most likely came to DOC via the "last-load" envelope at the end of the day on March 18, 2014. Trial Tr. at 79:15-17.**]**

> **A statement that the release order "most likely" came to DOC via the last load envelope is speculation, or at best, lay opinion, and not fact.**

**Revised finding: Robilyn Brown opined that it was more than likely that the 2014 release order was delivered from Superior Court by a transport officer. Tr. at 79.**

**ADD finding: Brown also testified that the person who time stamped the document was likely an LIE or Lead LIE, 3/16/17 Brown. Dep. at 21, and that the person who did so was then supposed to create an entry in TMS.**

34.   **[OMIT:** Ms. Brown performed a JACCS audit pertaining to this release order and found that it was not uploaded into JACCS, and therefore not processed. *Id.* at 96:22-97:5, 98:11-99:3; 3/16/17 Brown Dep. at 22:4-23:8.**]**

> **This testimony was not actually elicited at trial, and therefore, the SOF and citation to the trial transcript will not be adopted.**

**Revised finding: A later JACCS audit revealed that the release order was not uploaded into JACCS or processed. 3/16/17 Brown Dep. at 22:4-23:8**

### E.   The Department of Corrections Requires Staff to Report Allegations of Overdetentions.

35.   The DOC learns of overdetentions through multiple means, including correctional officers, case managers, or the general counsel. Trial Tr. at 184:21-25.

36.   If a DOC employee learns of an alleged overdetention, they are required to report it. *Id.* at 185:1-187:6.

**<u>Additional Findings by the Court</u>**

The last load envelope tends to arrives between 7 and 9 pm with the last busload of prisoners, and it goes to a Legal Instrument Examiner.  Testimony of Robilyn Brown, Tr. at 97.

LIEs are there to process legal instruments that arrive in the last load; the night shift for LIEs is from 1:30 pm to 10 pm. *Id.*

LIEs are supposed to complete the processing of the last load envelope before they depart and not leave orders to be processed the next morning. Tr. at 98.

According to the roster, or time clock print out of all the staff – Pl's Ex. 15 – LIEs, supervisors, or leads were present at the D.C. Jail on 3/18/14 until 12:00 am. Tr. 99-100:

AMY BERMAN JACKSON
United States District Judge

DATE: December 14, 2020